# IN THE UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF VIRGINIA
# ALEXANDRIA DIVISION

|  |  |  |
|---|---|---|
| In re: | : | |
| EQUAPHOR INCORPORATED, | : | Chapter 7 |
| Debtor. | : | |
|  | : | Case No. 10-20490-SSM |

## OPPOSITION TO MOTION TO APPROVE SALE OF ASSETS AND COMPROMISE RELATED CLAIMS, OR IN THE ALTERNATIVE REQUEST FOR LEAVE TO CONDUCT RULE 2004 EXAMINATIONS

Kevin McCarthy, Trustee ("Trustee") of the Debtor Equaphor Incorporated ("Debtor" or "Equaphor") has moved to approve the sale of virtually all the remaining assets of the Debtor's estate to an affiliate of the Debtor, Kobayashi Ventures LLC ("Kobayashi"), and to compromise related claims. Harry George and Fred Bamber (the "Derivative Plaintiffs"), who are Series F preferred shareholders of the Debtor and plaintiffs in a derivative action filed on behalf of Equaphor, styled *Bamber et al. v. Dechman et al.*, Case No. 5719-VCS (Del. Ch.) (the "Derivative Action"), oppose the motion.[1]

The proposed settlement is wholly inadequate because it would settle substantial claims for breach of fiduciary duty that Equaphor has against its senior officers James W. Dechman ("Dechman") and John T. Fiore ("Fiore"),[2] their companies Kobayashi and Monitoring Technology, LLC ("Monitoring Technology"), and three present or former directors of Equaphor[3] (collectively, the "Derivative Defendants") for only a small fraction of their value.

---

[1] This opposition is supported by a number of other minority Series F preferred shareholders represented by the undersigned counsel. The Series F shares have a liquidating preference such that they will receive all of any distributions to shareholders.

[2] Fiore was also a director of Equaphor at certain relevant times.

[3] Ed Spiva, J. B. Doherty and Molly Hale.

James R. Schroll, Esq.
Bean, Kinney & Korman, PC
2300 Wilson Blvd., 7th Floor
Arlington, Virginia 22201
(703) 525-4000

1

Indeed, the Derivative Defendants' inability to shed their liability to Equaphor in the Derivative Action advantageously is what caused them to put Equaphor into bankruptcy.

Moreover, the proposed sale of Equaphor's patents, and the related patent claims, is part of Kobayashi's continued manipulation of the patents for its benefit. Two years after Kobayashi purchased the patents, it sold them to Equaphor for $3,450,000 plus additional consideration, an amount more than 46 times the purchase price paid by Kobayashi, and shifted more than $1 million in patent litigation costs onto Equaphor. Now that Equaphor can no longer fund the patent litigation, Kobayashi is seeking to repurchase the patents and related claims and to obtain a general release, all for $250,000, asserting that the patents have "little value."

In addition, the Trustee fails to carry his burden of showing that other aspects of the proposed settlement are fair and reasonable. The Trustee assigns no value to the settlement of the preference claim against Equaphor's and Kobayashi's counsel, without any analysis as to whether the payment was a legitimate obligation of Equaphor. Further, under the proposed settlement, the Trustees' claims against the Derivative Defendants under Chapter 5 of the Bankruptcy Code would be released and discharged, without any analysis of the merits of those claims either.

In sum, the Trustee has failed to meet his burden of proving that the proposed settlement is fair and equitable to the Estate, and it should therefore be rejected by the Court.

I. **Background of the Bankruptcy Filing**

In September 2009, Equaphor sold a portion of its business, which represented some 30% of Equaphor's revenue and income and approximately 10% of its operating assets, to Cognex Corporation for $5,000,000. At the same time, Equaphor's officers Dechman and Fiore purchased (via Monitoring Technology) the remainder of Equaphor's business (representing 70% of Equaphor's revenue and income and 90% of its operating assets) to Monitoring Technology for only $1,617,034.

Also in September 2009, Dechman and Fiore (via Kobayashi) sold patents to Equaphor for $3,450,000 plus additional consideration, a price that was over 46 times the price at which they had purchased the patents just two years earlier. Equaphor had no use for the patents as it had sold all of its operating businesses.

In August 2010, minority shareholders of Equaphor brought the Derivative Action in Delaware, alleging that the sale to Monitoring Technology was for a grossly unfair price, and damages from the sale are $10,049,632. The minority shareholders also alleged that the purchase price paid to Kobayashi for the patents was grossly unfair, damaging Equaphor by $3,450,000 plus almost $1,000,000 in legal fees Equaphor has incurred in patent litigation as a result of owning the patents.

Following a settlement meeting in October 2010 and a settlement demand in November 2010, Equaphor's Board of Directors held a meeting on December 7, 2010, at which they decided to reject the settlement demand and to explore a bankruptcy filing, noting that if Equaphor filed "[t]he trustee could either sell or continue litigation for the benefit of the creditors and shareholders."[4] Three directors who were defendants in the Derivative Action, constituting a majority of the four member board, voted to approve a bankruptcy filing on December 16th.

## II. The Proposed Settlement

In exchange for a payment of $250,000[5], Kobayashi has agreed to purchase virtually all

---

[4] Minutes of Meeting, attached hereto as Exhibit 2. The December 7 minutes also indicate that there was a discussion of Equaphor's financial condition, and that Equaphor was out of funds, which had been the case for some time.

[5] Kobayashi also has agreed to release a claim it has against the Debtor's estate scheduled in the amount of $520,000. The only other undisputed claims, totaling approximately $236,000, are those of three law firms that have represented both the Debtor and Kobayashi in patent litigation, and a law firm that has represented defendants in the Derivative Litigation. These are (a) J.A. Lindeman & Co., PLLC ("Lindeman"), (b) LeClair Ryan P.C. ("LeCair Ryan") (c) Stein Sperling et al. P.C. ("Stein Sperling"), and (d) Whiteford, Taylor & Preston ("Whiteford"). Kobayashi would be purchasing these claims and asserting them on its own behalf as part of the proposed settlement.

the remaining assets of the Debtor's estate,[6] namely:

- Debtors' claims asserted in a shareholder derivative suit brought against insiders Kobayshi, Monitoring Technology, Dechman, Fiore, and three directors; and
- Debtor's rights to certain patent technology, and associated patent and royalty claims.

Further, under the proposed settlement, a potential preference claim in the amount of $249,000 against Stein, Sperling would be released. In addition, although the Trustee makes no mention of it in his moving papers, all claims that the Debtor has against the Derivative Defendants, including those under Chapter 5 of the Bankruptcy Code, would be released.

Finally, Kobayashi also has agreed to offer to purchase the scheduled claims of four law firms (a) Lindeman, (b) LeClair Ryan (c) Stein Sperling, and (d) Whiteford (collectively, the "Law Firms") (totaling approximately $236,000). However, Kobayashi will remain a creditor of the estate for the full amount of those claims. Thus, in essence, if the claims (which are listed on Equaphor's schedules as undisputed) are allowed, the $250,000 that Kobayashi is paying to purchase Equaphor's assets will come right back to Kobayashi. Kobayashi is also offering to purchase all of the Series F Shares that Dechman and Fiore do not own for approximately $100,000.

## III. <u>Standard for Approving Settlements</u>

Pursuant to Federal Rule of Bankruptcy Procedure 9019(a), "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr.P. 9019(a). The bankruptcy court must employ its "informed, independent judgment" to determine whether the settlement is both "fair and equitable." *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968)

---

[6] Equaphor ceased operations in 2009. The only scheduled assets not being purchased by Kobayashi are $39,880 that was in the Debtor's operating account at the commencement of the case and $15,023 in tax refunds owed to the Debtor. *See* Debtor's Schedules and Statement of Financial Affairs (collectively, "Schedules") (dated January 3, 2011 and amended February 24, 2011) (Paper Nos. 12 and 34).

("*TMT*") (quotation omitted). Where, as here, the bankruptcy estate is solvent, the court must consider the residual interests of equity holders in deciding on whether or not to approve the proposed settlement. *See In re Spielfogel*, 211 B.R. 133, 144-45 (Bkrtcy. E.D.N.Y. 1997).

In determining whether or not to approve the proposed settlement, a court "should form an educated estimate of the complexity, expense, and likely duration of such litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise." *TMT*, 390 U.S. at 424; *see also In re Bond,* 16 F.3d 408 (Table), 1994 WL 20107, at * 4 (4th Cir. 1994). In order to approve a settlement according to this standard, a court must consider the following factors:

(1) the probability of success in litigation;

(2) the likely difficulties in collection;

(3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and

(4) the paramount interest of the creditors.

*In re Final Analysis, Inc.*, 417 B.R. 332, 341 (Bkrtcy. D. Md. 2009), quoting *Will v. Northwestern Univ. (In re Nutraquest, Inc.)*, 434 F.3d 639, 644 (3d Cir. 2006). *See also Jeffrey v. Desmond,* 70 F.3d 183, 185 (1st Cir. 1995); *Jackson Brewing Co. v. Herpel (In the Matter of Jackson Brewing Co.)*, 624 F.2d 605, 607 (5th Cir. 1980); *Drexel Burnham Lambert, Inc. v. Flight Transp. Corp. (In re Flight Transp. Corp. Sec. Litig.)*, 730 F.2d 1128, 1135 (8th Cir. 1984); *In re Bowman*, 181 B.R. 836, 843 (Bkrtcy. D. Md. 1995).

"Basic to this process in every instance, of course, is the need to compare the terms of the compromise with the likely rewards of litigation." *Final Analysis, Inc.*, 417 B.R. at 341 (quoting *TMT*, 390 U.S. at 424–425); *see also Hicks, Muse & Co. v. Brandt (In re Healthco Int'l, Inc.)*, 136 F.3d 45, 50 (1st Cir. 1998), quoting *Jeffrey,* 70 F.3d at 185 ("The bankruptcy court

essentially is expected to assess and balance the value of the claims being compromised against the value of the compromise proposal."). While the Court may consider the Trustee's opinion in deciding whether to approve a proposed settlement, the Court may not simply "rubber stamp" the Trustee's proposal. *See Bond*, 1994 WL 20107, at * 4 (4th Cir. 1994); *Final Analysis, Inc.*, 417 B.R. at 341; *In re Toussaint*, 2008 WL 427278, *5 (Bkrtcy. D. Md. 2008); *see also Depoister v. Mary M. Holloway Found.*, 36 F.3d 582, 587 (7th Cir. 1994); *Spielfogel*, 211 B.R. at 143; *In re Planned Protective Services, Inc.*, 130 B.R. 94, 96 (Bkrtcy. C.D. Cal. 1991). A court may not approve a settlement if the "the proposed settlement falls below the lowest point of reasonableness." *United States ex rel. Rahman v. Oncology Assocs., P.C.*, 269 B.R. 139, 149–150 (D. Md. 2001), *aff'd United States ex rel. Rahman v. Colkitt*, 61 Fed. Appx. 860 (4th Cir. 2003). "The Trustee, as proponent of the proposed settlement, has the burden of establishing that the settlement is fair and equitable and should be approved by the Court." *In re Kay*, 223 B.R. 816, 819 (Bkrtcy. M.D.Fla.1998) (*citing In re A & C Properties*, 784 F.2d 1377, 1381 (9th Cir. 1986), *cert. denied*, 479 U.S. 854 (1986)). *See In re Lanier*, 383 B.R. 302, 307 (Bkrtcy. E.D.N.C. 2008) (trustee did not carry burden of proving that the settlement was in the best interests of the estate); *Toussaint*, 2008 WL 427278, at *5-6 (the Court cannot find that the Trustee carried his burden of showing that the settlement is "fair and equitable").

**IV. The Trustee Has Not Met His Burden of Proving that the Proposed Settlement Is Fair and Equitable, and in the Bests Interest of the Estate.**

**A. The Trustee Is Proposing to Settle Valuable Claims that the Debtor Has Against Kobayashi, Monitoring Technology, Dechman, Fiore and Other Equaphor Insiders For Only A Small Fraction of Their Value.**

On August 13, 2010, the Derivative Plaintiffs commenced the Derivative Action against Dechman, Fiore, Kobayashi, Monitoring Technology and three Equaphor directors, alleging that they breached their fiduciary duties to Equaphor under Delaware law when they orchestrated a series of transactions with Equaphor which deprived Equaphor of substantial assets and money,

6

all for the benefit of Dechman, Fiore, Kobayashi and Monitoring Technology.[7]

At issue in the Derivative Action are three sets of transactions which have caused more than $14 million in damage to Equaphor. Counsel for the Derivative Plaintiffs have agreed to pursue these claims on a contingent basis with no cost to the Debtor's estate.

### a. The Management Services Agreement and Sale Incentive Fee.

In September, 2007, Dechman and Fiore, who at all relevant times have been the two senior officers of the Debtor, caused Equaphor to enter into a Management Services Agreement with a company they created for this purpose, Monitoring Technology, which provided, *inter alia,* for a so-called Sale Incentive Fee to be paid to them in the event of a sale of all or substantially all of the Company's assets. The Sale Incentive Fee in essence put a cap or ceiling on what Equaphor and its shareholders could receive from such a sale, as all proceeds in excess of a certain formulaic amount (the "Investor Premium") were payable to Monitoring Technology, and its principals, Dechman and Fiore.[8] ¶ 19.[9]

The Management Services Agreement also required Equaphor's Board of Directors to accept and approve any offer that exceeded the threshold for payment of the Sale Incentive Fee. ¶ 20. The Board approved the Sale Incentive Fee without financial or legal advice, and without any negotiation of the formula. Equaphor's then legal counsel represented Dechman and Fiore with respect to the negotiation of the Management Services Agreement and the Sale Incentive Fee provision included therein. ¶ 21.

As alleged in the Complaint, it was a breach of fiduciary duty to enter into an agreement that limited what Equaphor and its shareholders could receive from a sale, and which had no limit on how much Dechman and Fiore could receive from a sale.

---

[7] A copy of the Derivative Action Complaint ("Complaint") is attached hereto as <u>Exhibit 1</u>.
[8] A copy of the Management Services Agreement is attached hereto as <u>Exhibit 3</u>.
[9] "¶ __" refers to paragraph numbers in the Complaint.

### b. The Patent Acquisition.

Equaphor had a license to certain patents from International Paper Company ("International Paper") that were critical to the Debtor's business. Dechman and Fiore purchased these patents, as well as the rights to enforce any existing licensing agreements, in exchange for $75,000 plus payments equal to 50% of the net royalties received on the patents, after expenses for negotiating or enforcing licensing or royalty agreements. The patents were acquired by Kobayashi, an entity formed by Dechman and Fiore for that purpose. This was a misappropriation of a corporate opportunity and a breach of fiduciary duty as officers of Equaphor. This was especially the case since Equaphor had an accrued royalty obligation on the patents of $640,000.[10] ¶¶ 23-25. Dechman subsequently claimed the Company owed an additional $261,833 in royalties, making a total of $901,833 allegedly owed to Kobayashi as owner of the patents.[11]

Moreover, Dechman falsely advised the directors of the Debtor that a condition of the patent licensing agreements prohibited Equaphor from acquiring the patents. ¶ 26. Contrary to Dechman's advice, nothing in the licensing agreements with any of the licensees of the patents prohibited Equaphor from acquiring the patents. ¶ 28. Notwithstanding Dechman's representation to the directors that Equaphor could not own the patents, Kobayashi later sold the patents to Equaphor when it became convenient for Kobayashi. ¶ 28.

The directors approved Kobayashi's purchase of the patents, and executed a Waiver Agreement purporting to release Dechman and Fiore from any liability on account on conflicts of interest in acquiring the patents, without the Board's having taken any steps to determine (a) the value of the patents, (b) whether the Company should take advantage of the opportunity to

---

[10] Equaphor disputed the royalty obligation; however, the Company could have extinguished any dispute over the $640,000 by acquiring the patents itself for $75,000 in cash.

[11] Indeed, when Kobayashi subsequently sold the patents to Equaphor in September, 2009, the purchase price was justified in part "to satisfy the unpaid royalty liability on [Equaphor's] balance sheet." *See* July 28, 2010 letter to Shareholders attached hereto as <u>Exhibit 4</u>.

purchase the patents, or (c) whether, in fact, the Company was prohibited from taking advantage of an opportunity to purchase the patents. ¶ 34. The Board then acquiesced in a request that it also waive any conflict of interest on the part of the Company's law firm, Stein Sperling. This constituted a further breach of fiduciary duties to Equaphor by the Derivative Defendants.

### c. The September 2009 Transactions.

The most egregious breaches of fiduciary duty occurred in September 2009. Equaphor had entered into an agreement with a company named Cognex Corporation ("Cognex") to sell to Cognex a portion of Equaphor's business (the Video business line) for $5 million. ¶ 41. The Video business was one of Equaphor's three business lines (¶ 3) and it constituted 30% of Equaphor's revenues and net income in 2009.

Two days before a Board meeting held on September 23, 2009, Dechman provided to the directors a summary of three proposed transactions: (1) the sale of the Video business for $5 million, (2) a sale to Monitoring Technology of Equaphor's remaining business and operating assets, inventories, and accounts receivable for a purchase price of only $1,617,034, and (3) the purchase by Equaphor of patents from Kobayashi for a purchase price of $3,450,000 plus additional payments to Kobayashi equal to any royalties or other revenues the Company received on account of the patents over the next 12 months. ¶ 42.[12]

On just two days' notice of the latter two proposed transactions, and without any financial advice as to the value of the businesses and assets to be sold to Monitoring Technology[13] or the value of the patents, the directors, with director Sumner Kaufman dissenting and director John Evans abstaining, approved all three transactions as proposed by Dechman. ¶¶ 46-48. A majority vote in favor of the transactions was obtained only by the fact that Molly

---

[12] Dechman and Fiore did not disclose to the Board that Koyabashi had settled a patent litigation for $690,000 shortly before the Board vote. The $690,000 settlement was paid to Kobayashi, making a total of $4,140,000 it received on the patents. ¶ 58.

[13] Dechman had previous advised the Board that the entire company had a value in the range of $15-17 million. ¶ 39.

9

Hale, an employee of Dechman and Fiore, was elected to the Board immediately prior to the meeting. She was elected by written consent of Monitoring Technology and directors Ed Spiva and J.B. Doherty, as these three owned or represented a majority of the Series E preferred shareholders, who had the right to elect an additional director. ¶ 45.

The purchase price paid by Monitoring Technology for the business lines not acquired by Cognex grossly undervalued these businesses. The Video business sold to Cognex for $5 million represented only 30% of the Company's revenues and approximately the same percentage of Equaphor's income during the period January to August 2009. Based on the arm's length transaction that valued the Video business at $5 million, the business lines acquired by Monitoring Technology for $1.6 million were worth over $11 million. ¶ 54.

The only ostensible justification offered for the patently unfair terms for Monitoring Technology's purchase of assets from Equaphor and Kobayashi's sale of the patents to Equaphor is that Monitoring Technology was entitled to the Sale Incentive Fee described above (*see* ¶ 61), and that the transactions with Monitoring Technology and Kobayashi had the same financial effect as payment of the Sale Incentive Fee would have had. This justification is completely without merit. Under the express terms of Section 9 of the Management Services Agreement (<u>Exhibit 3</u> attached hereto), a Sale Incentive Fee was due only in the event of a "Sale," which is defined in Section 9 as "the sale of all or substantially all of [MTC's] properties and assets."[14] ¶ 63. As noted above, Equaphor sold to Cognex one of three business lines, which constituted only 30% of Equaphor's revenue and income, and only 10% of Equaphor's assets (¶ 65)— clearly not close to "substantially all" of Equaphor's assets. In short, the sale to Cognex did not trigger the Sale Incentive Fee provision.

---

[14] The Management Services Agreement refers to MTC and Soze. At the time the agreement was entered, Equaphor was named Monitoring Technology Corporation ("MTC"), and the current Monitoring Technology was named Soze. When Soze purchased the businesses of Equaphor not purchased by Cognex, Soze took over the name Monitoring Technology, and Monitoring Technology's name was changed to Equaphor.

Moreover, as set forth in Section IV A. a above, the Sale Incentive Fee provision in the Management Services Agreement, which capped the return to shareholders in the event of a sale, was itself a breach of fiduciary duty.

### d. Damages.

As noted above, the Video business sold to Cognex for $5 million had 30% of the Company's revenues in the period January to August 2009. The remaining 70% of Equaphor, therefore, was worth approximately $11,666,666,[15] according to the following calculation:

| | |
|---|---|
| 70% / 30% = | ratio of 2.333 |
| 2.333 x $5,000,000 (purchase price for the Video business) = | $11,666,666 |
| Purchase price paid by Monitoring Technology = | ($1,617,034) |
| Amount of underpayment = | $10,049,632 |

In addition, Equaphor was damaged by paying $3,450,000 to Kobayashi for the patents, which had no value to Equaphor. Furthermore, as a result of the patent sale to Equaphor, the Company became embroiled in the patent litigation between Kobayashi and two licensees of the patents (Carotek, Inc. and Event Capturing Systems, Inc. (collectively, "Carotek"). Kobayashi was thereby able to shift responsibility for some or all of the litigation expense to Equaphor. It is estimated that Equaphor has paid $800,000 on legal fees for the patent litigation,[16] draining most of Equaphor's cash. In addition, approximately $184,000 of the Law Firms' claims against Equaphor relate to the patent litigation, adding another $184,000 in damages on account of the sale of the patents to Equaphor.

---

[15] This valuation is completely consistent with Dechman's representation in January 2009, that Equaphor was worth $15-17 million. *See* footnote 12 above.

[16] According to the July 28, 2010 letter, Equaphor had paid $550,000 in legal fees on account of the patent litigation. The Schedules reflect an additional $249,000 in payments to Stein Sperling between October and November 2010, on account of the patent litigation.

11

Thus, the damages suffered by Equaphor as a result of the Derivative Defendants' breaches of fiduciary duty total approximately **$14.5 million**.[17]

### e. Counsel for the Derivative Plaintiffs Have Offered to Pursue the Claims on Behalf of the Trustee on a Contingent Basis.

Evidencing their strong belief in the merits of these claims, the counsel for the Derivative Plaintiffs has agreed to pursue the claims asserted in the Derivative Action on a contingent basis.[18] Moreover, the Derivative Plaintiffs, and a group consisting of a number of the minority shareholders, have paid a retainer to be used for expenses of the litigation. If the expenses of the litigation exceed the amount of the retainer, the Derivative Plaintiffs' counsel has agreed to advance any additional expenses. Thus, the litigation can be pursued at no cost to the bankruptcy estate, unless there is a recovery.

### B. The Proposed Acquisition of the Patents and Related Claims Is Part of Kobayashi's Continued Manipulation of the Patents for Its Benefit.

Under the proposed settlement, Kobayashi would purchase Equaphor's patents and the related patent claims. The Trustee has assigned "little value" to these assets and claims. The proposed acquisition is just the latest in a series of transactions in which Kobayashi has manipulated the patents and patent claims for its benefit and to the detriment of Equaphor.

As described above, the Equaphor patents have changed hands twice since September 2007. In September 2007, Kobayashi usurped a corporate opportunity, and purchased the patents from International Paper for $75,000 plus payments equal to 50% of the net royalties received on

---

[17] The Derivative Plaintiffs do not have any reason to believe that there are any collectability issues here, and the Trustee does not suggest that there are any to justify the proposed settlement. Monitoring Technology has received over $4 million in dividends Equaphor paid to shareholders, and Kobayashi has received over $4 million from the patents that it purchased and then sold to Equaphor. In addition, Monitoring Technology continues to own the other business lines which generated approximately 70% of Equaphor's revenues and income prior to their sale to Monitoring Technology in September 2009.

[18] Any contingent fee agreement would, of course, be subject to the approval of this Court pursuant to 11 U.S.C. § 329.

the patents, after expenses for negotiating or enforcing licensing or royalty agreements.[19] ¶ 23. Kobayashi subsequently demanded that Equaphor pay it $901,833 on account of accrued but unpaid royalties, and Dechman put $901,833 on Equaphor's balance sheet as a liability. ¶¶ 37-38. Kobayashi also made demand on at least two other license holders – Papertech, Inc. ("Papertech") and Carotek – for unpaid royalties under their licensing agreements with International Paper.

Two years later, in September, 2009, Kobayashi sold the patents to Equaphor for $3,450,000, plus additional payments to Kobayashi equal to any royalties or other revenues the Company received on account of the patents over the next 12 months. ¶ 55. At the time of the sale, Kobayashi knew but did not disclose to Equaphor that Papertech had agreed to a $690,000 settlement, which was paid to Kobayashi shortly after the sale of the patents to Equaphor. ¶ 58. Equally important, and also not disclosed to Equaphor, Kobayashi was embroiled in increasingly contentious and expensive litigation with Carotek, which had refused to accede to Kobayashi's demands. On the heels of an adverse decision against Kobayashi in the patent litigation,[20] Kobayashi sold the patents to Equaphor for a price that was more than 46 times the price it had paid for the patents. ¶¶ 60(a), 79-87.

With sale of the patents, Kobayashi also jettisoned the cost of the litigation, which shifted to Equaphor. On October 29, 2009, Kobayashi moved to add Equaphor as a party to the Carotek

---

[19] To the best of the Derivative Plaintiffs' knowledge, Kobayashi has never paid any additional amounts to International Paper above the minimum payment of $75,000.

[20] On August 31, 2009, the District Court in *Carotek, Inc. v. Kobayashi Ventures, LLC*, Nos. 07 Civ 11163(NRB), 08 Civ 5706(NRB), 2009 WL 2850760, *7 (S.D.N.Y. Aug. 31, 2009), ruled that Kobayashi did not have standing to sue Carotek for past patent infringements or breaches of the licensing agreement under its acquisition agreement. The Court subsequently reversed the latter ruling (that Kobayashi could not sue for breach of the licensing agreements) on April 12, 2010. *See Carotek, Inc. v. Kobayashi Ventures, LLC*, Nos. 07 Civ 11163(NRB), 08 Civ 5706(NRB), 2010 WL 1640190, **2-4 (S.D.N.Y. Apr. 10, 2010).

litigation, which motion was allowed on December 2, 2009.[21] Over the course of the next year, Equaphor paid or incurred more than $1 million in legal fees in connection with the Carotek litigation. Now that Equaphor has run out of funds to continued funding the litigation, Kobayashi is seeking to buy the patent rights and associated claims back for essentially nothing.

The Derivative Plaintiffs believe that the patents have "little value" (and that Equaphor has been damaged by the patent purchases to the amount of the $3,450,000 purchase price, $1,000,000 in legal fees, plus unspecified damages sought by Carotek (for which Equaphor is not being indemnified)). However, Dechman and Kobayashi do not share that view. Although Dechman and Kobayashi apparently advised the Trustee that they too believe that the patent rights, and the related claims, have "little value," that is not what Dechman told Equaphor's shareholders in July 2010, when he was seeking to raise $1 million in capital to pursue the patent claims against Carotek. In a July 28, 2010 letter to shareholders (Exhibit 4 hereto), Dechman explained the potential value of the patent and the related claims as follows:

- First, Kobayashi had recovered $690,000 from Papertech on account of the patent, at a cost of $350,000;

- Second, while any recovery against Carotek was uncertain, the projected ruling by the Court in the Carotek litigation, "ranges from a cost to Equaphor of $2,000,000 if only Carotek/ECS claims are upheld to a benefit of $6,000,000 if only Equaphor claims are upheld"; and

- Third, "[b]eyond Papertech and Carotek/ECS, there remain five material potential licensees: Metso, Procemex, ISRA, MillSight and Viconsys. All five of these companies are based in Europe. We are in discussions with Metso, who is a prior licensee, on a licensing arrangement. There are other smaller companies who are likely infringing the patents. In addition, we likely do not have a complete list of infringing companies."

To date, Equaphor has already obtained partial summary judgment against Carotek in the amount of $101,578 with interest of $36,470, to cover the minimum royalty payments due under

---

[21] *See Carotek, Inc. v. Kobayashi Ventures, LLC*, Nos. 07 Civ 11163(NRB), 08 Civ 5706(NRB), 2009 WL 4756526, *1 (S.D.N.Y. Dec. 02, 2009).

the licensing agreement, which is not disclosed in the moving papers. *Carotek*, 2010 WL 1640190, at *7-8, as amended by Order, dated May 28, 2010.

> 3. **The Proposed Settlement Would Release Equaphor's Preference Claim Against Stein Sperling Without Any Evaluation Whether the Payment Was of a Legitimate Debt of Equaphor.**

As part of the proposed settlement, Equaphor would release a potential preference claim against Stein Sperling, which is serving as counsel for Kobayashi, Dechman and Equaphor in the Carotek litigation and the Derivative Litigation. The Trustee maintains that "the preference claim may well be a valid claim, but the Trustee believes the Agreement is a reasonable compromise because it pays all other scheduled undisputed claims, thereby throwing into question whether Stein Sperling was in fact preferred." However, there is a question whether the $249,000 that Equaphor paid to Stein Sperling during the preference period, was, in fact, a legitimate debt of Equaphor since Stein Sperling was jointly representing Kobayashi, Dechman and Equaphor in the Carotek litigation.[22] In fact, Dechman's July 2010 letter to Equaphor's shareholders raises substantial questions about the allocation of fees between Equaphor and Kobayashi. Even though the Carotek litigation had commenced in December 2007, and Equaphor was not added as a party until December 2009, of the $900,000 in fees incurred as of July 2010, only $350,000 had been paid by Kobayashi and a lop-sided $550,000 had been paid by Equaphor.[23] This raises substantial questions about whether the attorneys' fees were properly allocated between Kobayashi and Equaphor, and whether Equaphor was, in fact, paying Kobayashi's obligation or a joint obligation of Kobayashi and Equaphor, resulting in a fraudulent conveyance voidable under 11 U.S.C. § 548.

---

[22] In Equaphor's Schedules, both Kobayashi and Dechman are listed as co-debtors who are "also liable on any debts listed by debtor in the schedules of creditors."

[23] Despite a request by counsel for the Derivative Plaintiffs, it is understood that the Trustee has made no inquiry into how patent litigation fees were allocated between Kobayashi and Equaphor.

### 4. The Proposed Settlement Would Also Release All Claims Against the Derivative Defendants Under Chapter 5 of the Bankruptcy Code, Without Any Evaluation of the Merits of Such Claims.

Although the Trustee does not mention it in his papers, the proposed settlement would also release the Derivative Defendants "of all claims, demands or causes of action, known or unknown that the Trustee, Debtor or the bankruptcy estate may have against [them], *including but not limited to any claims under Chapter 5 of the Bankruptcy Code*, except as otherwise provided in this Agreement." The motion made no effort to evaluate the merits of the Chapter 5 claims that Equaphor may have against the Derivative Defendants despite many questionable transactions between Equaphor and the Derivative Defendants, who are company insiders.

For example, during the one year period prior to filing the petition, Equaphor made insider payments of $61,500 to Kobayashi and $988,766 to Monitoring Technology, which are subject to avoidance and more appropriately re-characterized as equity,[24] *In re Official Committee Of Unsecured Creditors for Dornier Aviation (North America), Inc.*, 453 F.3d 225, 231-35 (4th Cir. 2006); *In re Franklin Equipment Co.*, 418 B.R. 176, 190-94 (Bkrtcy. E.D. Va. 2009). These potential claims are yet another reason that the proposed settlement is not fair or in the best interests of the estate and its creditors and interest holders.

### 5. The Trustee Fails to Consider The Interests of the Minority Shareholders.

In support of his motion, the Trustee observes on several occasions that the proposed settlement will pay all scheduled undisputed claims not related to Kobayashi. However, where, as here, the bankruptcy estate is solvent, the court must consider the residual interests of equity holders in deciding on whether or not to approve the proposed settlement. *See Spielfogel*, 211

---

[24] The payments to Monitoring Technology purportedly were for accounts receivable Monitoring Technology acquired from Equaphor in connection with the sale of its business assets. As set forth above, the fire-sale price of those assets was purportedly justified by the Sale Incentive Fee, which put a cap on the recovery to the Series F Preferred Shareholders and had the effect of transferring the equity of the Debtor above the Investor Premium to Monitoring Technology. Under these circumstances, the payments to Monitoring Technology are properly classified as equity instead of debt. *Id.*

16

B.R. at 144-45.

The Trustee further maintains that the Minority Shareholders at most could obtain a recovery of $1 million. The Trustee's position is untenable because the potential recovery in the Derivative Action (approximately $14.5 million) after payment of all scheduled claims and administrative claims (of approximately $1 million) would leave $13.5 million for the Series F Shareholders. The Minority Shareholders collectively own over 20% of the Series F shares and, therefore, would be entitled to approximately $2.7 million, compared to the $100,000 that the Derivative Defendants have offered to them.

Moreover, under principles of equitable subordination, this Court may "subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest." 11 U.S.C. § 510(c). In light of the highly inequitable conduct of the Derivative Defendants alleged in the Complaint, there are substantial grounds to subordinate their interest to the interests of the Derivative Plaintiffs.[25] *See In re ASI Reactivation, Inc.*, 934 F.2d 1315, 1320-21 (4th Cir. 1991) (a creditor's claim can generally be subordinated under 11 U.S.C. § 510(c) if (1) the claimant or interest holders engaged in inequitable conduct; (2) that conduct injured other creditors or interest holders; and (3) subordination is consistent with other bankruptcy law); *see also U.S. v. Noland*, 517 U.S. 535, 538-39 (1996) (holding that § 510(c) was intended to incorporate existing doctrine of equitable subordination as exemplified by *In re Mobile Steel Co.*, 563 F.2d 692 (5th Cir. 1977)). Because Kobayashi, Monitoring Technology, Dechman and Fiore were corporate insiders and fiduciaries, the fairness of the transactions demands close scrutiny. *See In re Daugherty Coal Co., Inc.*, 144 B.R. 320, 324 (N.D.W.Va. 1992); *In re Sys. Impact, Inc.*, 229

---

[25] "The statute's distinction between 'claims' and 'interests' corresponds to the distinction between creditors and equity holders. The plain language and legislative history of § 510(c) indicate that a claim may be subordinated to another claim and an interest may be subordinated to another interest under court-developed principles of equitable subordination." *Adelphia Recovery Trust v. Bank of America, N.A.*, 390 B.R. 80, 98-99 (S.D.N.Y. 2008)

B.R. 363, 371 (Bkrtcy. E.D.Va. 1998); *In re N & D Properties, Inc.*, 799 F.2d 726, 731 (11th Cir. 1986).

V. **IN THE ALTERNATIVE, THE MINORITY SHAREHOLDERS REQUEST LEAVE TO CONDUCT RULE 2004 EXAMINATIONS**

In the event the Court is disinclined to rule on the Trustee's motion based on briefing by counsel, the minority shareholders request leave to conduct Rule 2004 examinations and for a brief evidentiary hearing to show that the real beneficiaries of the proposed compromise of the Debtor's claims and sale of assets are the very officers who have appropriated valuable assets of Equaphor and who engineered this bankruptcy in order to evade responsibility for their wrongdoing. Subjects for the Rule 2004 examinations would include (1) the circumstances and reasons for Equaphor's filing for bankruptcy, and the conflicts of interest on the part of the directors who both voted to file for bankruptcy and who were defendants in the Derivative Action, (2) the allocation of fees among Dechman, Kobayashi and Equaphor of the law firms that are creditors of the estate, (3) the potential preference claim against Stein Sperling which has represented Dechman, Kobayashi and Equaphor in the patent litigation as well as representing Dechman, Fiore, Kobayashi and Monitoring Technology in the Derivative Action, and (4) the potential Chapter 5 claims against Kobayashi and Monitoring Technology.

The minority shareholders would also request that the Trustee waive Equaphor's attorney-client privilege to the extent necessary to permit them to conduct such discovery, or in the alternative that the Court direct the Trustee to waive such privilege.

VI. **CONCLUSION**

After purchasing Equaphor's valuable business lines for substantially less that they were worth, and selling Equaphor patents for 46 times the price it paid for them, Kobayashi is now seeking to purchase the remaining Equaphor assets. The most notable of those assets is the claim that the Debtor has against Kobayashi and the other Derivative Defendants for breaching their fiduciary duties to Equaphor when engaging in (or, as to the three directors, approving) the

forgoing transactions to their personal benefit. For all the foregoing reasons, the Trustee's Motion to Approve Sale of Assets of the Estate Free and Clear of Claims and Other Interest and Compromise of Related Claims should be denied. In the alternative, limited discovery should be authorized as suggested in Section V above.

Dated: April 20, 2011

Respectfully submitted,

FREDERICK BAMBER AND HARRY GEORGE
By Counsel

/s/ James R. Schroll
James R. Schroll
Bean, Kinney & Korman, PC
2300 Wilson Blvd., 7th Floor
Arlington, Virginia 22201
(703) 525-4000
(703) 525-2207 (fax)
*jschroll@beankinney.com*


SHAPIRO HABER & URMY LLP

Thomas G. Shapiro, Esq.
Michelle H. Blauner, Esq.
53 State Street
Boston, Massachusetts 02109
(617) 439-3939
(617) 439-0314 (facsimile)

## CERTIFICATE OF SERVICE

I HEREBY certify that on this 20th day of April, 2011, this Motion was served via CM/ECF upon all required parties:

Steven B. Ramsdell, Esq.
Tyler, Bartl, Ramsdell & Counts, P.L.C.
300 N. Washington Street, Suite 202
Alexandria, VA 22314

Carotek, Inc.
Raymond R. Castello, Esq.
Fish & Richardson
601 Lexington Avenue
New York, NY 10022

LeClairRyan, A Professional Corporation
Attention: Ryan C. Day, Esq.
2318 Mill Road, Suite 1100
Alexandria, VA 22314

Whiteford, Taylor & Preston
Attention: George S. Lawyer, Esq.
7 St. Paul Street.
Baltimore, MD 21202

Event Capturing Systems, Inc.
Raymond R. Castello, Esq.
Fish & Richardson
601 Lexington Avenue
New York, NY 10022

Equaphor Incorporated
12587 Fair Lakes Cir.
Suite 303
Fairfax, VA 22033

American Express Travel Related Services
Becket and Lee LLP
16 General Warren Boulevard
Malvern, PA 19355

Kevin R. McCarthy, Esq.
1751 Pinnacle Drive, Suite 1115
McLean, VA 22102
(Also by email)

Monitoring Technology, LLC
12701 Fair Lakes Cir.
Suite 320
Fairfax, VA 22033

Kobayashi, LLC
12701 Fair Lakes Cir.
Suite 320
Fairfax, VA 22033

Stein, Sperling, Bennett, De Jong, Dirscoll & Greenfeig
25 W. Middle Lane
Rockville, MA 20850

J. A. Lindeman & Co., PLLC
3190 Fairview Park Drive
Suite 480
Falls Church, VA 22042

Office of the U.S. Trustee
115 South Union Street
Suite 210
Alexandria, VA 22314

Snell & Wilmer L.L.P.
Attention: Michael B. Reynolds
600 Anton Blvd., Suite 1400
Costa Mesa, CA 92626

/s/ James R. Schroll
James R. Schroll, Esq.