UNITED STATES BANKRUPTCY COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

ALEXANDRIA DIVISION


- - - - - - - - - - - - - - - - - x

IN RE: EQUAPHOR INCORPORATED,      : Case No. 10-20490-SSM

                                   :

        Debtor.                    :      (Chapter 7)

- - - - - - - - - - - - - - - - - x


Monday, May 2, 2011

U.S. Bankruptcy Court

Alexandria, Virginia


    The above-entitled matter came on to be heard before

THE HONORABLE STEPHEN S. MITCHELL, Judge in and for the

United States Bankruptcy Court, for the Eastern District of

Virginia, Alexandria Division, beginning at approximately

11:00 o'clock, a.m.


* * * * *

Page 2

APPEARANCES:

On behalf of the Debtor:

STEVEN RAMSDELL, ESQUIRE

On behalf of Chapter 7 Trustee:

KEVIN McCARTHY, ESQUIRE

On behalf of Frederick Bamber and Harry George:
JAMES SCHROLL, ESQUIRE
THOMAS G. SHAPIRO, ESQUIRE

On behalf of Kobayashi Ventures, LLC:
JAMES REYNOLDS, ESQUIRE
JEFFREY SCHWABER, ESQUIRE

On Behalf of Carotek, Inc. And Event Capture
Systems, LLC:
DAVID SWAN, ESQUIRE
KENNETH MISKEN, ESQUIRE
THAD ADAMS, ESQUIRE (via telephone)

* * * * *

C O N T E N T S

Page 3

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|
| KEVIN McCARTHY | | 5 | 40 | 44 |
| | | (Shapiro) | (McCarthy) | |
| JAMES DECHMAN | 47 | 65 | 82 | |
| | (McCarthy) | (Misken) | (Shapiro) | |
| JOHN B. DOHERTY | 114 | 121 | 135 | |
| | (McCarthy) | (Misken) | McCarthy) | |
| | | 121 | | |
| | | (Shapiro) | | |
| CLARENCE E. SPIVA | 136 | 139 | | |
| | (McCarthy) | (Misken) | | |
| | | 140 | | |
| | | (Shapiro) | | |

E X H I B I T S

| | MARKED FOR IDENTIFICATION | IN EVIDENCE |
|---|---|---|
| Bamber Exhibit A | 16 | 92 |
| Bamber Exhibit B | 19 | |
| Bamber Exhibit C | 22 | 84 |
| Bamber Exhibit D | 36 | |
| Bamber Exhibit E | 46 | |
| Bamber Exhibit F | 82 | |
| Bamber Exhibit G | 86 | |
| Bamber Exhibit H | 89 | |
| Bamber Exhibit I | 92 | |
| Bamber Exhibit J | 98 | |
| | | |
| Carotex Exhibit No. 3 | | 33 |
| Carotex Exhibit No. 8 | | 32 |
| Trustee Exhibit A | 41 | 44 |
| Trustee Exhibit B | 135 | 136 |

1                    P R O C E E D I N G S

1          THE COURT: Good morning.  Please be seated.  We

2     will call our 11:00 o clock matter.

3          THE CLERK: We have items number one and two,

4     Equaphor, Incorporated, Case Number 10-20490.

5          THE COURT: Will counsel please put their appearance

6     on the record?

7          MR. McCARTHY: Good morning, Your Honor.  Kevin

8     McCarthy, the trustee and the attorney for the trustee.

9          MR. SCHROLL: Good morning, Your Honor.  James

10    Schroll and Thomas Shapiro on behalf of Harry George and

11    Frederick Bamber.

12         MR. ADAMS: And Your Honor, this is Thad Adams in

13    Charlotte, North Carolina, appearing by telephone.

14         THE COURT: Just a second, Mr. Adams.  We need to

15    get the volume up on the phone system here.  Okay.  In the

16    meanwhile.

17         MR. REYNOLDS: Your Honor, James Reynolds on behalf

18    of Kobayashi Ventures, LLC.  I also have with me as co-

19    counsel Jeffrey Schwaber from the law firm of Stein Sperling.

20         MR. SWAN: Good morning, Your Honor.  David Swan for

21    Carotex and ECS.  With me is Ken Misken and on the phone is

22    Thad Adams.

23         THE COURT: Mr. Adams, are you on the phone?

24         MR. ADAMS: Yes, Your Honor, I am.

25         THE COURT: Okay.  Thank you.

Page 5

1          MR. RAMSDELL: Steven Ramsdell for the debtor.

2          THE COURT: Okay.  Thank you, Mr. Ramsdell.

3          I believe where we were when we adjourned on last

4   week was that Mr. McCarthy was on the witness stand and we

5   were in the middle of cross examination by Mr. Misken.

6          MR. SHAPIRO: I think I was cross examining.

7          THE COURT: You were examining.  I m sorry, Mr.

8   Shapiro.

9   Whereupon,

10                        KEVIN McCARTHY

11  was resumed as a witness and, having been previously duly

12  sworn, was examined and testified as follows:

13                      CROSS EXAMINATION

14          BY MR. SHAPIRO: (Resumed)

15      **Q    Good morning, Mr. McCarthy.**

16      A    Good morning, Mr. Shapiro.

17      **Q    You were asked last week some questions about the**

18  **legal bills that underlay the claims by the three law firms**

19  **or four law firms that are claims against the estate, and I**

20  **won t ask you to repeat what was asked then.**

21          **Would you agree that if any of the work underlying**

22  **those bills that make up the law firm claims was done in**

23  **whole or in part on behalf of Kobayashi and Dechman, who were**

24  **parties to the Carotex litigation, that it wouldn t be proper**

25  **to charge all of those fees to Equaphor?**

1    A    Yes.

2        Q    And if it wasn t proper to charge all the fees to

3    Equaphor then those claims would be subject to challenge,

4    would they not, in the bankruptcy proceeding?

5        A    Yes.

6        Q    And is it correct that you do not know whether or

7    not Kobayashi or Mr. Dechman were charged any legal fees in

8    the Carotex litigation after the point in time when the

9    patents were sold to Equaphor in September 2009?

10       A    I don t know that.  I do know after our cross

11   examination or my cross examination last week, I went back

12   and I had in fact received the bills, and I don t think I d

13   remembered that at the time when you examined me; and I did

14   give you a cover sheet showing the bills were transmitted to

15   me, and I ve since rechecked and the bills all say  Equaphor

16   on them.  But whether or not there were additional bills

17   going to Kobayashi and Dechman at the same time I don t know.

18       Q    And whether or not the work that was charged to

19   Equaphor benefitted Equaphor, Kobayashi and Mr. Dechman you

20   don t know; is that right?

21       A    I guess I don t know if there would have been an

22   indirect benefit, as well.

23       Q    Well, Kobayashi and Dechman were parties to the

24   litigation after September 2009 and continued to be parties;

25   didn t they?

1    A    They did.

2    **Q    And you ve never seen the underlying bills with any**

3    **itemization of what work was done or what days, by whom, that**

4    **sort of thing?**

5    A    Other than the bills that were presented to

6    Equaphor that became claims within this estate.  I did look

7    at those invoices.

8    **Q    And what was in the invoices?  Were there just**

9    **bills stating, for services rendered,  X  dollars were owed?**

10   A    It was itemized.  My focus though was on to whom

11   the bill was addressed, and I probably looked at the

12   substance but not in much detail, and the reason is because

13   you told me that was an issue and so I wanted to check out at

14   least to whom the bills were addressed and whether or not on

15   the face of them they looked to be appropriate claims against

16   Equaphor.

17   **Q    But the work that was reflected in those bills**

18   **would benefit all of the defendants that were defendants in**

19   **damage claims by Carotex?**

20   A    I would expect that to be the case.

21   **Q    But you still don t know whether Mr. Dechman or**

22   **Kobayashi paid any part of that work?**

23   A    No.

24   **Q    You testified last week that PaperTech offered to**

25   **pay the estate $60,000 for the patents?**

Page 8

1      A     Yes.

2      **Q     And did you attempt to negotiate a higher price**

3  **with PaperTech?**

4      A     No; but when I made the outline of the deal, I

5  sent you an e-mail to keep you informed and I sent them an

6  e-mail to keep their attorney, Mike Reynolds, to keep him

7  informed, as well, the idea being that  - and I think I sent

8  David Swan an e-mail, as well  - the idea being to keep

9  everybody informed; and whether I said,  Do you want to bid

10  or not?  I kind of doubt it at that point.  But the idea was

11  if you want to bid more, you know, you may.

12      **Q     Did you do any evaluate of the payments to**

13  **Kobayashi that were made within one year prior to the**

14  **bankruptcy filing?**

15      A     I did in the sense of I got the asset purchase

16  agreement that was made and approved by the board in 2009 and

17  I made certain that the accounts receivable were on the list

18  that were attached to the asset purchase agreement because a

19  large group of payments made to  - I get it a little bit

20  mixed up sometimes but I think in this case it probably was

21  Monitoring Technology, LLC.

22          The large group of payments made to Monitoring

23  Technology, LLC were accounts receivable that I was told

24  should have come to them but it came to the debtor because of

25  the way the accounts were set up among the customers, and I

Page 9

1    verified that that appeared to be consistent with the

2    agreement.

3        Q    I was going to come to that next.  So, let me ask

4    you a question and then I ll go back to the Kobayashi

5    payments.  Okay?  I believe it was Monitoring Technology that

6    acquired the business assets of Equaphor other than the ones

7    that were sold to Cognex.  Do you understand that to be the

8    case?

9        A    Yes.

10       Q    And that was in an acquisition, $1.5 million, in

11   round numbers; correct?

12       A    Yes.

13       Q    And then that purchase  - they paid a million-five

14   and part of what they got was the right to all the accounts

15   receivable, and I believe Exhibit 10 which is now in

16   evidence, one of the bankruptcy schedules, reflects that a

17   approximately $988,000 was paid by Equaphor over to

18   Monitoring Technology during the preference period for

19   insider-related transactions?

20       A    Yes.

21       Q    And it s your understanding that was accounts

22   receivable that were paid over?

23       A    Yes.

24       Q    And you understand that that s part of the damage

25   claim that s asserted in the derivative action?

Page 10

1    A    Yes.

2    Q    **Now, going back to Kobayashi, Kobayashi was the**

3    **entity created by Mr. Dechman and Fiore for the purpose of**

4    **purchasing these patents; is that right?**

5    A    Yes.

6    Q    **To your understanding.  And according to Exhibit**

7    **10, $61,500 was paid over to Kobayashi by Equaphor during**

8    **the preference period.  Do you recall that, sir?**

9    A    Sixty-one-five?

10   Q    **Yes.**

11   A    Not specifically; but I think it s in the statement

12   of financial affairs, and I definitely looked at that, got a

13   schedule of all of the payments to insiders within a year and

14   all the payments to non-insiders within 90 days and I looked

15   at them.

16        MR. SHAPIRO: Your Honor, it s in Exhibit 10, page,

17   Bates number 202, which is the Schedule of financial affairs.

18        BY MR. SHAPIRO:

19   Q    **And did you investigate what those payments were**

20   **for?**

21   A    Well, could I have back the  - I have it in my bag.

22        THE COURT: Just a second.  The exhibits are back in

23   chambers.  My law clerk is going to get them.

24        THE WITNESS: Judge, may I go get my copy, too?

25        THE COURT: We re going to bring back the one that

Page 11

1    should be on the witness stand.

2           THE WITNESS: I may have ended up with that.

3           THE COURT: Oh.  Okay.  Go ahead.

4           MR. SHAPIRO: Mr. Schroll took the liberty of taking

5    this out of your bag.

6           THE COURT: The witness has a copy.  So, you can

7    just leave that.

8           BY MR. SHAPIRO:

9      Q    It s at tab ten; and then, if you would turn to the

10   page.  I think it s CAR202 within Exhibit 10.

11     A    Okay.  I see it.

12     Q    Did you investigate what that $61,500 was for?

13     A    Those payments I think were part of the MSA  - no.

14   I m sorry.  Part of the asset  - MSA was in  07.  The asset

15   purchase agreement was in  09; and in  09, there was an  -

16   as I recall, amidst the asset purchase agreement was a fee

17   that was permitted to be charged by Kobayashi for the purpose

18   of administering Equaphor s affairs with respect to the

19   patent. That s about as well as I can say it.

20     Q    So, it was in September 2009 that Kobayashi sold

21   the patents to Equaphor; correct?

22     A    I think the settlement may have been as of October.

23     Q    Okay.  And Equaphor was to pay Kobayashi

24   $3,450,000?

25     A    Correct.

Page 12

1    Q    And then on top of that it s your understanding

2    that Equaphor was required to pay Kobayashi some fees for

3    managing the patents that Kobayashi had just sold to

4    Equaphor?

5    A    Correct.

6    Q    And that s what the $61,500 was?

7    A    I think that s right.

8    Q    Did you investigate whether that could be

9    recovered by the estate as a preference?

10   A    Well, in the sense of verifying that payments

11   appeared to have been made in accordance with the asset

12   purchase agreement which was approved by the board and which

13   in turn flowed from the MSA in  07 which was approved by the

14   board; and once somebody  - maybe Mr. Misken asked me earlier

15   whether I d reviewed balance sheets.  I did look at balance

16   sheets, as well.  Again, I m not saying my level of analysis

17   was very detailed but I remember looking at a bottom line and

18   saying, oh, I guess they were solvent.

19        So, I considered those factors as part of, you

20   know, my looking at all of the payments that were made to

21   Kobayashi or Monitoring Technology.  I was focusing on

22   primarily: Were the payments consistent with contracts that

23   were approved by the board and was there any obvious

24   insolvency at the time such that I might have wanted to take

25   a second look at that?

1    Q    Apart from whether Kobayashi had a contract right

2    to the money, did you evaluate whether the 61,500 that was

3    paid during the preference period could be recovered by the

4    estate as a preference?

5    A    You say apart from whether it was consistent with

6    the contract?

7    Q    Yes.

8    A    I don t think I did; no.

9    Q    And if the estate could recover that money at

10   having been a preferential transfer then that s money that

11   would have been available to the estate to pay administrative

12   expenses, including expenses for defending the estate in the

13   Carotex litigation; is that right?

14   A    Yes.

15   Q    And the $988,000 that was paid to Monitoring

16   Technology on account of accounts receivable, the money that

17   was paid over within a year of bankruptcy, that could be

18   recovered as a preference; could it not?

19   A    I don t know.  I don t think so.  I mean, you

20   know, I  -

21   Q    Well, it was paid on account of a contract that

22   was signed in 2007; correct?

23   A    Right.  The way I understood your question, you

24   were asking me to conclude that they were preferential

25   payments.  Certainly they could have been if all of the

Page 14

1   elements of Section 547 had been satisfied.

2       Q    Did you evaluate whether they were satisfied or

3   did you just simply decide that they were accounts receivable

4   that were required to be paid over by the 2007 contract?

5       A    Well, as I said, there are two things I focused

6   on.  One, was the company insolvent?  I looked at some

7   balance sheets.  It should have been insolvent in order for

8   there to be a recoverable preference.  And then two, I looked

9   at the contract to see whether they were consistent with the

10  contract; talked to two of the board members from  - well,

11  from all the way back to  07, Mr. Doherty and Mr. Spiva, as

12  well, about certain aspects of the deals.  And based on all

13  of that, I didn t think that there was an obvious preference.

14          I don t say that somebody couldn t come to a

15  different conclusion but I think I had something reasonable

16  to go on in not pursuing that.

17          MR. SHAPIRO: May I have just a moment, Your Honor?

18          (Pause.)

19          BY MR. SHAPIRO:

20      Q    If all or some part of the $988,000 could have been

21  recovered as a preference then that would have brought money

22  into the estate that could have been used to pay for legal

23  costs in the Carotex litigation; correct?

24      A    Yes.

25      Q    Did you determine at what point Equaphor became

Page 15

1  insolvent?

2     A    I asked for a balance sheet as of September 26th

3  of  09 and I m not sure at this point why that was but I was

4  probably focusing on before the deal closed; and then I asked

5  for a balance sheet at the end of October of  09 and I think

6  I was focusing on after the deal closed.  So  - I actually

7  forgot your  -

8     Q    All right.  Did you determine at what point the

9  company became insolvent?

10     A    Oh.  And both of those indicated that the company

11  was solvent.

12     Q    In September of  09?

13     A    And even after the deal, at least on paper.

14     Q    But how long after the deal?  When did it become

15  insolvent?

16     A    September  - well

17     Q    Do you know whether the company was insolvent at

18  the time it filed a voluntary petition in bankruptcy?

19     A    No, I don t.  There would be a presumption of

20  insolvency during the 90 days before that.

21     Q    A presumption but you didn t evaluate whether the

22  financial condition of the company was such that it was

23  insolvent?

24     A    No.

25     Q    Are you aware that filing a petition in bankruptcy

Page 16

1   **divests shareholders of the right to bring or maintain a**

2   **derivative action?**

3        A    I became aware of that.

4        **Q    Have you seen the director s  - the minutes of the**

5   **director s meeting when they decided to explore bankruptcy?**

6        A    I have.  I think it was attached to your

7   opposition.

8             MR. SHAPIRO: May I approach, Your Honor?

9             THE COURT: No.  Pass it through the court security

10   officer.  We will mark it as Bamber s Exhibit A.

11             MR. SHAPIRO: Exhibit A?  The letter  A  did you

12   say?

13             THE COURT: The letter  A.

14                          (Bamber s Exhibit A

15                          was marked for identification.)

16             MR. SHAPIRO: I offer this into evidence, Your

17   Honor.

18             MR. REYNOLDS: Your Honor, I ll object.  There s no

19   foundation that Mr. McCarthy was present at the meeting.  I

20   will object on hearsay but there s no foundation that he was

21   present at the meeting and that he can testify as to this.

22             THE COURT: Do you want to lay a foundation for its

23   admission?

24             MR. SHAPIRO: I ll have to call another witness.

25   I could call the director who s here in the room who was at

Page 17

1    the meeting.

2              THE COURT: Okay.  I ll let you examine right now,

3    subject to tying it up.

4              MR. SHAPIRO: Okay.  Thank you.

5              BY MR. SHAPIRO:

6         Q    The first time you saw these minutes was when you

7    saw the opposition to the motion for approval of compromise

8    and the sale?

9         A    I think that s right.

10        Q    If you look under paragraph number two,

11    Discussion,  it says:  The board discussed the offer sent by

12   Shapiro for the Bamber, George lawsuit.  The consensus was

13   that this was an outrageous offer.  Do you see that?

14        A    I do.

15        Q    And then at the bottom of the page it says the

16   board discussed filing for bankruptcy?

17        A    Yes.

18        Q    And then it says:  An independent court-appointed

19   trustee would take over the company and manage the final

20   liquidation.  The trustee could either sell or continue

21   litigation for the benefit of the creditors and

22   shareholders.  Do you see that, sir?

23        A    Yes.

24        Q    And did you have discussion with counsel for the

25   company or any of the directors as to whether one of the

1   **reasons they filed this voluntary petition in bankruptcy was**

2   **to try to eliminate the shareholder derivative case?  Did you**

3   **have any discussion on that issue?**

4       A    Yes.  It seems to me I was told by someone on that

5   side, whether it was one of the attorneys or Mr. Dechman,

6   that the shareholder derivative suit was  - there wasn t

7   money to handle it and it helped propel the debtor into

8   bankruptcy.

9       **Q    Do you know who the defendants were in the share-**

10  **holder derivative suit?**

11      A    Well, I reviewed your complaint and the  - Mr.

12  Spiva, Mr. Doherty, Molly Hale, I think Jim Dechman.

13          MR. SHAPIRO: I would like to offer the derivative

14  action complaint, Your Honor.  I could testify as to its

15  authenticity, filed in Delaware, Chancery Court.  I don t

16  know if there would be any objection to offering  -

17          MR. McCARTHY: I don t object to it, Your Honor.

18          MR. REYNOLDS: Your Honor, I don t object to the

19  exhibit being offered as a lawsuit that was filed in

20  Delaware; but as to the truth of the statements therein, I

21  would object.

22          THE COURT: Just being offered to show what the

23  contentions are and what s at play?

24          MR. SHAPIRO: Exactly, Your Honor.

25          THE COURT: We will mark it as Bamber s Exhibit B.

Page 19

1                          (Bamber s Exhibit B

2                          was marked for identification.)

3        BY MR. SHAPIRO:

4        Q    I sent you a copy of this complaint some time ago;

5   did I not, Mr. McCarthy?

6        A    Yes.

7        Q    And did you read it at that time?

8        A    I did.

9        Q    And you notice in the caption it says that Equaphor

10  is a nominal defendant?

11       A    Yes.

12       Q    And are you aware that means that no damages or

13  relief was sought from the company itself?

14       A    I m aware of that.

15       Q    Okay.  So, the damages sought in this lawsuit were

16  sought from Mr. Dechman, Mr. Fiore, Monitoring Technology,

17  Kobayashi, Molly Hale, who was a director of the company,

18  correct, and Mr. Doherty and Mr. Spiva, and not from

19  Equaphor; correct?

20       A    That you were not seeking damages from Equaphor, I

21  agree with that.

22       Q    So, when someone told you there was no money to

23  defend the lawsuit, were they saying that Mr. Dechman, Fiore,

24  et cetera, did not have money to defend the lawsuit?

25       A    The bylaws require indemnification of expenses,

Page 20

1    including attorney fees; and as I understand it, that is

2    supposed to be made along the way.  Now, there may be

3    discretion as to whether it can be made along the way but

4    it s a requirement of the bylaws that directors be

5    indemnified against expenses, including attorney fees so long

6    as they re found to be in good faith down the road.

7            I don t have the bylaws in front of me right now

8    but it was arguably a claim that was against the debtor in

9    terms of that.

10       **Q    You testified last week, I think in answer to one**

11   **of my questions, that you didn t obtain books and records of**

12   **the company from Mr. Dechman or Monitoring Technology who**

13   **had them in his  - you believed they were in his offices.**

14   **Did you see the bylaws yourself?**

15       A    Well, yes.  No.  I looked at the bylaws.  Sure.

16       **Q    And how did you obtain a copy of the bylaws?**

17       A    I obtained them from Mr. Dechman.

18       **Q    So, the indemnification right would be a claim**

19   **that directors would have against the company; correct?  It s**

20   **a claim you have?**

21       A    It s certainly a claim, and I d like to have a copy

22   of the bylaws in front of me right now to refresh myself.

23   There at least was something in there that authorized  -

24   well, I don t want to speculate.  It was a claim.  At this

25   point, without them in front of me, I can t tell you that it

Case 10-20490-SSM   Doc 71-1   Filed 06/08/11   Entered 06/08/11 11:41:38   Desc
Exhibit A - Hearing Transcript dated May 2   2011   Page 21 of 172

Page 21

1   is something that had to be paid as expenses were incurred or

2   not.

3       Q     Well, whether it had to be paid or whether it s a

4   discretion of the board, it would be a claim against the

5   company, like a law firm claim or some other claim; right?

6       A     Correct.

7             MR. SHAPIRO: Excuse me, Your Honor.

8             (Pause.)

9             BY MR. SHAPIRO:

10      Q     You testified that you did look at balance sheets

11  of the company; correct?

12      A     Yes.

13      Q     Did you look at income statements?  Did you look

14  at a set of financial statements that would be balance sheet,

15  income statement and cashflow that came together?

16      A     I m not sure that I did look at income and

17  expenses.

18            MR. SHAPIRO: Could I ask the witness to be shown

19  this, Your Honor?

20            THE COURT: We will mark it as Bamber s Exhibit C.

21                         (Bamber s Exhibit C

22                         was marked for identification.)

23            MR. REYNOLDS: Your Honor, just to clarify, is this

24  being moved into evidence at this time?

25            THE COURT: I haven t heard a motion to admit it.

Page 22

1          MR. REYNOLDS: Thank you.

2          BY MR. SHAPIRO:

3     **Q    I m showing you a document that says at the top**

4  **Equaphor Income Statement for the Month Ending November 30,**

5  **2010 and Year to Date.   Have you seen that before?**

6     A    I don t recall having seen this before. It s

7  possible it was attached to something but I don t recall it

8  right now.

9     **Q    Do you have with you in your bag the financial**

10 **statements you obtained?**

11    A    I do.

12         THE WITNESS: Your Honor, I have a Redweld of two

13 folders.  One is entitled,  Documents I Received Before the

14 Compromise.   The other, just to keep it straight in my own

15 mind, is  Documents Received After the Compromise.   If I

16 could have that with me, I might be able to respond better to

17 the questions.

18         MR. SHAPIRO: Maybe there s no objection, Your

19 Honor. I don t know if there s an objection.  I would offer

20 it in evidence.

21         MR. REYNOLDS: Your Honor, if this document is being

22 offered into evidence, we don t know if Mr.  - the question

23 is, has Mr. McCarthy seen this document before?  And he

24 doesn t know.

25         THE COURT: I ll let Mr. McCarthy get his  -

Page 23

1          THE WITNESS: Thank you, Your Honor.

2          MR. SHAPIRO: Well, I would like to offer it whether

3     he s seen it or not, Your Honor, if there s no objection.

4          MR. REYNOLDS: There is an objection on hearsay and

5     there s no foundation for it at this point.

6          MR. SHAPIRO: Okay.  I ll tie it up through another

7     witness or through myself, Your Honor.

8          (Pause.)

9          THE COURT: If you ll give Mr. McCarthy a moment so

10    he can look to see what he has.

11         (Pause.)

12         THE WITNESS: I think I can safely say I haven t

13    seen that before.

14         MR. SHAPIRO: May I question him subject to tying it

15    up later, Your Honor?  I just have one question.

16         THE COURT: Okay.  Go ahead.

17         BY MR. SHAPIRO:

18    **Q    Do you see, Mr. McCarthy, in the list of expenses**

19    **in the bottom half of the page, there s an item,  General**

20    **Legal Expenses,  $158,000 in November 2010 and $803,540 year**

21    **to date?**

22    A    Yes, sir.

23    **Q    Were you aware that the company had spent $803,000**

24    **on legal expenses in 2010?**

25    A    I knew it was hundreds of thousands of dollars.

Page 24

1    I m not sure I knew about the specific figure.

2        Q    All right.  Other than what you ve testified to

3    earlier, did you investigate whether these payments could be

4    recovered as a preference?

5        A    Yes.

6        Q    As you described earlier?

7        A    Yes.

8        Q    Is it your understanding that all of those expenses

9    were for the Carotex litigation?

10       A    I think that s right.

11       Q    And you are aware, are you not, sir, that the sale

12   of the patents to Equaphor is one of the transactions alleged

13   in the derivative complaint to have damaged Equaphor?

14       A    Yes.

15       Q    Now, there was also testimony last week about

16   $249,000 paid to Stein Sperling during the preference period.

17   Do you recall that?

18       A    Yes.

19       Q    And you agree that that s a significant claim of

20   the estate?

21       A    Potentially.

22       Q    Did you look at the Stein Sperling invoices before

23   entering into the agreement with Kobayashi and Dechman?

24       A    They were included in the attorney bills that I

25   looked at.

1    Q    And I believe you testified  - and see if I

2    understand you correctly, that your testimony was that your

3    analysis showed that the new value in ordinary course was a

4    small percentage of the $249,000 and you thought there was a

5    substantial claim against Stein Sperling.

6    A    I did, if all of the other elements of preference

7    were present; yes.

8    Q    And any recovery on a preference claim against them

9    would have brought money into the estate that could have been

10   used to defend the Carotex litigation?

11   A    Yes.

12   Q    Now, under the proposed agreement we re here

13   discussing, all of Equaphor s claims against Carotex and the

14   other plaintiff in that case, ECS, are to be transferred to

15   Kobayashi along with the patents; correct?

16   A    All of Equaphor s claims in what?

17   Q    Against Carotex and ECS, any patent claims that

18   they have.

19   A    Yes.

20   Q    Whether it s against Carotex and ECS in the pending

21   litigation or any other party involved in the patents?  All

22   the claims that Equaphor has are to be transferred to

23   Kobayashi along with the patents; is that right?

24   A    Yes.

25   Q    So, under this agreement, Equaphor is giving up any

1   **claims it has but it remains liable for any damage claims**

2   **that Carotex and ECS have asserted against Equaphor; correct?**

3       A    Yes; I mean, to the extent they can be separated in

4   that fashion.

5       **Q    What do you mean could be separated?**

6       A    Some of the litigation is about whether or not the

7   patents are valid in the first place.

8       **Q    I mean the damage claims, Carotex s claims for**

9   **damages.**

10      A    Yeah, I think that s right. If there is a damage

11  claim, it remained against the estate.

12      **Q    So, Equaphor, the estate, remains a party to that**

13  **litigation with no claims it s asserting but damage claims**

14  **against it will survive?**

15      A    Yes.

16      **Q    And part of the agreement is that Kobayashi will**

17  **pay any legal fees for Equaphor in that litigation?**

18      A    Yes.

19      **Q    And what is your understanding as to who will**

20  **represent Equaphor?  Do you have any understanding?**

21      A    Well, we don t have it in the agreement.  I think

22  the understanding has been Stein Sperling by virtue of its,

23  you know, familiarity with the litigation would handle it.

24      **Q    It would be up to Mr. Dechman and Kobayashi to**

25  **decide who would represent Equaphor?**

Page 27

1    A    And me.

2    Q    And you?  Does the agreement give you a say-so in

3    that?

4    A    Well, it doesn t take it away.

5    Q    Have you evaluated whether there s a conflict of

6    interest in having Equaphor represented by the same law firm

7    that represents Kobayashi and Dechman?

8    A    Right.  We didn t spell out who would be  - I think

9    Stein Sperling  - you know, there would be an issue there

10   because they are representing insiders, as well.  We didn t

11   spell it out in the agreement.  We simply said that the

12   litigation costs have to be handled or paid for by Kobayashi.

13   Q    Do you recall you testified last week  - and I can

14   show you the transcript  - it s at page 17  - that you

15   thought that Kobayashi had reached an agreement with Stein

16   Sperling that it would handle the representation of Equaphor

17   at little or no cost to Kobayashi?

18   A    Yes.  I ve heard that.

19   Q    And who did you hear that from?

20   A    Mr. Dechman.

21   Q    So, they were going to be generous and undertake to

22   be responsible for Equaphor s legal fees but they worked out

23   a deal with Stein Sperling that would cost them little or

24   nothing; correct?

25   A    Well, I think that s an argument.

1    Q    Well, under the agreement, they ve agreed to be

2    responsible for Equaphor s legal fees?

3    A    That is correct.

4    Q    And they ve indicated they ve got an agreement with

5    or an understanding with Stein Sperling that Stein Sperling

6    will charge them little or nothing for representing Equaphor

7    along with or in addition to the representation of Kobayashi

8    and Dechman; correct?

9    A    Yes.

10   Q    Did you inquire why Stein Sperling was willing to

11   do that?

12   A    Well, Stein Sperling  -

13   Q    You can answer that yes or no.  Did you inquire?

14   A    I don t think I inquired; no.

15   Q    Have you discussed the issue of possible conflict

16   of interest with any attorney at Stein Sperling?

17   A    As to that  - I mean, back when I was looking into

18   whether Stein Sperling could pursue the litigation or not,

19   before this deal materialized, I think I looked into whether

20   or not a special counsel could be owed money or not by the

21   estate.  I looked up some case law on that.  I was looking

22   into conflict of interest at least in terms of what would

23   disqualify from the standpoint of the Bankruptcy Code; but

24   again, that was before the deal.

25        If you re asking whether I talked to somebody about

Page 29

1

2   conflict of interest, per se, involving Stein Sperling

3   representing the estate in objecting to the claim of Carotex,

4   the answer is no.

5       **Q    So, you did not have any discussion with a Stein**

6   **Sperling attorney about the conflict of interest question?**

7       A    Did not.

8       **Q    Do you have any of the pleadings?  Did you get any**

9   **of the pleadings in the Carotex litigation?**

10      A    Well, they re in the exhibit book that Mr.  -

11      **Q    Right.  But before you entered into this agreement,**

12  **had you seen any of the pleadings in the Carotex litigation?**

13      A    No.

14      **Q    Did you know what the basis of the damage claim was**

15  **against Equaphor?**

16      A    I had an understanding about that because I talked

17  to Mr. Adams in the courthouse one day about what was the  -

18  you know, how could Carotex which said these patents were

19  worthless  - how could Carotex have affirmative claims

20  against the debtor?

21      **Q    What did you learn about the basis for the claims**

22  **against Equaphor?**

23      A    He mentioned letters that were written by the

24  attorney for Equaphor, by Stein Sperling, and he

25  characterized them as letters to customers of Carotex,

Page 30

1    asserting that there was a patent and they might be

2    infringing upon the patent and said that the business

3    stopped; the business with those customers froze up after

4    those letters were sent.

5        **Q    And he said it was sent by Equaphor s counsel,**

6    **Stein Sperling?**

7        A    Sent by Stein Sperling.  Whether or not they were

8    representing Equaphor at the time, you know  - hmmm.

9        **Q    Do you understand when the letters were sent?**

10       A    It was a couple of years ago.

11       **Q    Before Equaphor acquired the patents.  If you**

12   **could turn to tab six in the exhibit book that Mr. Misken put**

13   **together.  First, let s turn to tab six, if you would.  I m**

14   **sorry.  Never mind.**

15           **If you ll look at page CAR156 in tab six of Mr.**

16   **Misken s exhibit book, and you ll see a letter  -**

17       A    Yes.

18       **Q     - on the letterhead of Stein Sperling, dated**

19   **November 26, 2007?**

20       A    Yes.

21           MR. SHAPIRO: I m sorry.  Could I have just a

22   moment, Your Honor?

23           THE COURT: Yes.

24           MR. SHAPIRO: I apologize, Your Honor.  This is not

25   the letter I was thinking of.

1          BY MR. SHAPIRO:

2      Q     Well, it s your understanding, sir, that the

3   damage claim against Equaphor was based upon letters that

4   Stein Sperling had sent to customers?

5      A     Yes.

6      Q     And is it your belief those letters were sent on

7   behalf of Equaphor?

8      A     Well, I find myself wondering how could Carotex

9   have a claim against Equaphor if the letters were sent before

10  Equaphor acquired the patents; but somehow, I have that

11  understanding.

12     Q     Well, if you look at tab eight of the exhibit book,

13  there s a letter on Stein Sperling letterhead, dated April

14  24, 2008, addressed to a vice president of a company called

15  Pulp and Paper.

16     A     I m sorry.  Where are you?

17     Q     Tab eight.

18     A     Eight.  Yes.  I have seen a letter like this.

19     Q     When did you first see it?

20     A     Well, I think I saw it since our last get-together

21  in court here.

22     Q     You saw it here in this book?

23     A     No.  I was actually sent a copy by Mr. Dechman but

24  the copy I was sent, because it was dated, you know, like

25  April 28

                          th of 2011, because the way Word operates, I

     m sure

                          th of 2011, because the way Word operates, I

m sure

Page 32

1   somebody just printed out a current version of it and Word

2   won t let you print it out with the original date on it.

3       **Q     But Mr. Dechman sent you a copy of this letter**

4   **which is tab eight in the exhibit book?**

5       A    A letter just like this but whether it was to this

6   particular customer or not, I don t know; and now I can

7   answer your question.  Yes, the letter was sent on behalf of

8   Kobayashi.

9       **Q     It begins, this  -**

10          MR. SHAPIRO: Well, may I offer this into evidence,

11   Your Honor?

12          MR. McCARTHY: I don t have any objection, Your

13   Honor.

14          THE COURT: It will be admitted.

15                          (Carotex Exhibit No. 8

16                          was received in evidence.)

17          MR. SHAPIRO: Is that  D,  Your Honor?

18          THE COURT: What?

19          MR. SHAPIRO: Is that  D?

20          THE COURT: Well, it has been marked as Exhibit 8.

21          MR. SHAPIRO: I m sorry.  Excuse me.  Of course.

22          BY MR. SHAPIRO:

23       **Q     And the letter begins,  This law firm represents**

24   **Kobayashi Ventures which is the owner of certain patents,**

25   **et cetera; right?**

Page 33

1    A    Yes.

2    Q    **Do you understand then that the claim against**

3  **Equaphor is based upon letters that Kobayashi s law firm,**

4  **Stein Sperling, sent to customers of Carotex while Kobayashi**

5  **owned the patents?**

6    A    Yeah.

7    Q    **If you d turn to tab three in the exhibit book.**

8         MR. SHAPIRO: I don t believe this has been

9  introduced into evidence, Your Honor.  I would offer it into

10  evidence for not the truth of what s in it but for the

11  allegations.  This is a copy of the document that was filed

12  in the Southern District of New York.

13        THE COURT: It will be admitted for that purpose.

14                              (Carotex Exhibit No. 3

15                              was received in evidence.)

16        BY MR. SHAPIRO:

17   Q    **It s tab three in the exhibit book, Mr. McCarthy.**

18   A    I see it.

19   Q    **Okay.  Did you see this document before you entered**

20  **into the agreement, proposed agreement?**

21   A    No.

22   Q    **If you d look at page four of Exhibit 3.  It s with**

23  **the Bates number CAR20-7.**

24   A    Yes.

25   Q    **And I direct your attention to paragraph 12 which**

1    **alleges  Upon information and belief, Defendant Dechman was**

2    **and is the moving, active, conscious force behind the**

3    **activities of Kobayashi and Equaphor that have damaged**

4    **Carotex and ECS  business as complained of herein.**

5              MR. REYNOLDS: Your Honor, if I may objection.  Mr.

6    McCarthy has already testified that he hasn t seen this

7    document before.  I think the scope of the examination needs

8    to be: What did Mr. McCarthy review prior to accepting the

9    settlement?  I think we are now going beyond the scope of

10   what that examination should be and  -

11             THE COURT: I think he can say that had Mr. McCarthy

12   reviewed it, he would have seen this allegation and it might

13   have affected or might not have affected his determination

14   whether or not to settle.  I ll overrule the objection.

15             THE WITNESS: I see that.

16             MR. SHAPIRO: Your Honor, I can shorten this a

17   little bit.  I ll just call the court s attention to

18   paragraph 13 which alleges on information and belief that

19   Defendant Dechman personally authorized and approved the

20   activities of Kobayashi and Equaphor and that it damaged

21   Carotex and ECS  business as complained of herein and

22   paragraph 17

23             MR. REYNOLDS: Your Honor  -

24             MR. SHAPIRO: I won t read it but I ll just call

25   the court s attention to it.

1          MR. REYNOLDS:  - these aren t questions.

2          MR. SHAPIRO: I m calling the court s attention to

3     something.

4          MR. REYNOLDS: But Your Honor, this has only been

5     admitted into evidence for the purpose of showing that this

6     is the second amended declaratory judgment filed up in New

7     York.

8          THE COURT: You can refer to it in argument.  Let s

9     go on with the examination.

10          MR. SHAPIRO: Thank you, Your Honor.

11          BY MR. SHAPIRO:

12     **Q    Did you explore the possibility of reaching a**

13     **settlement with Carotex, that Equaphor would give up its**

14     **claims against Carotex if Carotex would release its claims**

15     **against Equaphor?**

16     A    Prior to making the deal that I made, I don t think

17     so.  There have been some discussions since our last hearing.

18     **Q    Now, I understand your testimony from last week**

19     **that you were told by Mr. Dechman that the justification for**

20     **the sale of assets to Monitoring Technology and the sale of**

21     **the patents by Kobayashi to Equaphor were related to the sale**

22     **incentive fee?  Do you recall that testimony?**

23     A    Yes.

24     **Q    Have you seen the sale incentive fee provision in**

25     **writing?**

Page 36

```
 1      A    Yes.

 2      Q    And where did you see it?

 3      A    I saw it attached to your opposition.  It was  -

 4      Q    Did you see it  -

 5      A    Go ahead.

 6      Q    Go ahead.  I m sorry.  Go ahead.

 7      A    I ve seen it since our last hearing.  I saw it

 8  attached to your opposition and it was characterized to me

 9  when I had spoke with Mr. Dechman and Mr. Fiore in our

10  lengthy meeting on Friday.

11      Q    You did not see the actual document before you

12  entered into this proposed agreement?

13      A     As far as I could tell, I saw the asset purchase

14  agreement but I didn t see the MSA that contained the sale

15  incentive fee.  I saw the  09 agreement but not the actual

16   07 agreement, Your Honor.

17           MR. SHAPIRO: I would like to offer the Managements

18  Services Agreement, Your Honor, if there is no objection.

19           THE COURT: We will mark it as Bamber Exhibit D.

20                              (Bamber Exhibit D

21                              was marked for identification.)

22           MR. REYNOLDS: Your Honor, he may be able to get

23  this in through another witness but I think Mr. McCarthy has

24  testified that he hasn t seen it.

25           THE COURT: Well, he can show it to Mr. McCarthy and
```

Page 37

1    ask him if he has seen it.

2           THE WITNESS: Well, this is what  - oh, is there a

3    question?

4           BY MR. SHAPIRO:

5      **Q    This is what you ve seen in  -**

6      A    This is what I ve seen that I was referring to

7    earlier; and I don t doubt that this is it, and I don t

8    object to its admission.

9      **Q    And this is dated in October of 2007 or actually**

10   **handwriting  - that may be a different month.  But it was**

11   **entered into in 2007, is your understanding?**

12     A    Yes.

13     **Q    All right.  And I would ask you to turn to para-**

14   **graph eleven on page four.**

15     A    Yes.

16     **Q    Entitled,  Compensation to Soze for sale of MTC?**

17     A    Yes.

18          MR. SHAPIRO: Your Honor, I don t know if there will

19   be an objection but if I could just explain some of the

20   nomenclatures so Your Honor is not totally lost here.

21          THE COURT: No.  Examination is examination.  I ve

22   told lawyers many times, don t interrupt it and explain to me

23   what s going on.  You re not the witness.  That s the

24   witness.

25          BY MR. SHAPIRO:

Page 38

1    Q    Were you aware that the company which is now named

2  Equaphor was previously named Monitoring Technology

3  Corporation or MTC?

4    A    Yes.

5    Q    And that when Mr. Dechman and Mr. Fiore bought the

6  assets, the remaining assets, business assets after the sale

7  to Cognex, that they took the name MTC or Monitoring

8  Technology and gave Monitoring Technology the new name,

9  Equaphor?  Were you aware of that?

10   A    Yes.

11   Q    And what is now known as Monitoring Technology was

12  originally known as  - I m not sure I know how to pronounce

13  it but S-o-z-e.  Correct?

14   A    I m aware of that.

15   Q    And you re aware that Soze was an entity that was

16  created by Mr. Dechman and Mr. Fiore; correct?

17   A    Yes.

18   Q    So, paragraph eleven begins,  In the event of a

19  sale,  and it goes on to describe a formula for calculating

20  what s known as a sale incentive fee; correct?

21   A    Yes.

22   Q    And if you turn over to page five  - I m sorry.  Go

23  back to page four.  In the first line of paragraph eleven it

24  says,  In the event of a Sale,  and you see  Sale  has a

25  capital  S?

Page 39

1        A      Yes.

2          Q      And then it says, parentheses,  as defined below.

3    Correct?

4        A      Yes.

5          Q      And then turning over to page five, further down in

6    paragraph eleven  - I m sorry.  Okay.  About four lines from

7    the end of paragraph eleven, do you see the sentence that

8    reads,  Sale shall mean the sale of all or substantially all

9    of MTC s properties and assets to any person or entity. ?

10       A      Yes.

11         Q      And it s person or entity in the same  - correct?

12   And you would agree that the sale to Cognex was not a sale of

13   all or substantially all of the assets of MTC; wouldn t you?

14       A      Yes.

15            MR. SHAPIRO: I have no other questions, Your Honor.

16            THE COURT: I have only one question, Mr. McCarthy.

17   Under the asset purchase agreement, it s providing that the

18   sale of the patents would be free and clear of all licenses

19   which I assume would include the license to Carotex.  The

20   question I have is, is that the intent and if so what is the

21   legal authority to sell free and clear of Section 365(N)

22   rights?

23            THE WITNESS: I don t think that was the intent.

24   For example, there are three paid-up licenses; and I think I

25   said in my opening statement that if the court does approve

Page 40

1   the deal that I m going to submit a revised order to the

2   court that clarifies.  Honeywell is in there and PaperTech is

3   in there.  I don t think there was any intent to prejudice

4   any license rights.

5         Now, you know, there s so much in there about we

6   have the right to pursue, you know, the litigation against

7   Carotex; but I don t know that it occurred to anybody that,

8   you know, we were undermining that by saying, free and clear

9   of any licenses that Carotex might have because that s kind

10  of part and parcel of the litigation.

11        THE COURT: Well, I guess that was the question,

12  whether that was an attempt to in effect short-circuit the

13  litigation by pulling the rug out under Carotex.

14        THE WITNESS: That would not be my understanding.

15        THE COURT: Okay.

16        MR. McCARTHY: Your Honor, could I do some redirect

17  of myself?

18        THE COURT: Yes, you may.

19                    REDIRECT TESTIMONY

20        MR. McCARTHY: There have been many questions about

21  what did I review, and I would like to offer this into

22  evidence.

23        THE COURT: The court security officer will take it.

24  We ll mark it.

25        MR. McCARTHY: Well, I actually marked it.  I guess

Page 41

1    we need to call it Trustee s Exhibit A.

2          THE COURT: Right.  We will call it Trustee s

3    Exhibit A.

4                          (Trustee s Exhibit A

5                          was marked for identification.)

6          MR. McCARTHY: What this is is simply covering e-

7    mails that I assembled over the weekend to refresh myself on

8    what all I had looked at, and that s why I developed the

9    Redweld I mentioned earlier.  I actually have the documents

10   here in Redweld.

11         So, I looked at everything that is mentioned here,

12   Equaphor payables during the last 90 days; the Whiteford

13   invoice; Aronson invoice; some Cognex invoices, as well;

14   Kobayashi, LeClair Ryan, Lindeman and Stein Sperling

15   invoices.  I looked at the promissory note that Kobayashi

16   took back from the debtor after the  09 agreement for

17   $500,000 and the two balance sheets  - remember I mentioned

18   10/31/09 and 9/26/09.  Those were attachments to this

19   February 15

                          th e-mail from Steve Ramsdell.

20         There are additional documents he also sent me on

21   February 15

                          th.  This is mostly the transfers.
     There was a

22   spreadsheet that had who got what and when during the year

23   prior to the bankruptcy.  This is what I looked at when I was

24   going through whether I thought there was a solid preference

25   claim or not against different entities; and I went through

Page 42

1   that on the phone with  - and I think Mr. Dechman and Molly

2   Hale, the controller, may have been in on that conversation,

3   at least on the conversation or he was talking to her while I

4   was talking to him.

5           And then the bylaws, and I looked at the bylaws on

6   March 9th.  This is from Dechman to me, telling me where to

7   look for the indemnification provisions, and I did look at

8   those.  That formed the basis of my understanding.

9           Also, the question has been raised about the

10  Carotex claim.  The court can take judicial notice.  There s

11  a four-million-dollar claim filed by Carotex on Friday, the

12  29th; also one filed by ECS.  I kind of think they re the same

13  thing.  I don t know if they meant eight million or four

14  million; but whatever, they are big claims.

15          I have received snippets of skepticism towards

16  Carotex s claims against the debtor in conversations with

17  both Mr. Dechman and a conversation I had with Jeff Schwaber,

18  the main litigation counsel for Equaphor in the Carotex

19  suits.

20          Over the weekend, Mr. Dechman sent to me  - and I

21  have it in my bag but it s a transcript of a hearing from the

22  District Court in which  - I think it s a partial summary

23  judgment ruling, you know, and I just looked very quickly at

24  it.  Mr. Dechman sent me an e-mail, an excerpt from it in

25  which the judge said something like: Writing letters and

Page 43

1    asserting that there is a patent infringement as a basis for

2    a claim against the writer of the letter is kind of something

3    new, beyond ordinary patent misuse litigation.  She seemed

4    very skeptical of the claim; and I would say, you know, I

5    didn t have that in my head when I made this deal but there

6    were questions raised about Carotex s claims against the

7    debtor.

8           I remember wondering, gee, is writing  - I mean,

9    you know, in other areas of the law, if you think you have a

10   claim you have a right to assert it without necessarily

11   triggering a tort.  I remember thinking that that might not

12   be a good claim.  But what do I know?  And then, you know,

13   that s just my intuitive general lawyer sense, plus Mr.

14   Schwaber having expressed some skepticism about Carotex s

15   position overall and then this Federal District judge saying

16   the same kind of thing makes me think those aren t good

17   claims, at least on the merits.

18          So, that concludes my redirect.

19          MR. SHAPIRO: I have a couple of follow-up

20   questions, if I may, Your Honor.

21          THE COURT: Certainly.

22          MR. McCARTHY: Could I move this into evidence, Your

23   Honor?

24          THE COURT: I ll admit Trustee s Exhibit A.

25                            (Trustee s Exhibit A

Page 44

1                                    was received in evidence.)

2                        RECROSS EXAMINATION

3          BY MR. SHAPIRO:

4      Q    First, just one or two questions about Exhibit A

5  or Trustee s Exhibit A.  In the second e-mail on the first

6  page, the February 1, 2011 e-mail, and the fourth line, it

7  refers to  I also understand that principals of my client

8  will be in touch with you through Jim Reynolds.   Did you

9  understand that to refer to Mr. Dechman and Mr. Fiore as

10 principals of Equaphor?

11     A    I m sorry.  Where are you?

12     Q    The fourth line in the February 1 e-mail, on the

13 first page of Trustee s Exhibit A.  There s an e-mail from

14 Mr. Ramsdell who is bankruptcy counsel for Equaphor; correct?

15     A    Yes.

16     Q    And it refers to  principals of my client will be

17 in touch with you through Jim Reynolds.   Is it your

18 understanding he was referring to Mr. Dechman and Mr. Fiore

19 as the principals?

20     A    Oh, yes.

21     Q    And then on the next page, Mr. Ramsdell gives

22 contact information for Molly Hale, controller, Monitoring

23 Technology?

24     A    Yes.

25     Q    And you re aware that Molly Hale is an employee of

1   **Mr. Dechman and Mr. Fiore at Monitoring Technology?**

2       A    Yes.  I am.

3       **Q    And you are aware that she was one of the directors**

4   **who voted to put the company into bankruptcy?**

5       A    Yes.

6       **Q    And she was one of the directors who voted in**

7   **favor of the asset purchase agreement with what was then**

8   **Soze, what is now Monitoring Technology, and the patent**

9   **purchase agreement between Kobayashi and Equaphor?**

10      A    Yes.

11      **Q    Do you have the bylaws with you that you examined?**

12      A    I do.

13           MR. SHAPIRO: May I see them, Your Honor?

14           THE COURT: After Mr. McCarthy locates them.

15           THE WITNESS: I have them here.  It has a work

16   product note on it but I don t mind exposing that to the

17   court.

18           (Document handed to Mr. Shapiro.)

19           MR. SHAPIRO: If I could have just a moment, Your

20   Honor.

21           THE WITNESS: I think I may have marked the

22   pertinent part there, Mr. Shapiro, with a post-it.

23           MR. SHAPIRO: Thank you.

24           (Pause.)

25           MR. SHAPIRO: I would like to offer this into

Page 46

1   evidence, Your Honor.

2            MR. McCARTHY: No objection.

3            MR. REYNOLDS: No objection.

4            THE COURT: We will mark it as Bamber s Exhibit E.

5                          (Bamber s Exhibit E

6                          was marked for identification.)

7            BY MR. SHAPIRO:

8       **Q      The work product note, is that just the note on**

9   **the first page or are there other notes in here?**

10      A      No.  That s it.

11           MR. SHAPIRO: Okay.  Thank you. I have no other

12  questions.

13           THE COURT: We ll put it on the witness stand but

14  don t run away with it, Mr. McCarthy; but we will make a copy

15  for you after the hearing. Anything further?  Thank you for

16  testifying.  You may stand down.

17           MR. McCARTHY: Thank you, Your Honor.

18           Your Honor, shall I leave all of the exhibits?

19           THE COURT: All of the exhibits there.  Yes, please.

20           Did you have any witnesses you wish to call, Mr.

21  McCarthy?

22           MR. McCARTHY: I do, Your Honor.  I would like to

23  call Mr. Dechman and also one of the directors, Mr. Doherty.

24           THE COURT: Okay.  Mr. Dechman, if you will please

25  stand in front of the clerk and be sworn.

Page 47

1    Whereupon,

2                          JAMES DECHMAN

3    was called as a witness and, having been first duly sworn,

4    was examined and testified as follows:

5                       DIRECT EXAMINATION

6           BY MR. McCARTHY:

7       Q    **Mr. Dechman, would you state your name and address,**

8    **please?**

9       A    James Dechman, 3189 Mary Etta Lane, Oak Hill,

10   Virginia.

11      Q    **What is your position with Equaphor?**

12      A    President and CEO.

13      Q    **And what is your position with Kobayashi?**

14      A    Managing member.

15      Q    **And what is your position with Monitoring**

16   **Technology, LLC?**

17      A    Managing member.

18      Q    **Could you please describe for the court the 2007**

19   **transactions between Equaphor and Monitoring Technology, LLC?**

20      A    In 2007, there were three transactions.  The first

21   was a Management Services Agreement between Equaphor and

22   Monitoring Technology, LLC; and there was a patent waiver

23   agreement between Equaphor and Kobayashi Ventures, and there

24   were purchases of  F  shares from individual shareholders by

25   Monitoring Technology, LLC.

1     **Q     Would you tell the court how the debtor or how you**

2     **paid the debtor for the patent waiver and, you know, the**

3     **other transactions?  How did the money go back and forth and**

4     **what were the terms going on in that connection?**

5     A     Again, this was in 2007.  Just a quick backdrop.

6     There were three board members, J.B. Doherty, Ed Spiva and

7     John Evans, and the three of them represented venture capital

8     firms that owned 76 percent of Equaphor.  They had made their

9     investments at least back in 1996.  So, they had been

10    involved with the company for the last eleven years in a

11    controlling situation on the board.

12            And in 2007, we had just finished a lawsuit with a

13    company called ABB and  -

14            THE COURT: Called what?

15            THE WITNESS: Sorry.  ABB.

16            THE COURT: ABB.  Okay.

17            THE WITNESS: ABB.  And in that lawsuit  - as a

18    result of a settlement in that lawsuit and as a result of a

19    compensation package that the board had approved for John

20    Fiore and myself back in  - I think the compensation package

21    was put in place in 2004 and it continued.

22            So, as the basis of that compensation package, we

23    were due a bonus of two and a half million dollars at the end

24    of 2006; and so, the board in 2007 was negotiating to come up

25    with a structure where it could retain John Fiore and myself

1  to manage Equaphor and to help prepare for a sale of the

2  company.

3        So, with the details of the Management Services

4  Agreement was a three-year management contract at a million

5  dollars a year that John Fiore and myself would share and a

6  sales incentive fee, that if we were able to sell the company

7  we would be compensated at a  - for a sales commission over

8  the investor premium plus the book value of the assets less

9  liabilities.

10        So, there s the sales commission fee and then the

11  patent waiver agreement.  Equaphor was agreeing to allow

12  Kobayashi to pursue and try to acquire patents that

13  International Paper owned and that Equaphor had been a

14  licensee of, and Equaphor had accrued liability for those

15  patents, licensing fees.  And Equaphor had a desire to try

16  to have the market be more level.  Some competitors weren t

17  paying their license fees and some were.

18        And on the third piece, the share purchase piece,

19  they were working to try to get management to be aligned with

20  shareholders.  So, for $1.8 million we purchased individual

21  shares from individual  F  shareholders.  As a result of

22  those purchases, Monitoring Technology, LLC ended up owning

23  43.5 percent of the Series F shares.  So, roughly 88 percent

24  of the Series F shareholders agreed to sell their shares to

25  us for the 1.8 million.

Page 50

1       **Q      What happened to the $2.5 million in bonuses as**

2   **part of this?**

3       A    It was never paid; and so, it was kind of bundled

4   into these other agreements.

5       **Q      And what would happen if you hadn t been able to**

6   **sell any of its services agreement  - what would happen if**

7   **you weren t able to sell the business in three years?**

8       A    Right.  So, yeah.  It s another provision in the

9   MSA.  If we were unable to sell within the three years, we

10  had to manage Equaphor for free for years four and five.  So,

11  I mean, the bottom line was a, you know, for the board  - and

12  again, Mr. Doherty or Mr. Spiva can testify if needed on

13  that.

14          But I think the desire in 2007 was to retain

15  management, avoid the $2.5 million of cash outflow which

16  would have put Equaphor in a difficult financial position

17  with no management and to have management invest in the

18  company and to encourage Kobayashi to purchase the patents

19  and try to level the playing field out in the market.

20      **Q      All right.  Did you discuss all of this with me**

21  **prior to our entering into the deal that s before the court**

22  **now?**

23      A    Absolutely.  Yes.

24      **Q      And do you recall what documents you provided to**

25  **me?**

Page 51

1      A    Well, for the 2007 transactions, uh  -

2      Q    **Well, let me withdraw that question.  I ll withdraw**

3   **that question.**

4           **And was the board represented by counsel in  07**

5   **when these three agreements that you mentioned were entered**

6   **into?**

7      A    Yes.  The negotiation for these agreements lasted

8   just over nine months.  So, it took quite a bit of time;

9   and George Lawler of Whiteford Taylor represented Equaphor.

10     Q    **All right.  And did you discuss that point with me**

11  **prior to our entering into the agreement?**

12     A    Yes.

13     Q    **And who all was on the board of directors at that**

14  **time?**

15     A    Mr. J.B. Doherty, Ed Spiva and John Evans.

16     Q    **And what was the vote in connection with the  07**

17  **agreements?**

18     A    It was unanimous support.

19     Q    **And were those directors independent of management**

20  **at that time?**

21     A    Yes.

22     Q    **Did you discuss that point with me prior to our**

23  **entering into the agreement?**

24     A    Yes.

25     Q    **Would you please describe for the court the  09**

1    **transactions involving the debtor, Cognex and Monitoring**

2    **Technology, LLC?**

3        A    Sure.  So, in September and October of 2009, the

4    different agreements were a sale of Equaphor s Smart Advisor

5    video operating business to Cognex Corporation, a sale of

6    the Hindsight and Smart Advisor vibration operating business

7    to Monitoring Technology, LLC and a purchase by Equaphor of

8    patents that Kobayashi Ventures owned.

9        **Q    And how did the money go back and forth in**

10   **connection with those deals?**

11       A    The Cognex agreement was for $5 million for the

12   Smart Advisor video operating business, some inventory, work

13   in process parts, and that was for $5 million; 4.5 million

14   paid up front and 500,000 to be held in escrow for 12 months.

15       The purchase by Monitoring Technology, LLC was for

16   1.5 or 1.6 million for the Hindsight video business and Smart

17   Advisor vibration business, for remaining accounts

18   receivables, remaining inventory, remaining accounts payables

19   and remaining service contract liabilities.  I m sure I m

20   leaving off some assets and liabilities.

21       And then the patent purchase was for $3.45 million,

22   2.95 million to be paid in cash and 500,000 to be paid in the

23   form of a note that was due in three years.

24       **Q    And what role, if any, did a non-compete agreement**

25   **play in connection with the Cognex transaction?**

Case 10-20490-SSM    Doc 71-1    Filed 06/08/11    Entered 06/08/11 11:41:38    Desc
Exhibit A - Hearing Transcript dated May 2   2011    Page 53 of 172

Page 53

1      A      Exactly.  So, you know, again in  - so, in 2009,

2   there were five directors on the board; and so, again, Mr.

3   Doherty and Mr. Spiva, Mr. Evans were still on the board  -

4          MR. SHAPIRO: Objection, Judge.  Non-responsive.

5   The question was about a non-compete.

6          THE COURT: I think he s trying to lay the

7   background for it.  I ll overrule the objection.

8          BY MR. McCARTHY:

9      **Q      Continue.**

10     A      Okay.  So, there were five directors.  So, Mr.

11  Doherty, Mr. Spiva, Mr. Evans and Miss Hale and Mr. Sumner

12  Kaufman were on the board; and obviously, the three directors

13  that originally entered into the Management Services

14  Agreement were still on the board and still in control at

15  that point.

16          As has been talked about here, the Management

17  Services Agreement has language in it that deals with a

18  sales incentive fee and a requirement to sell the company if

19  the company sells substantially all of its assets.

20          So, leading up to this, the events in  09  - in

21  September  09 the board had been meeting for about nine

22  months, reviewing different proposed deals and updates on

23  Cognex and doing some pretty detailed minutes on how

24  different deals would work and how they would fit with the

25  MSA and even spreadsheets and models showing how money would

Page 54

1    be handed to the  - or available to the shareholders for

2    dividends.

3              So, there was a whole structure in place using the

4    MSA of what  - what the sales incentive fee payment would be

5    and what the  - remaining payments due and the Management

6    Services Agreement.

7              So, I m getting back to the non-compete because

8    what ended up happening is, the deal always happens a little

9    different than you expect and Cognex required a pretty

10   substantial non-compete from John Fiore and myself, a

11   personal non-compete for five years and $250,000 per incident

12   personally, separate from any non-compete required by

13   Equaphor.

14             THE COURT: I m sorry.  I missed what the 250,000

15   was for.

16             THE WITNESS: Sure.  Cognex  - and Cognex is a

17   billion-dollar company.  They re not as big as General

18   Electric but they re fairly big.  Their CEO and founder

19   actually got involved in this non-compete requirement and he

20   actually wrote the language for it and it requires John Fiore

21   and I to pledge $250,000 personally per incident if we were

22   to compete with the provision that again he wrote and there s

23   language about what businesses were not allowed to

24   participate in or compete with Cognex in.

25             And Equaphor has a non-compete provision, too, as

1    the company, but they wanted it specifically from John Fiore

2    and myself, as well.

3         Prior to these deals, there were no agreements

4    between us and Equaphor or the board to not compete in a

5    certain area for five years.  So, it was a new requirement.

6         And so, when we were involved in the September

7    negotiations, we ended up doing a deal that used the

8    Management Services Agreement as some framework but we ended

9    up restructuring the deal to have Equaphor purchase the

10   patents from Kobayashi; and by paying 3.45 million for the

11   patents, it  - Monitoring Technology, LLC would waive some of

12   the fees that were due in the MSA.

13        So, for the board, they could have stayed more with

14   the MSA, more consistent with the minutes that they had

15   worked on over the summer and if they had done that they

16   would have paid a million dollars for the third year for the

17   management service contract.  They would have paid $900,000

18   for the  - 950,000 I think it was for the licensing fee to

19   Kobayashi and they would have paid a million and a half for

20   the sales commission fee based on the calculation which

21   ended up totaling 3.45 million.

22        So, instead of going that route, they accepted a

23   deal where they would purchase the patents for the same

24   amount and get to keep 500,000 in the company to help give

25   the company money to enforce the patents and keep upside if

Page 56

1   they were able to successfully enforce the patents and get

2   these non-competes from John Fiore and myself, as well.

3        **Q      And did you discuss all of that with me prior to**

4   **entering into our compromise and sales agreement?**

5        A    Yes.

6        **Q      And what was the reason for the timing of the  09**

7   **transactions?**

8        A    Yes.  Cognex was a friendly party in the

9   transactions but they were a little scary because they were

10  big.  So, we had started talking to Cognex about a year

11  before and made good progress for a couple of months and they

12  were looking at buying the whole company at that point and

13  then kind of after three months they just went totally silent

14  and couldn t understand what was going on.

15       Then they came back and said that they weren t

16  interested.  So, then things settled for a couple of months

17  and then we went back and talked to them again about just

18  selling the Smart Advisor video portion and they seemed

19  interested again and so we started working through that deal.

20       Again, you know, the board is controlled by venture

21  capitalists.  So, we had board minutes and the board approved

22  for John Fiore and I to have discussions with Cognex and we

23  were continuing to work with them and they had told us near

24  the end of this deal that it was time to either get the deal

25  done or not and that they had a big trade show coming up and

Page 57

1    they had a competitor that had a product that was   - they

2    were buying our product to integrate it with one of their

3    products so that they had an integrated solution in the

4    market and one of their competitors had a similar product

5    already.

6           They were putting a lot of pressure on us to get

7    the deal done.  They knew we had a board meeting coming up

8    and they expected to get closure on the deal from our side.

9    And so, they were putting quite a bit of time pressure and

10   they were basically threatening to  - that they could do a

11   deal with somebody else similar to us that had a similar

12   product that they could integrate.  So, we were pushing hard

13   to close the deal and get it done.

14       **Q    Now, it ended up that Equaphor ended up paying**

15   **apparently 800-and-some thousand dollars of attorney fees,**

16   **0-10?**

17       A    2010.  Yes.

18       **Q    When the deal was made in  09 whereby the patents**

19   **were acquired by Equaphor, what was the expectation of how**

20   **the litigation with Carotex would play out at that time?**

21       A    Well, I mean, that s a  - it s a great question.

22   I mean, again, Carotex - you know, Carotex entered into a

23   licensing agreement on these patents in I think it was 2000

24   or 1999 and had made some payments and then had stopped

25   making payments, and they had filed suit against Kobayashi

Page 58

1   in a declaratory judgment and their initial claim was that

2   PaperTech, another company in this market, was not paying

3   anything and therefore Carotex shouldn t have to pay

4   anything.

5          And so, our hope around the timing of the

6   September, October,  09 transactions was that PaperTech was

7   getting very close to a settlement and we thought, gee, if we

8   could get PaperTech to settle then maybe Carotex would

9   settle, and if we could get both of them to settle then we

10   could use some money to go after the other four or five

11   competitors in the market.

12          It s not a huge market but there s, you know, five

13   or six players in the market that were all using  - we

14   believed using the technology and the patents and not paying

15   royalties.

16          So, we thought if we could get PaperTech to fall

17   then Carotex would do an agreement along  - again, we already

18   had Honeywell and Cognex ended up getting a license, too, as

19   part of their deal.  So, that had been our hope.

20          And so, we left 500,000 in Equaphor.  We were

21   hoping that would be enough seed money to steer through that;

22   and as it turned out, that was not the case.  As you

23   mentioned, the legal fees were gigantic and there s this

24   whole  - and again, I m a mechanical engineer.  So, I don t

25   follow a lot of the patent stuff but it s a  - the Markman

Page 59

1   hearing on these patents is a complicated and very expensive

2   proposition.

3          What happened in 2010 is that after a couple of

4   years of kind of start-and-stop litigation with Carotex in

5   New York, the court got focused and got everybody on a

6   Markman schedule; and you know, when you re on that schedule,

7   it drives a certain level of costs.

8          So, out of the 800,000 spent in 2010, I  - I mean,

9   some of the money was clearly  - you know, the derivative

10  suit was filed in the summer of 2010; and again, Equaphor had

11  counsel and they reviewed the derivative suit and directors

12  and officers submitted personal agreements where we pledged

13  to pay back any money if the indemnification claims were

14  deemed invalid later.

15         At that time, Equaphor could  - and again, based on

16  the board vote, Equaphor began to reimburse legal fees

17  related to the derivative suit, too.  So, of that 800,000 I

18  would guess  - you know, I mean certainly some portion was

19  used for defending the directors and officers in that suit.

20     Q    **With respect to Cognex pressuring you to get a**

21  **deal done, is that something that you discussed with me prior**

22  **to our own agreement?**

23     A    Yes.

24     Q    **After the money came into the company from the**

25  **Cognex deal was there a liquidating dividend out to the**

Page 60

1    **Series F shareholders at that time?**

2      A    Yes.  Exactly.  Very soon after the deal.  I think

3    within a week, the board  - again, and I left that off there.

4    So, just stepping back briefly, on the deals that were done

5    in September, October, there were five directors.  Three were

6    the original venture capital directors.  One was Molly Hale

7    and one was Sumner Kaufman.  Of those voting, three voted for

8

9    and Mr. Evans abstained and Mr. Kaufman voted against.

10           The liquidating dividend, the 5.2-million-dollar

11   liquidating dividend that was then approved  - actually it

12   was unanimously approved by everyone on the board and it was

13   paid out just following the transactions in early October.

14     **Q    What were conditions like in Equaphor s industry**

15   **when the  09 transactions were approved?**

16     A    I mean, that was a dark time in the industrial

17   market.  So, you know, to go back in perspective, you know,

18   industrial customers were our customers.  You typically work

19   off of a backlog; and so, you know, somebody in a factory

20   buys some equipment and they have to get capital approved and

21   then they have to go through a process to actually spend that

22   capital and the manufacturer takes time to produce.  I mean,

23   you re not selling shampoo.  You re actually selling, you

24   know, a large capital asset.  And so, you work off a backlog.

25           With the financial meltdown factories started to

1   not spend; and so, we saw revenues - we saw orders - excuse

2   me - orders drop significantly over the 12-month period.  We

3   were happy to be able to get a deal done during those times.

4        **Q    All right.  Had you been able to sell the company**

5   **for more or to a third party for more than what you ended up**

6   **selling the various parts of the company for under these**

7   **deals you ve described in  09?  Under the MSA, how would that**

8   **have been affected?**

9        A    Exactly.  So, again, a lot has been talked about in

10  this sales incentive fee and whether it was capped or how it

11  actually worked.  The way that fee worked is that  - the key

12  piece in there or one of the key pieces in there is the

13  investor s premium and investor s premium was based on a

14  multiple of free cashflow, basically the net income of the

15  enterprise for the prior 12-month period.

16       And so, if the company kept growing a lot and

17  making a lot of profit then the investor premium would keep

18  getting higher over time.

19       The sales incentive fee was capped on the specific

20  day, basically, that the deal was done because it looked at

21  the free cashflow for the 12 months prior and calculated the

22  investor premium.

23       So, you know, on the time that the transaction

24  actually occurred with Cognex, if somebody else had offered

25  substantially more money then the free cashflow would have

Page 62

1   still been the same and the investor premium would have still

2   been the same.  And so, the sales commission fee would have

3   gotten bigger, dollar per dollar, of anybody else paying

4   anything more; and all of this had been reviewed quite a bit

5   in board minutes with speadsheets and models.

6          It was pretty clear to all the directors of how

7   this work; and again, the three  - I guess my bottom-line

8   point is, the three venture capitalists that had all been

9   invested in the company since 1996 and approved the MSA, who

10  were 76-percent shareholders and controlled the board at all

11  times, they all agreed to all of these deals.  They were all

12  in writing and they still agree with all these deals.  So,

13  they understood.

14         So, stepping back again, if the deal was for more

15  money, it would have just increase the sales incentive fee.

16     **Q    All right.  Did you discuss that point with me**

17  **priori to our agreement?**

18     A    Yes.

19     **Q    Okay.  Who owned the majority of Series F stock**

20  **back in  07?**

21     A    Prior to Monitoring Technology purchasing 43.5

22  percent, the three venture capital groups owned together

23  76 percent of Series F and Series E actually.

24     **Q    What did they end up doing with their stock?**

25     A    In the fall of 2007, they sold just under half of

1   their holdings to Monitoring Technology, LLC along with I

2   think another ten or 15 investors sold a part of their

3   holdings to Monitoring Technology, LLC, and then they kept

4   their remaining shares.  So, they sold off just under half of

5   their shares in 2007 to Monitoring Technology, LLC.

6        **Q    What about in  09?**

7        A    And in  09, they still had their shares, same

8   number of shares.  So, at that point, they would have had

9   39 percent of the company.  So, in  09, they would have had

10  39 percent of  F.   Monitoring Technology, LLC would have

11  had 43.5 percent and then the other, you know, 18 percent

12  would be the other shareholders.

13       **Q    Did they sell shares after  09?**

14       A    They did.  They held their shares for the 5.2-

15  million-dollar distribution and then they received  - they

16  received their money along with all the other shareholders.

17  It went through the liquidation dividend and then the three

18  V-Cs sold their remaining shares to us beginning in December

19  2009 and through I think around May 2010.

20       **Q    All right.  And if the court approves this deal,**

21  **how will the Series F shareholders who didn t sell to you**

22  **fare compared to those who did sell?**

23       A    So, I mean, it s all pretty interesting.  So, if

24  you  - as the majority holders, when they sold their shares

25  to us in  07 for the $1.8 million, that was actually lower

Page 64

1   than what the company ended up selling for, if you follow my

2   point.

3          So, they  - you know, those shareholders that sold

4   to Monitoring Technology, LLC in 2007 received 1.8 million

5   divided by the number of shares and the enterprise later on

6   ended up being worth, you know, as cashflow and dividends,

7   et cetera, around $8 million. So, they, you know, sold their

8   piece of their shares for less than what it ended up selling

9   for.

10          So, as the bottom line, an  F  shareholder who

11   decided not to sell us their shares in  07 and who kept their

12   shares actually made more per share on their investment

13   than any of the majority shareholders because the majority

14   shareholders sold their shares in  07 for less money than

15   the company ended up being worth in  09.

16          Now, some of those  F  shareholders still have not

17   sold their shares. So, they still  - there s 16.5 percent

18   that still own their  F  shares and we  - as part of the

19   offer, we made an offer to purchase their remaining shares

20   for a hundred thousand which is 50 percent more than what

21   the, say, venture capitalists were paid for their remaining

22   shares, as an example.  So, again, they would make more per

23   share than the venture capitalists made.

24      **Q    All right.  Did you discuss that aspect of the**

25   **deal with me prior to our making the agreement?**

Page 65

1      A    Yes.

2           MR. McCARTHY: Okay. I don t have any more

3    questions, Your Honor.

4           THE COURT: Okay.

5                     CROSS EXAMINATION

6           BY MR. MISKEN:

7      Q    **Good afternoon, Mr. Dechman.**

8      A    Good afternoon.

9      Q    **At the time that the patents were sold to**

10   **Equaphor, you were a member of Kobayashi Ventures, LLC;**

11   **correct?**

12     A    Yes.

13     Q    **And I believe you testified you were the managing**

14   **member?**

15     A    Yes.

16     Q    **And who were the other members of Kobayashi**

17   **Ventures at that time?**

18     A    Just John Fiore.

19     Q    **Did you guys have separate ownership percentages or**

20   **how was it broken out?**

21     A    We each owned half.

22     Q    **Has that ownership structure changed since the sale**

23   **of the patents to Equaphor?**

24     A    No.

25     Q    **And at the time the patents were sold to Equaphor,**

Page 66

1    you were a member of Monitoring Technology, LLC?

2        A    Yes.

3        Q    And were you also the managing member of Monitoring

4    Technology?

5        A    LLC; yes.

6        Q    LLC.  And who were the other members of Monitoring

7    Technology, LLC?

8        A    John Fiore and Steve Book.

9        Q    And what were your membership percentages?

10       A    What they currently are are I own 40 percent; John

11   Fiore owns 40 percent, and Steve Book owns 20 percent.

12       Q    And was that the same percentages at the time the

13   patents were sold to Equaphor?

14       A    I m not sure.  Steve originally bought in for less

15   and then increased his share later.  I m not sure about the

16   timing.

17       Q    Kobayashi has offered to purchase the Equaphor s

18   patents from the bankruptcy estate; correct?

19       A    Yes.

20       Q    And Kobayashi purchased the patents in October

21   2007?

22       A    On or about there from International Paper; yes.

23       Q    Did they buy it from International Paper or did

24   they purchase them from Jacklin Associates?

25       A    Right.  Correct.  Yes.  They purchased them from

Case 10-20490-SSM   Doc 71-1   Filed 06/08/11   Entered 06/08/11 11:41:38   Desc
Exhibit A - Hearing Transcript dated May 2, 2011   Page 67 of 172

Page 67

 1   Jacklin Associates.

 2       **Q      And Jacklin Associates was the entity that**

 3   **purchased them from International Paper?**

 4       A     Yes; and then Kobayashi had an agreement with

 5   Jacklin for an immediate transfer to Kobayashi as part of

 6   the purchase.

 7       **Q      Were you a shareholder of Jacklin Associates?**

 8       A     No.

 9       **Q      Were you an officer in Jacklin Associates?  Any**

10   **relationship with Jacklin Associates at all?**

11       A     No.  No.

12       **Q      Any of the other members of Kobayashi have any**

13   **relationship with Jacklin Associates?**

14       A     No.

15       **Q      Jacklin Associates was formed for the expressed**

16   **purpose of acquiring the patents; is that correct?**

17       A     No.

18       **Q      So, why did Jacklin Associates acquire the patents**

19   **then?**

20       A     They were paid a  - I think it was a 5,000-dollar

21   fee to help with the transaction.  It might have been 10,000;

22   five or ten thousand.

23       **Q      Is it your position that Kobayashi could have**

24   **purchased the patents directly?**

25       A     From?

Page 68

1    Q    From International Paper.

2    A    I m sure that they could have.  I imagine.  Yes.

3    Q    Why was this transaction set up to have Jacklin

4  Associates purchase the patents?

5    A    We were trying  - International Paper was  -

6  Equaphor had tried to purchase the patents or get a paid-up

7  licensing fee from International Paper several times over the

8  years; at least two or three times.  We even hired one of the

9  ex-International-Paper employees to help broker a deal and

10  each time it had failed.  And again, International Paper is a

11  gigantic company.  So, it s a little hard to figure out

12  exactly why it failed but certainly being a licensee and

13  having that relationship made it more complicated and,

14  frankly, we were concerned about, you know, International

15  Paper focusing on Equaphor and requiring Equaphor to, you

16  know pay up on its royalties that it had been accruing.

17         And so, we thought it would be valuable to have an

18  intermediary company work to purchase the patents, and

19  International Paper was focused on some divestitures at the

20  time and it seemed interesting to have  - you know, to kind

21  of go about it as just a patent purchase which ended up being

22  successful at the time.  Of course, we didn t know it would

23  be successful but it ended up being good strategy.

24    Q    And then in I believe it was December 2007 or

25  October 2007 Kobayashi purchased the patents from Jacklin or

Page 69

1   **how did that transaction  -**

2       A     There was an agreement between Kobayashi and

3   Jacklin where Jacklin would attempt to purchase the patents

4   from International Paper and then the portfolio would be

5   transferred immediately to Kobayashi and Jacklin be paid a

6   finder s fee.

7       **Q     How much did Jacklin purchase the patents for from**

8   **International Paper?**

9       A     It was a long agreement and the immediate cashflow

10  was 75,000, to my memory, and then there was  - what  - what

11  International Paper wanted was to have someone buy the

12  patents and enforce them which it knew would be expensive to

13  enforce them but if the enforcement went well then

14  International Paper would share in the proceeds.  They didn t

15  want to sell something and, you know, we ended up enforcing

16  and making a lot of money and then they would look funny.

17          So, the deal ended up being 75,000.  I believe that

18  was the number up front and then 50 percent of the net

19  proceeds of whatever was collected and then there were

20  minimum payments each year regardless of what was collected

21  of I think 25,000, and I think those minimum payments  - the

22  minimums I think added up to 125,000.  I probably need to

23  look at the agreement before I go too far.  But that was just

24  minimum.  So, if we went out and collected $2 million net

25  then they would be due their 50 percent of that net.

1    **Q    How much was actually paid to International Paper**

2    **for those patents?**

3    A    Well, at the time, it was 75,000 paid up front and

4    then - you know, for the first year - I guess two years.

5    That was October 07. So, yeah, for two years. We collected

6    some money and we spent a lot of money.  So, it ended up not

7    being that great of an investment to start off with; and so,

8    IP just  - they received their 75.  I can t remember if we

9    paid them one minimum payment.  But right around the timing

10   of one of the minimum payments, either the first one or the

11   second minimum, we had further conversations where we

12   negotiated to buy the patents outright from them, and then

13   that was payment of 150,000 in addition.  So, I know we paid

14   225,000 and I believe that was it.

15   **Q    And that was Kobayashi that made those payments;**

16   **correct?**

17   A    Well, yeah.  Again, as I said, Jacklin, you know,

18   paid the first 75 but then Kobayashi paid Jacklin.  I believe

19   it was 80 or 85; and then Kobayashi paid the second 150

20   directly to IP.

21   **Q    Did Kobayashi obtain any opinions regarding the**

22   **value of those patents at the time of the purchase?**

23   A    No; but when we  - Mr. Fiore and myself, when we

24   were at Equaphor, we had reviewed the patents because we were

25   licensees and, you know, everybody we reviewed them with said

Page 71

1    that they looked good and obviously were worthy of trying to

2    purchase.

3        **Q      Was there any litigation, any pending litigation or**

4    **threatened litigation at the time Kobayashi purchased the**

5    **patents?**

6        A    From Jacklin?  Not that I m aware of; no.

7        **Q      And then Kobayashi sold the patents to Equaphor in**

8    **September 2009; correct?**

9        A    Yes.

10       **Q      And who negotiated that sale on behalf of the**

11   **debtor?**

12       A    Well, you know, obviously the board.  Ed Spiva was

13   the chairman of the board.  He had the principal role but I d

14   say the other directors were obviously involved, as well.

15       **Q      You were not a member of the board of Equaphor at**

16   **this time?**

17       A    No.  Actually, I - I - the last time I was on the

18

19   board of Equaphor was in early  07 and Mr. Fiore did get on

20   the board but it was in late 2010.  So, for this period of

21   time either of us were on the board.

22       **Q      Were you an officer of Equaphor at that time?**

23       A    Yes.

24       **Q      And what was your position?**

25       A    President and CO.

Page 72

1   Q    And how about Mr. Fiore?  What was his position

2   with Equaphor at that time?

3   A    He was the chief technology officer.  Again, at

4   that time, both of us were on contract through the Management

5   Services Agreement.  So, we  - you know, I mean to be

6   precise, Equaphor contracted with our services to fulfill

7   those roles through the Management Services Agreement.

8   Q    Well, did you or the debtor obtain any opinion from

9   a non-insider, third party as to the value of the patents at

10  the time that Equaphor purchased the patents?

11  A    No.  As I said earlier, the value of the patents is

12  largely driven by the value of the payments that were due

13  from Equaphor to either Monitoring Technology, LLC or

14  Kobayashi Ventures for other services.

15  Q    At the time of the sale of the patents to the

16  debtor was there any pending or threatened litigation with

17  regard to the patents?

18  A    Yes.  So, at the time of the sale, the PaperTech

19  case was still active and the Carotex and ECS cases were

20  active.

21  Q    That s the New York action that we ve been

22  referencing here; correct?

23  A    Yes; along with PaperTech which was also a New York

24  action.

25  Q    In that action, Carotex challenged the validity of

Page 73

1   the patents?

2        A    I d have to check on the timing for that.  Again,

3   as I said, my memory is, on their initial declaratory

4   judgment that  - I don t believe there was a claim of

5   invalidity.  I think it was just that they were upset that

6   PaperTech was getting it free, supposedly.  Again, we were

7   filing suit against PaperTech but I guess they didn t know

8   that; and somewhere along the way, they did add the

9   invalidity.

10        So, at the time of the sale from Kobayashi to

11   Equaphor, I believe that claim had been added by Carotex;

12   yes.

13        Q    Did Equaphor obtain any opinions at the time of

14   the sale regarding the validity of the patents?

15        A    No.

16        Q    Please turn to Exhibit 10 which is a statement of

17   financial affairs, and in particular paragraph ten which is

18   Bates stamped 204.  There has been some testimony as to the

19   5.2-million-dollar liquidating dividend and that Monitoring

20   Technology was the largest shareholder; correct?  Largest

21   preferred shareholder?

22        A    Yes.  In October  09, that s correct.

23        Q    How much of that 5.2 million did Monitoring

24   Technology receive?

25        A    Monitoring Technology, LLC received 43.5 percent,

Page 74

1    approximately, of the $5.2 million.

2        **Q    And what did Monitoring Technology do with those**

3    **funds that it received?**

4        A    I think we put it in the bank.

5        **Q    Were there any distributions made to any of the**

6    **members of Monitoring Technology, LLC?**

7        A    I m sure there were.  There were distributions in

8    2009.  I m not sure exactly what those amounts were.

9        **Q    Please turn to Exhibit 8.  I believe Exhibit 8 has**

10   **been entered into evidence.  Are you familiar with this**

11   **document?**

12       A    Yes.

13       **Q    In the first line it says,  This firm  - and it s**

14   **referring to Stein Sperling  -  represents Kobayashi.   Is**

15   **that correct?**

16       A    Yes.

17       **Q    And Stein Sperling did represent Kobayashi?**

18       A    Yes.

19       **Q    And when was this letter sent?**

20       A    This says April 24, 2008.

21       **Q    Does that seem accurate?**

22       A    It seems about right; yeah.  It s probably dead-on,

23   I would guess.

24       **Q    And this letter was sent after the litigation began**

25   **in New York between Carotex and Kobayashi; correct?**

Page 75

1    A    Yes.

2       Q    And was Pulp and Paper a client or customer of

3    Carotex at this time?

4    A    I think you re off on  - the company is actually

5    J.D. Irving and his title is vice president of Pulp and Paper

6    which is a division of J.D. Irving.

7       Q    So, J.D. Irving was a customer of Carotex at this

8    time?

9    A    As far as I know.

10      Q    And did Kobayashi also send a letter to Sunoco?

11   A    Sonoco?

12      Q    Sonoco.

13   A    Yes.  I believe.

14      Q    Similar letter or just like this one?

15   A    Yeah.  Well, Stein Sperling sent a letter to

16   Sonoco similar; very similar to this, I would think.

17      Q    On Kobayashi s behalf?

18   A    Yes.

19      Q    Was there another customer of Carotex named Dontar?

20   A    Domtar?

21      Q    Domtar.  And a similar letter was sent by Stein

22   Sperling on behalf of Kobayashi?

23   A    I believe that s right; yes.

24      Q    Was Georgia Pacific a customer of Carotex at this

25   time?

1      A    As far as I know.

2          Q    Was a similar letter sent by Stein Sperling on

3    behalf of Kobayashi?

4      A    Yes.

5          Q    Did Carotex have a customer by the name of SAPPI?

6      A    Yes.

7          Q    Is that how you pronounce it?

8      A    It sure is.  South American Pulp and Paper, Inc.,

9    I think.

10         Q    Was a similar letter sent to them on behalf of

11   Kobayashi by Stein Sperling?

12     A    Yes.

13         Q    How about Procter & Gamble?  Is that another

14   customer of Carotex?

15     A    Yes.

16         Q    And a similar letter was sent?

17     A    Yes.

18         Q    Was Kimberly-Clark a customer of Carotex?

19     A    Yes.

20         Q    And a similar letter was sent?

21     A    Yes.

22         Q    And also a customer, New Page?

23     A    Yes.

24         Q    And a similar letter was sent?

25     A    I believe so.

Page 77

1       Q     Two other companies, Quebecor World and

2    AbitibiBowater; is that correct?

3       A     Yeah.  AbitibiBowater.  A-b-i-t-i-b-I and

4    Quebecor.

5       Q     And similar letters were sent?

6       A     Yes.

7       Q     Were those letters sent at your direction?

8       A     I reviewed and approved this letter; yes.

9       Q     Who else did Stein Sperling represent in the New

10   York action with Carotex besides Kobayashi?

11      A     At this time?

12      Q     Or at any time throughout the New York action, who

13   have they represented?

14      A     At this time, in April of  08, I believe the only

15   party was Kobayashi.  I believe that s right; and so, Stein

16   Sperling was representing Kobayashi in New York.  Then, if my

17   memory is right, I think Carotex added  - Carotex and ECS I

18   think added me personally and Equaphor in November of

19   December of 2009, I believe, and at that time Stein Sperling

20   represented me personally, as well, and then Stein Sperling

21   also represented Equaphor at that time.

22      Q     Are you aware that Carotex has offered to the

23   trustee to settle Carotex s claims against the estate in

24   exchange for the estate settling the claims against Carotex?

25      A     You re asking me if I m aware that the trustee has

1    heard an offer for  -

2         Q    That s correct.

3         A    Is it eight million or four million total or four

4    million each?

5         Q    All I m just asking right now is if you are aware

6    that an offer was made by Carotex to the trustee.

7         A    I  - there  - I was aware  - I believe I was aware

8    of that one.  I think there was also an offer made that we

9    just walk away from everything and give Carotex a paid-up

10   license.

11        Q    So, you re aware of that?

12        A    Is that the one you re speaking of with the fully

13   paid-up license  -

14        Q    Yeah.  Both sides would agree to walk away from the

15   litigation.

16        A    Yes.  I m aware of that.

17        Q    Are you aware if the trustee was agreeable to

18   walking away?

19        A    That I don t know.  Again, that offer to me, if

20   it s the one I m thinking of, was just made last week, I

21   think.

22        Q    Were you not agreeable to walking away from that

23   litigation?

24        A    I think it was prior to  -

25             MR. McCARTHY: Your Honor, I have to object to the

Page 79

1   line of questioning to the extent that it goes other than to

2   what did the trustee know and reasonably consider prior to

3   entering into this deal and I think we re beyond that because

4   we re into last week.

5           THE COURT: I think that s correct.  I ll sustain

6   the objection.

7           BY MR. MISKEN:

8       **Q    In the complaint in the New York action, Equaphor**

9   **seeks $3.5 million in compensatory damages; is that correct?**

10      A    That sounds about right; yes.

11      **Q    And approximately five million in punitive damages?**

12      A    It s been a while since I ve look at that, frankly;

13  so, I ll trust what you re saying.

14      **Q    So, Kobayashi is purchasing from the bankruptcy**

15  **estate a potential 8.5-million-dollar claim?**

16      A    I lost your math.  8.5 million?

17      **Q    Correct.  Kobayashi is proposing to purchase the**

18  **estate s claims against Carotex; correct?**

19      A    Yes.

20      **Q    And those claims total approximately 8.5 million?**

21      A    Again, if you say so.  It s been a while since I ve

22  looked at that.

23      **Q    And you think that Equaphor is likely to succeed in**

24  **that New York action against Carotex?**

25      A    I sure believe so.

Page 80

1    **Q     Is Kobayashi willing to purchase the patents**

2    **without the releases?**

3        A    No, I don t think so.

4    **Q     In paragraph 4-A of the asset purchase agreement,**

5    **which is at Exhibit 2, Bates stamped 13, it states that  The**

6    **order approving the sale to Kobayashi must include a specific**

7    **finding that Kobayashi is a good-faith purchaser of the sale**

8    **assets.   Do you see that?  It s Romanette (ii).**

9        A    Yes.

10   **Q     If the court did not make a finding that Kobayashi**

11   **was a good-faith purchaser would Kobayashi still purchase the**

12   **sale assets?**

13       A    You know, again, I m  - as I said, I m a mechanical

14   engineer.  So, sometimes the  - and not that I m not familiar

15   with contracts and not reasonably sophisticated here but I m

16   not exactly sure what that means.  I m going to have to leave

17   that for counsel.

18           MR. MISKEN: Okay.  I have no further questions,

19   Your Honor.

20           THE COURT: Okay.  It s about the time I would break

21   for lunch.  If you were planning ten minutes of cross

22   examination I would hold off but if it s longer I think we

23   will go ahead and take a lunch break.

24           MR. SHAPIRO: No.  It will be longer.

25           THE COURT: Okay.  We will go ahead and take a lunch

1    break.  We will resume 50 minutes from now which will be at

2    ten minutes of 2:00.

3              (Whereupon, a luncheon recess was taken.)

4                        * * * * *

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 82

1

2                    A F T E R N O O N   S E S S I O N

3            THE COURT: Please be seated.  I apologize for the

4    delay in getting back.  I believe Mr. Dechman was on the

5    witness stand.

6            Mr. Shapiro.

7            MR. SHAPIRO: Your Honor, I would like to have the

8    witness shown this document.  I have a copy for the court.

9            THE COURT: Okay.  We will mark it as Bamber s

10   Exhibit F.

11                           (Bamber s Exhibit F

12                            was marked for identification.)

13           MR. SHAPIRO:  F  did Your Honor say?

14           THE COURT: Yes.

15                          CROSS EXAMINATION

16           BY MR. SHAPIRO:

17       Q    Take a moment to look at Exhibit F and my first

18   question is whether this is a letter that you sent to the

19   shareholders of Equaphor on or about July 28, 2010.

20       A    Yes, it is.

21       Q    And on the second page, third paragraph, would you

22   read the first sentence of the third paragraph out loud?

23       A     If the company is unable to obtain capital it will

24   be deemed insolvent and will cease operations.

25       Q    And that is something that you sent in July of

Page 83

1    2010?

2

3        A    Yes.

4        Q    And then turning back to the first page of Exhibit

5    F and the fourth paragraph and the fourth line, you say that

6    legals to date are approximately $900,000 of which 350 had

7    previously been paid by Kobayashi and 550,000 by Equaphor.

8    And when you said 350 had previously been paid by Kobayashi,

9    that s previous to what?

10       A    Previous to Equaphor purchasing the patents.

11       Q    And the $550,000 was spent after Equaphor purchased

12   the patents?

13       A    Yes.

14       Q    And that is what they had spent up to July of 2010?

15       A    Yes.

16       Q    Did Kobayashi pay any legal fees for the Carotex

17   litigation after the patent sale to Equaphor?

18       A    No.

19       Q    And what is the total amount that Equaphor has

20   paid for the patent litigation with Carotex?

21       A    You know, I m not sure of the precise number but

22   I would guess it s around 800,000; something like that.

23       Q    I think you have Exhibit C, the income statement

24   for November 30, 2010 in front of you.

25            MR. SHAPIRO: Your Honor, I confess.  I m not sure

Page 84

1    whether this is admitted before.

2            THE COURT: It was not.

3            MR. SHAPIRO: I didn t think so.

4            BY MR. SHAPIRO:

5        Q    **Do you have that in front of you?**

6        A    Yes.

7        Q    **And is this the income statement for Equaphor for**

8    **the month ending November 30, 2010 and year to date?**

9        A    Yes.

10           MR. SHAPIRO: I would like to offer that into

11   evidence, Your Honor.

12           THE COURT: It will be admitted.

13                            (Bamber s Exhibit C

14                            was received in evidence.)

15           BY MR. SHAPIRO:

16       Q    **You see the line item,  General Legal Expenses,**

17   **$803,540?**

18       A    Yes.

19       Q    **Were those expenses for the Carotex litigation paid**

20   **by Equaphor as of that time?**

21       A    Those are the legal expenses paid by Equaphor at

22   that period of time and as I mentioned earlier I imagine some

23   part of those were for the derivative lawsuit,

24   indemnification and  - but the majority would be for the

25   patent work.

1      Q    And the $158,000 paid in November, was that for the

2   patent litigation?

3      A    You know, I m not sure.  Again, there was some

4   derivative work, the derivative lawsuit work that was more

5   hot around November.  So, I m not sure of the breakdown for

6   November itself.

7      Q    Do you recall there was a meeting in Wilmington,

8   Delaware in October that you attended and I attended?

9      A    Yes.

10     Q    And you made a presentation to me?

11     A    Yes.

12     Q    And there was an extension of the time to respond

13  to the complaint while we continued discussions; isn t that

14  right?

15     A    Yes.

16     Q    Okay.  That extension continued through the

17  December board meeting, the early December board meeting at

18  which you considered or the board considered an offer that I

19  had made; correct?

20     A    I believe that s right.  Yes.

21     Q    There wasn t much going on in the derivative

22  litigation in November; was there?  There was certainly no

23  court activity in November; was there, sir?

24     A    Not that I m aware of; no.

25     Q    So, is it fair to say that most if not all of the

1    **$158,000 spent on legal expenses in November 2010 were**

2    **related to the Carotex litigation?**

3        A    You know, again I m not sure.  I don t have that

4    breakdown; but based on what we said, that sounds okay.

5            MR. SHAPIRO: Your Honor, I would like to show the

6    witness several pages, what begins with an email dated May

7    20, 2009.

8            THE COURT: We will mark it Bamber Exhibit G.

9                    (Bamber s Exhibit G

10                   was marked for identification.)

11           MR. SHAPIRO: If I might clarification one thing,

12   Your Honor.  There are some underlinings, obviously added

13   later.  So, I m not really offering that as part of the

14   exhibit.

15           THE COURT: I understand.

16           BY MR. SHAPIRO:

17       Q    **This May 20, 2009 email, that s something that you**

18   **sent to the board of directors of Equaphor around that time?**

19       A    Yes.  That s what the heading has here.  Yeah.

20       Q    **And this was  - I think you testified on your**

21   **direct examination there had been discussions with the board**

22   **over a period of time about the sale, possible sale to Cognex**

23   **and how the Management Services Agreement fit into that.**

24       A    Yeah.  At this point in time  - and certainly we

25   were discussing things with Cognex.  But this was more of a

Page 87

1    general review of, trying to clarify some of the text in the

2    MSA for the board.

3        **Q    And this was discussed at a board meeting?**

4        A    Yes.

5        **Q    And there were comments and feedback from the**

6    **directors and you revised this and sort of updated it to**

7    **reflect what the consensus of the board was on these issues**

8    **during the meeting?**

9        A    Yeah; and I think I m a little  -

10       **Q    Would you just answer my question?**

11       A    Oh, I m sorry.  I m confused a little bit on the

12   third page here as I look at it though.  So, I want to be

13   sure I m testifying correctly.  So  - because there was an

14   email that was sent out prior to the board meeting where we

15   had a model showing different transactions and how the math

16   was done and then some text to try to clarify the terms; and

17   then, as you said, there was an actual board meeting where we

18   reviewed that text line by line and edited it in real-time

19   and then approved each of the changes.

20            So, as I look at this third page, this looks like

21   the  - the  - the  - the work, the work product that we did

22   out of the meeting where we edited and then read back and got

23   approval for each section whereas this first email looks more

24   like the very first email we sent.

25            So, I don t know that these pages go together is my

1    point.  They were related to the same meeting and notes but

2    the email - you know, the email mentions an attachment, MTC,

3    progressions current, and that s not the attachment.  This

4    third page is not that attachment.  That attachment was an

5    Excel spreadsheet.

6        **Q    I didn t mean to suggest it was by marking the**

7    **exhibit, Mr. Dechman.**

8            **But the text in your May 20 email, which is the**

9    **first page carried over to the top of the second page of**

10   **Exhibit G, was revised in light of the discussion at the**

11   **board meeting; correct?**

12       A    Well, the email wasn t revised.  This was, you

13   know, text that was sent prior to the board meeting.  Then

14   yes, during the board meeting we went through this text line

15   by line and edited it.

16       **Q    And the edits are reflected on the third page; are**

17   **they not?**

18       A    I believe that s right.  But the Excel model that

19   was attached here isn t - you know, it s not a complete

20   document.  That s all.

21       **Q    I d like to direct your attention to paragraph**

22   **number five that begins  Book value of assets and**

23   **liabilities,  et cetera.**

24       A    Yes.

25       **Q    In the last sentence of that paragraph you wrote,**

Page 89

1    **One or more companies may pool to conduct this transaction**

2    **and satisfy the sale of substantially all assets.   Do you**

3    **see that, sir?**

4        A    Yes, I do.

5        **Q    What did you mean by  satisfy the sale of**

6    **substantially all assets?**

7        A    The text that was in the MSA stating about  - you

8    know, there s text in there about what  substantially all

9    assets  means.

10       **Q    The sale was defined as a sale of all or**

11   **substantially all of the assets that triggered the sale**

12   **incentive fee; correct?**

13       A    I believe that s right.  Yeah.

14       **Q    And the board meeting took place on May 27, 2009;**

15   **did it not?**

16       A    That I don t know but I m sure it was around that

17   time period.

18           MR. SHAPIRO: I would like to offer the May 27, 2009

19   board minutes.

20           THE COURT: Okay.  We ll mark it as Exhibit H,

21   Bamber s Exhibit H.

22                              (Bamber s Exhibit H

23                              was marked for identification.)

24           BY MR. SHAPIRO:

25       **Q    Take a moment to read it, Mr. Dechman.  But is**

Page 90

1    Exhibit H the minutes of the board meeting on May 27, 2009?

2        A    Yes.

3        Q    And did you prepare the minutes?  I see it has your

4    name at the bottom.

5        A    Yes, I did.

6        Q    Okay.  And that was done on June 4, 2009, as

7    indicated by the date at the top?

8        A    I believe that s right.

9        Q    Okay.  And in paragraph two,  Soze Commission.   Is

10   it  Soze  or  So-ze?  I m sorry.

11       A    So-ze.

12       Q    So-ze.  And Soze was a character in the movie,

13   The Usual Suspects; is that right?

14       A    Yes.

15       Q    And Kobayashi was also a character in the movie?

16       A    Yes.

17       Q    They were the bad guys; weren t they?

18       A    (Laughter.)

19            BY MR. SHAPIRO:

20       Q    You wrote under paragraph two,  In an effort to

21   better clarify the Management Services Agreement between MTC

22   and Soze, the board reviewed a letter and spreadsheet model

23   prepared by Jim Dechman.   That was the letter that s an in

24   email form here.  It s the first page of Exhibit G with

25   the  - is that right?

Page 91

1      A    Yes.

2      Q    And then you wrote:  During the meeting Mr. Dechman

3  updated the letter to better capture the agreement.   And the

4  third page is the updated letter to better capture the

5  agreement, correct, the third page of Exhibit G?

6      A    Yes.

7      Q    And then in paragraph five, the last sentence of

8  the May 20 email,  One or more companies may pool to conduct

9  this transaction and satisfy the sale of substantially all

10 assets.   If you turn to the third page of Exhibit G and you

11 look at paragraph five that begins  Book value of assets and

12 liabilities,  that s the paragraph again in the May 20 email;

13 correct?

14     A    Yes.

15     Q    And then if you look at the box over on the right

16 where it says,  Deleted,  and the second sentence in the

17 deleted box is,  One or more companies may pool to conduct

18 this transaction and satisfy the sale of substantially all

19 assets.   You deleted that from the outline; correct?

20     A    Yes.

21          (Pause.)

22          BY MR. SHAPIRO:

23     Q    I digress for a moment.  Do you have in front of

24 you Exhibit A which is the minutes of the December 7, 2010

25 board meeting?  I have an extra copy here if you need it.

Page 92

1      A    I have them.

2      Q    And are these the minutes of that meeting?

3      A    I m sorry.

4      Q    The document in front of you marked  A,  are those

5    the minutes of the December 7, 2010 board meeting?

6      A    Yes.

7           MR. SHAPIRO: I would like to offer that into

8    evidence at this time, Your Honor.

9           THE COURT: It will be admitted.

10                              (Bamber Exhibit A

11                              was received in evidence.)

12          (Pause.)

13          MR. SHAPIRO: I will offer, Your Honor, the

14    September 25, 2007 email.

15          THE COURT: We will mark it as Bamber I.

16                              (Bamber Exhibit I

17                              was marked for identification.)

18          BY MR. SHAPIRO:

19      Q    Looking at the email, dated September 25, 2007 in

20    Exhibit I, is that an email that you sent to the three

21    directors and copied Mr. Fiore on September 25, 2007?

22      A    Yes.

23      Q    And in paragraph 1-B, you wrote:  As a condition of

24    the royalty agreements, KV must not be owned or associated

25    with a competitor of the licensees and therefore MTC cannot

Page 93

1    be involved.    There was no provision in the royalty agree-

2    ment that prohibited Equaphor from owning the patents; was

3    there?

4         A    No.  There was a provision that talked about if a

5    competitor acquired the license agreements that the licensee

6    had the right to terminate.

7         Q    But nothing that prohibited Equaphor from

8    purchasing the patents?

9         A    Again, as I said, Equaphor tried to buy these

10   patents three or four times over the years.

11        Q    But Equaphor didn t try to buy them in September

12   2007; correct?

13        A    No.

14        Q    In the beginning of the email you said,  The

15   International Paper patent negotiations are nearly complete.

16   Who conducted those negotiations with International Paper?

17   What person or persons?

18        A    It was Jacklin and an attorney, Jay Spitson.

19        Q    So, Jacklin was essentially a straw that you used

20   to purchase the patents?

21        A    As I said before, yeah, we engaged Jacklin to

22   negotiate a deal and then sell, immediately sell the

23   portfolio to Kobayashi.

24        Q    And it says in paragraph 1-C, little one, two, I

25   guess, that  Kobayashi will retain the law firm, Stein

Page 94

1    **Sperling (Jeff Schwaber) to enforce the agreements, pursue**

2    **infringements, et cetera.    Correct?**

3         A    Yes.

4         **Q    Stein Sperling was Equaphor s law firm up until**

5    **September 2009; was it not?**

6         A    Stein Sperling did work for Equaphor, as did

7    Whiteford Taylor.

8         **Q    And Mr. Schwaber is here in the courtroom, at**

9    **counsel table?**

10        A    Yes, he is.

11        **Q    You said that you believed that $225,000 is the**

12   **total amount that was paid to  - paid by Kobayashi to**

13   **purchase the patents; is that right?**

14        A    Yes.

15        **Q    My question is, did that include the money that**

16   **was paid to Jacklin, that Jacklin paid to International**

17   **Paper?**

18        A    Yes.  To be carefully slow on it, Kobayashi paid

19   Jacklin.  I believe it was 80,000.  Jacklin paid

20   International Paper 75,000 of that 80,000; and then Kobayashi

21   later paid 150,000 directly to International Paper.

22        **Q    So, International Paper at that point knew that**

23   **Kobayashi owned the patents?**

24        A    They knew immediately after the transaction because

25   the patents were transferred from Jacklin to Kobayashi.

Page 95

1    Q    And you said that International Paper wanted to

2    have someone own the patents who would have the ability to

3    pursue royalty claims because International Paper was to get

4    50 percent of anything collected after expenses; correct?

5         A    I believe that s what  - they were interested based

6    on the way they negotiated the agreement.

7    Q    And Jacklin was basically a shell company formed

8    for the purpose of acting as a straw for Kobayashi; wasn t

9    it?

10        A    No.

11        Q    No?  What was Jacklin?

12        A    Jacklin I believe is an accounting company.  It s

13   been around for many years.

14        Q    Molly Hale is and has been for some time an

15   employee of Monitoring Technology?

16        A    Yes.  Molly Hale was an employee of Equaphor and

17   now she s an employee of Monitoring Technology, LLC.

18        Q    And there was a board meeting scheduled in

19   September 2009 to consider approval of the sale to Cognex,

20   the purchase of the remaining business assets by Monitoring

21   Technology and the sale of the patents from Kobayashi to

22   Equaphor; correct?

23        A    Yes.

24        Q    And the board at that time?  There were four

25   directors; correct?  There s Mr. Evans, Mr. Kaufman, Mr.

Page 96

1    **Spiva and Mr. Doherty?**

2        A    Yes.  Prior to adding Molly Hale to the board,

3    that s correct.

4        **Q    And was it your understanding prior to the meeting**

5    **that Mr. Spiva and Mr. Doherty would vote in favor of this**

6    **transaction?  Is it your belief that they would?**

7        A    Yes.  I thought they would.

8        **Q    And you expected that Mr. Kaufman would oppose the**

9    **transaction; did you not?**

10       A    You know, I m not sure whether he would or not. But

11   I wasn t sure he would support it; no.

12       **Q    And had you had any discussions with Mr. Evans**

13   **about his position?**

14       A    I don t remember. I know we  - we scheduled a board

15   meeting and it was  - you know, sometimes we had a board

16   meeting remotely where all these folks would dial in because

17   some were in Boston, and Philly, and Baltimore; and for this

18   one, we had called an in-person meeting.  And I know Mr.

19   Evans and Mr. Kaufman had both said they were coming but then

20   one of them said they couldn t and then the other one said

21   that he couldn t.  So, they attended by phone.

22       **Q    Did you have any discussions with Mr. Evans prior**

23   **to the meeting as to how he would vote?**

24       A    Not that I recall.

25       **Q    So, you didn t know how he would vote?**

Page 97

1       A    I wasn t sure; no.

2       Q    And Miss Hale was elected as a director immediately

3   prior to the meeting; correct?

4       A    Yes.

5       Q    And it was done by a consent, majority of the

6   Series  - one of the preferred series other than  F.   Let me

7   back up just a minute.   There were a number of different

8   series of preferred stock in Equaphor; were they not?

9       A    Yes.

10      Q    And one of the series of was a  D  that had the

11  right to elect a director?

12      A    Actually it was Series E had the right to elect

13  another director.

14      Q    And between Monitoring Technology and Mr. Spiva and

15  Mr. Doherty, the three controlled the majority of the

16  Series E shares; correct?

17      A    Yes.

18      Q    And so, the three of you, Monitoring Technology,

19  Mr. Spiva on behalf of the venture capital fund that owned

20  the shares and Mr. Doherty on behalf of the venture capital

21  fund he was associated with, the three voted the shares to

22  elect Miss Hale director?

23      A    Yes.

24      Q    And that was done minutes before the meeting

25  started; was it not?

Page 98

1     A   It was done immediately prior to the meeting; yes.

2     **Q   And that gave you three directors to vote in favor**

3  **of the transaction?**

4     A   Assuming that Molly Hale would vote in favor, yes.

5     **Q   It was a safe assumption, was it not?  She worked**

6  **for you?**

7     A   Well, you d have to know Molly.  But you know, you

8  never know.  I m sure she would vote what she thought was

9  right.

10     **Q   Do you recall the date of the board meeting?**

11     A   I m sorry, Mr. Shapiro.

12     **Q   Do you recall the meeting was on September 23,**

13  **2009?**

14     A   You know, I m not sure of the exact date.

15     MR. SHAPIRO: I would like to offer a memo.

16     THE COURT: We ll mark it as Bamber Exhibit J.

17               (Bamber Exhibit J

18               was marked for identification.)

19     BY MR. SHAPIRO:

20     **Q   Is Exhibit J a memorandum that you wrote on**

21  **September 21, 2009?**

22     A   Yes.

23     **Q   And this was circulated to the directors at that**

24  **time?**

25     A   Yes.

1    Q    And you recall it was just two days later when the

2    directors held a meeting to approve the transactions?

3    A    I mean, I know we had been talking about these

4    transactions for nine months and I can t remember the date of

5    the actual board meeting; but two days sounds probably about

6    right.

7    Q    Well, a sale to Cognex had been discussed for many

8    months; had it not?

9    A    Yes.

10    Q    Was a sale of the patents to Equaphor discussed in

11    advance of September 21?

12    A    I may have discussed it with J.B. Doherty or Ed

13    Spiva before.

14    Q    You didn t discuss it with Sumner Kaufman before

15    September 21; did you, sir?

16    A    Not that I remember.

17    Q    And you hadn t discussed with Mr. Kaufman before

18    September 21 the proposal that Soze, later named MTC, would

19    buy all the assets not bought by Cognex; did you?

20    A    I m not sure.  I mean, we certainly talked about

21    having multiple parties buy the assets in those different

22    board meetings.

23    Q    Originally Cognex was to buy the entire company;

24    was it not?

25    A    When we first met with Cognex, yes.  About a year

Page 100

1    prior to that, we were hoping that they would buy the whole

2    thing.

3        **Q    And when was it that they made a decision they only**

4    **wanted to buy the Smart Advisor video business?**

5        A    As I said, we met with them in the fall of 2008,

6    good meetings, and their CEO and founder attended the

7    meeting, and it seemed like things were going along pretty

8    good; and then they went silent, and  -

9        **Q    It s a simple question.  When did they tell you**

10   **they were only interested  - when did Cognex tell you it was**

11   **only interested in buying the Smart Advisor video business**

12   **and not the other businesses?**

13       A    And I appreciate it.  I m not trying to be verbose

14   here but I m not sure exactly when the date was. So, I ll

15   leave it at that, I guess.

16       **Q    Can you tell us approximately when it was?**

17       A    As I said: So, we had some conversations and then

18   they went silent.  When we started having conversations

19   again, they seemed more interested in just the Smart Advisor

20   video business and so that started that focus which would

21   have been I guess around May, May of 2009.

22       **Q    And the board on September 23, 2009 approved the**

23   **three transactions; correct?**

24       A    Well, as I said before, you ve given that date

25   before and I ll trust you that that s it.  That sounds about

Page 101

1    right.

2        **Q      And it was approved by the vote of Mr. Spiva, Mr.**

3    **Doherty and Molly Hale?**

4        A      Yes, with Evans abstaining and Kaufman dissenting.

5        **Q      You re not claiming that the patents when they were**

6    **sold to Equaphor were worth $3,450,000; are you?**

7        A      No.  I mean, there was no valuation done on it.

8    You know, so it was more that  - it was an alternative deal

9    structure than the one that was in the MSA.

10       **Q      So, the purchase price of $3,450,000 was calculated**

11   **based on what you claimed the sale incentive fee would be to**

12   **Soze; correct?**

13       A      No.  It was based on three things, as I said

14   before, the sales incentive fee to Monitoring Technology, LLC

15   that was around one and half million; the third year of the

16   Management Services Agreement which was a million, and the

17   patent liability, patent royalty liability which was 900,000.

18       **Q      At the time Kobayashi bought the patents from**

19   **International Paper there was an accrued royalty liability of**

20   **640-some-odd-thousand dollars to International Paper;**

21   **correct?**

22       A      Yes.

23       **Q      And didn t you advise the board that because some**

24   **other licensees were not paying International Paper that**

25   **Equaphor didn t need to pay it under the most favored nation**

Page 102

1    **provision of the royalty agreement?**

2        A    We tried that argument with International Paper

3    back  - back when we were trying to buy the patents from IP,

4    one of the first times.  So, Equaphor tried that argument

5    just as a letter and hoping that International Paper would

6    either start to enforce the patents equally to level the

7    playing field or that they would agree, you know, and then

8    the playing field would be level; and then, IP didn t, didn t

9    accept that position.

10       **Q    Well, regardless of what IP s position was, wasn t**

11   **it your position as president of Equaphor that the most**

12   **favored nation provision gave Equaphor the right not to pay**

13   **the 640,000-dollar royalty?**

14       A    Well, again, as I said, we had counsel  -

15       **Q    Can you answer that yes or no?**

16       A    I don t think I can because, again, we had counsel

17   and counsel suggested that we send the letter out but they

18   also suggested that it was a weak position and, you know,

19   we d just see what would happen.

20       **Q    But for whatever reason, Equaphor didn t pay the**

21   **money and International Paper never pressed for payment; did**

22   **it?**

23       A    Not at that time; no.  Not especially.

24       **Q    And two years went by without International Paper**

25   **having pressed for that money?**

Page 103

1    A    That s correct; and we kept accruing the liability

2    on the books.

3        **Q    That was your decision to accrue the liability?**

4    A    No.  It was the board s decision.

5        **Q    You approached the board and said that you wanted**

6    **to buy the patents back in 2007 and you got the board to give**

7    **a conflict of interest waiver; did you not?**

8    A    Well, we  - I don t know if you d call it conflict

9    of interest but we had the board agree to a waiver to allow

10   us to do the purchase.

11       **Q    Well, a waiver of any claims against you or**

12   **Kobayashi on account of Kobayashi purchasing the patents?**

13   A    I believe that s right; yeah.

14       **Q    And then Stein Sperling went to the board and said,**

15   **we d also like a waiver of any claims against Stein Sperling**

16   **on account of our having been counsel to the company and now**

17   **representing Kobayashi in this patent business; correct?**

18   A    Yes.

19       **Q    And Mr. Spiva and Mr. Doherty and Mr. Evans agreed**

20   **to those?**

21   A    Yes.

22       **Q    And was there any discussion at that time about**

23   **whether the company would owe you or Kobayashi the $640,000**

24   **on the accrued royalty?**

25   A    Yeah.  I think  - I mean, we d need to pull the

Page 104

1    patent waiver agreement out.  I haven t looked at it for a

2    little bit but I think there might have been a sentence even

3    in there about that.

4        **Q**    **You remember that or are you speculating?**

5        A    I guess I am speculating.  I d have to see the

6    document, to read the sentence; but my memory is is that it

7    was  - that Kobayashi was free and clear to pursue the patent

8    enforcement, and the objective was to level the playing field

9    and market.

10       **Q**    **You recall Mr. Evans asking about what s going to**

11   **happen with this $640,000 and you said don t worry about it?**

12       A    No, I don t recall that.

13       **Q**    **Do you have the waiver agreement with you here?**

14       A    I don t have it here, I don t think.  I think it s

15   in  -

16       **Q**    **It s not in front of you, as far as I know.  Did**

17   **you bring it with you to court?**

18       A    I don t think I did.

19       **Q**    **So, getting back to the sale of the patent to**

20   **Equaphor, $900,000 of what Equaphor paid Kobayashi**

21   **represented this accrued royalty obligation?**

22       A    Yes.

23       **Q**    **And Equaphor could have bought the patent for**

24   **$225,000 and been rid of that obligation; couldn t it?**

25       A    I don t think so.

Page 105

1      Q      You don t think Jacklin could have bought it as a

2    straw for Equaphor just as it bought it as a straw for you?

3      A      Well, I think if it had done that  - I mean, again,

4    a lot of things transpired before those two deals.  And

5    again, just in a hypothetical, you know, maybe Equaphor could

6    have bought it using Jacklin as a straw for the 75 up front

7    and the 50-percent enforcement but then Equaphor would be

8    faced with  - you know, I don t think it could just waive its

9    royalty without paying IP some of that based on the intent of

10   the agreement.  And of course, after we purchased it and

11   before we purchased the remaining piece for the 150, we had

12   invested heavily on legal fees and enforcement.  So, Equaphor

13   would have had to invest in it, as well.  It s hard to say.

14     Q      Isn t possible that one of the ways the

15   transactions could have been conducted in September of 2009

16   was that Equaphor just pay Kobayashi the $3,450,000 and you

17   keep the patent?  That would have worked out the way you

18   figured the math based on the sale incentive fee and the

19   royalty obligation.  That would have  -

20     A      Well, part of the  -

21     Q      Could you just answer the question?  It could have

22   just paid the three-million-four-fifty.  That would have been

23   full payment to Kobayashi or whatever Kobayashi was owed and

24   Kobayashi could have kept the patents.  Isn t that right?

25     A      I guess the deal could have been structured any

Page 106

1    way but there were advantages to having Equaphor own the

2    patents.

3        Q    **Well, one of the advantages was that if Equaphor**

4    **owned the patents it had to pay the expenses for the Carotex**

5    **litigation; correct?**

6        A    Well, yeah.  I mean, if they bought the  -

7        Q    **Okay.  You ve answered the question.**

8            **Now, at the time the patent was sold, you had an**

9    **agreement in principle with PaperTech for PaperTech to pay**

10   **$690,000; did you not?**

11       A    No.

12       Q    **No?  How soon after the patent sale did you get the**

13   **$690,000 from PaperTech?**

14       A    Very quickly.

15       Q    **Okay.**

16       A    But it was in court as a negotiated settlement with

17   Judge Preska in New York and it was by no means a clear

18   outcome for that.

19       Q    **You had this settlement agreed to with PaperTech**

20   **subject to court approval?**

21       A    No.  We had reached a settlement for I think

22   around 800,000 and then PaperTech backed out and they were

23   getting real excited and upset and the judge ordered us back

24   up to court to try to sit down and have another settlement

25   discussion and that happened on I think October 1st or 2nd.

Page 107

1       Q      Didn t you testify in response to questions by Mr.

2   McCarthy that you either had or thought you had a deal with

3   PaperTech and therefore you were optimistic that Carotex

4   would follow suit and you could settle with Carotex, as well?

5       A      Sure.  Yeah.  I mean, again, we had a  -

6       Q      And that was your thinking at the time you sold the

7   patent to Equaphor; wasn t it?

8       A      As I said  - I think I said it correctly before. We

9   felt like we had reached a deal with PaperTech and they

10  backed down and then we were going up to see the judge in New

11  York to hammer out a deal. Then she had us leave the room and

12  give her numbers that we would take.  I mean, it was a full-

13  fledged negotiation.  I mean, you know, that  -

14      Q      At the time you sold the patent to Equaphor, you

15  thought you had a deal with PaperTech?

16      A      We thought we could get to a deal with PaperTech.

17  Yeah.

18      Q      And you thought that if you got to a deal with

19  PaperTech there was a good chance that Carotex would follow

20  suit and you could settle with Carotex?

21      A      We had hoped that was the case; and Equaphor, you

22  know, by owning the patents had this, you know, lost profit

23  claim that it could bring and, you know, it had some

24  different material claims that it could bring which made it a

25  better holder for the patents.

Page 108

1    Q    But you didn t put a value on those claims or those

2    considerations in deciding on the 3,450,000-dollar purchase

3    price?  That was driven by what was owed on the management

4    agreement and the sale incentive fee and the royalties;

5    correct?

6    A    That s correct, and  -

7    Q    So, the other claims you gave to Equaphor for free?

8    A    Right; and then the other  -

9    Q    Okay.  You ve answered my question.

10        MR. REYNOLD: Your Honor, Mr. Shapiro keeps on

11   interrupting Mr. Dechman.

12        THE COURT: Do let the witness answer the question.

13        THE WITNESS: Thank you.

14        MR. SHAPIRO: I think he s going beyond the

15   question, Your Honor, but okay.

16        BY MR. SHAPIRO:

17   Q    Go ahead.

18   A    You were asking kind of what all went into the

19   deal and the other piece of the deal was  - and I mentioned

20   it earlier but was the non-compete piece that all worked

21   into that total deal.

22   Q    So, part of the patent sale to Equaphor included a

23   provision that any royalties collected on account of the

24   patents within a year of the sale would be paid over to

25   Kobayashi; correct?

Page 109

1    A    Yes.

2    Q    And so, the $690,000 that was paid by PaperTech

3  after the sale to Equaphor, Equaphor received it and paid it

4  right over to Kobayashi?

5    A    Yes.

6    Q    And in fact, you had caused Equaphor  - you caused

7  that to be treated as an additional purchase price paid for

8  the patent; didn t you?

9    A    That s what the tax accountants told me to do.

10   Q    And then Equaphor had to treat that $690,000 as

11  ordinary income and you got to treat it as a capital gain

12  when you received it, didn t you?

13   A    It s what the tax folks said to do.

14   Q    Your tax lawyer?

15   A    No, I m not a tax lawyer.

16   Q    I said, your tax lawyer, advising Kobayashi  -

17   A    Actually both.  They met together and discussed it.

18   Q    So, if your hope or expectation that you could

19  settle with PaperTech and then settle with Carotex proved to

20  be true then all the money that came in from those settle-

21  ments would go to Kobayashi, notwithstanding that the patents

22  had been sold to Equaphor; correct?

23   A    Yes.

24   Q    And if your hope or expectation turned out not to

25  be true and this expensive litigation with Carotex continued

Page 110

1    on then Equaphor would have the burden of the expense of that

2    litigation, wouldn t it?

3         A    Yes.

4         Q    Sort of a win-win for Kobayashi; wasn t it, sir?

5         A    I mean, if you state it that way.  I mean, the

6    500,000 in Equaphor was a note provided by Kobayashi.  So,

7    the money was coming from Kobayashi and we owned 83.5 percent

8    of Equaphor.  So, it wasn t that much of a win-win, I don t

9    think.

10        Q    Now, Mr. McCarthy asked you about  - I m sorry.

11   Mr. Misken asked you about a series of letters that Mr.

12   Schwaber sent on your behalf to customers of Carotex.  Do

13   you recall that, sir?

14        A    Yes.

15        Q    And I think you testified that you authorized those

16   letters.

17        A    Yes.

18        Q    And you did that on behalf of Kobayashi; did you

19   not?

20        A    Yes.

21        Q    And the purpose of those letters was to try to

22   enforce a royalty or licensing agreement so that Kobayashi

23   could collect royalties?

24        A    Yes; and I should  - you know, those letters were

25   sent on advice of counsel.  So, it was part of a strategy

1    meeting with counsel and they suggested sending the letters

2    and I authorized it.

3        **Q    And that was counsel for Kobayashi, Stein Sperling?**

4        A    There were other counsel involved, too, but it was

5    counsel for Kobayashi.

6        **Q    Various law firms representing Kobayashi?**

7        A    I think Finnegan.  Finnegan was involved at that

8    point and  -

9        **Q    Right. There were no lawyers for Equaphor involved**

10   **in sending letters on behalf of Kobayashi, were there?**

11       A    No.

12       **Q    And you didn t do this on behalf of Equaphor; did**

13   **you, sir?**

14       A    No.

15       **Q    And do you understand, sir, that the damage claim**

16   **against Equaphor that has been asserted by Carotex and ECS is**

17   **based primarily on the letters that you sent on behalf of**

18   **Kobayashi?**

19       A    Yes.

20           MR. SHAPIRO: Thank you.  I have no other questions.

21   Can I have just one minute, Your Honor?

22           (Counsel confer.)

23           MR. SHAPIRO: Your Honor, I think the exhibits that

24   were referred to earlier that weren t admitted have now been

25   admitted.  I think there were just two that have now been

Page 112

1    admitted, the balance sheet and the board minutes.

2           THE COURT: Those two have been admitted.

3           MR. SHAPIRO: I have no other questions.

4           THE COURT: Okay.  Any redirect, Mr. McCarthy?

5                   REDIRECT EXAMINATION

6           BY MR. McCARTHY:

7       **Q    Mr. Dechman, the judge asked me when I as on the**

8    **stand whether we were attempting to affect the Carotex**

9    **license, if any, by virtue of that language within the**

10   **adversary  - the APA, and I think I answered not that I know**

11   **of.  Could you clarify that from your standpoint, please?**

12      A    I ll do the best I can.  I think as you said, there

13   are three paid-up licenses.  Cognex has a paid-up license;

14   Honeywell has a paid-up license, and PaperTech has a paid-up

15   license.  Clearly all of those three are paid up and will  -

16   you know, they still  - they ll retain their same license

17   agreements.

18           And Your Honor asked a question about Carotex.

19   Carotex terminated their license agreement during the lawsuit

20   and I assume whatever the judge in New York decides around

21   their license is what it should be.  So, she  - I don t know

22   if that s clear enough or not.

23           We have no intention of using this process to

24   short-circuit any licensing with Carotex; but to the extent

25   that the judge in New York says the license is intact or is

1   not, we would honor whatever she says.

2   **Q    All right.  On the issue of the MSA and the**

3   **reference in it to the formula that applies if substantially**

4   **all assets are sold, I believe Mr. Shapiro questioned you**

5   **about whether or not that applied in this situation since**

6   **Cognex of course did not buy all of the assets.  What was**

7   **your understanding as to the applicability of that part of**

8   **the MSA and as to the board s consideration of that, as well?**

9   A    Sure.  Yeah.  From my perspective, there were three

10

11  board members when the MSA was done and they obviously had

12  counsel; and those three board members during the summer of

13  2009 and again during the deal time in September of 2009 all

14  either voted for the deal or later said that they abstained

15  because there just wasn t time to review it and they re fine

16  with it now.

17        So, the authors of the MSA agreed to it all later

18  and, you know, during the minutes  - Mr. Shapiro had me

19  review the minutes and showed the section that was deleted

20  about pooling interests, and the discussion at the board

21  meeting was that that was too limiting, that two companies

22  didn t need to pool their interest; it could just be two

23  acquirers buying substantially all the assets.  And if you

24  look at the rest of the minutes, it talks about acquire and

25  acquirers.  And I d say that is what was discussed.

Page 114

1          I d further say that when we had the board meeting

2   to do the transactions, the same people either voted for it

3   or abstained, and then the one that abstained came back later

4   and said the deals were proper and  -

5       **Q    And did you and I talk about this question of**

6   **whether or not the sale of substantially all assets in the**

7   **MSA was triggered by the structure of the deal in  09?**

8       A    Yes.

9          MR. McCARTHY: I don t have any more questions, Your

10  Honor.

11         THE COURT: Thank you for testifying.  You may stand

12  down.

13         MR. McCARTHY: Your Honor, I would like to call J.B.

14  Doherty.

15         THE COURT: Mr. Doherty, if you will come forward,

16  stand in front of the clerk and be sworn.

17  Whereupon,

18                   JOHN BRUCE DOHERTY

19  was called as a witness and, having been first duly sworn,

20  was examined and testified as follows:

21                   DIRECT EXAMINATION

22         BY MR. McCARTHY:

23      **Q    Good afternoon, Mr. Doherty.  Would you please**

24  **state your name and address for the court?**

25      A    It s John Bruce Doherty.  My address is 212

1   Cheswold Hill Road, Haverford, Pennsylvania.

2      **Q     Okay.  Could you please briefly tell the court**

3   **about your educational background?**

4      A     I graduated from the United States Naval Academy

5   with a Bachelor of Science in Engineering degree; and then

6   after Vietnam, I went to Stanford and got an MBA in Finance.

7      **Q     What has your work background been since then?**

8      A     I was recruited out of Stanford to join a Wall

9   Street investment banking firm, Blyth, Eastman Dillon, where

10   I worked in corporate finance.  I was then recruited away

11   from there by a private equity firm that was then advising

12   the Ford Foundation and its direct, private, negotiated

13   investments and remained at that partnership until 1992,  93;

14   and through that history, I was acting as a principal in

15   direct, private, negotiated, also known as venture capital

16   or private equity deals beginning in 1976, and I did so

17   reasonably successfully.  We were the seed capital in the

18   ESPN.  We were the original equity investor in Airgas which

19   is a very large, publicly-owned company, the largest

20   independent, industrial gas distributer in the country.

21         By the time of this transaction, I was the managing

22   general partner of a private equity fund that was the

23   investor.

24      **Q     What was your position with the debtor in 2007?**

25      A     In 2007, I was a director.

1    **Q    And did you have some stock ownership at that time,**

2  **as well?**

3    A    Not personally.  The fund that I managed was a

4  substantial investor and held  E  and  F,  preferred.

5    **Q    Okay.  And that fund combined with whatever entity**

6  **that Mr. Spiva controlled added up to what percentage of**

7  **ownership of stock at that time?**

8    A    As among Vimac, which was the fund John Evans

9  managed, and the fund managed by Ed Spiva, and ourselves,

10  that s the 76 percent that we ve been referring to.

11    **Q    Is that 76 percent of Series F?**

12    A    That s correct.

13    **Q    Which is the only series that gets paid  -**

14    A    We ve got an economic stake by then.

15    **Q    All right.  You ve heard Mr. Dechman describe the**

16   **07 transactions.  I won t ask you to go back over them**

17  **unless there was something that you heard that, you know, you**

18  **want to correct from your standpoint.**

19    A    What I ve heard is completely consistent with my

20  recollection.  These things were considered carefully.  We

21  had counsel advising us and they were interpreted in good

22  faith throughout the process.

23    **Q    Who was the counsel in  07?**

24    A    George Lawler, maybe.  The firm, Whitford [sic]

25  Taylor?  He has been correctly described previously.

Page 117

1    Q    What was your understanding of what was going to

2    happen to those business  - what was going to happen if Mr.

3    Dechman and Mr. Fiore were unable to sell the business within

4    three years of the Management Services Agreement?

5    A    We had with, you know, clear-eyed intent

6    established an arrangement where they were obligated to

7    continue to run the business for no further consideration.

8    Q    And what was the reason for that?  And, you know,

9    if you could add anything else to the reasons for the

10   transaction in  07 other than what Mr. Dechman has already

11   told the court.  Could you tell the court?

12   A    I think as previously stated, the intent was to

13   align the interests of management and the shareholders in

14   general and to do so in a way that increased the likelihood

15   that the business would be sold at some point in the

16   foreseeable future and not simply revert to, you know, a

17   convenient vehicle for its management.

18        The investors had been invested in this company for

19   a very, very long time and they had invested in the company

20   with the expectation of a return on investment.

21   Q    Okay.  And as to the  09 transactions, you ve also

22   heard Mr. Dechman describe those.  Is there anything that you

23   want to add to his describe or alter as to his description of

24   those transactions in  09?

25   A    No; only that I was at the time worried about the

Page 118

1   economy in which we found ourselves and the environment in

2   which this company would have to be operating going forward

3   and the difficulty of doing any kind of a deal in that

4   environment, as well as the reputation that Cognex had for

5   being a difficult party to close transactions with.

6       **Q    Now, you said that you and Mr. Spiva controlled**

7   **the funds that owned collectively about 76 percent of the**

8   **Series F stock back in  07.  What did you eventually  -**

9       THE COURT: I think he said his fund, Mr. Spiva s

10  funds, and Mr. Evans  fund owned 76 percent; but you said

11  just the two.

12      MR. McCARTHY: I did.

13      BY MR. McCARTHY:

14      **Q    Is the judge right or am I?**

15      A    The judge is right.  Sorry.  There were three

16  significant funds and each one of those funds actually had a

17  director on the board.  So, John Evans represented about a

18  third of the 76 percent; I represented or  - and so on.

19      **Q    Okay.  And all three of you voted for the  07**

20  **transactions?**

21      A    That s correct.

22      **Q    And what happened to your stock and to Mr. Spiva s**

23  **stock and to Mr. Evans  stock after  07?**

24      A    Well, I guess the first thing that happened was

25  contemporaneously with all of that we sold a portion of it to

Page 119

1   I guess MTC, LLC.

2       Q    Monitoring Technology, LLC?

3       A    Yes.

4       Q    Okay.  So, you sold some of it to Monitoring

5   Technology, LLC.  That was part of the three-way transaction

6   Mr. Dechman described?

7       A    Yes.

8       Q    Okay.  And then, did there come a time when you

9   sold the rest of it?

10      A    As described earlier, at the time of the Cognex

11  sale or shortly thereafter there was a big liquidating

12  dividend and then thereafter we sold the balance of our

13  shares.

14      Q    And when you say  we,  you re talking about all

15  three of you?

16      A    Ultimately, yes; not in locked step but in a very

17  short period of time.

18      Q    And you guys again were majority shareholders

19  effectively in  07.  How did those of you who sold your stock

20  fare relative to those who didn t sell their stock?

21      A    Well, perversely, the people who took the

22  obstructive view actually did better.  I will say that we

23  felt we were being good citizens on behalf of the corporation

24  because we were willing to sell basically half of our

25  position to achieve this alignment with management and the

Page 120

1    minority hold-out group actually enriched itself by being

2    obstructive at that point.

3         **Q    Okay.  Now,, did you and I have a conversation on**

4    **March 15**

th?

5         A    Yes.

6         **Q    Do you recall the gist of that conversation?**

7         A    You were asking me about these sorts of things and

8    I think trying to establish whether we understood what we

9    were doing and understood what we agreed to and  -

10        **Q    Do you recall whether or not you and I talked about**

11   **the issue of whether Equaphor itself could have purchased the**

12   **patents, at least legally speaking, directly from IP?**

13        A    We talked about that; and at that time, I shared

14   with you my perspective which was that from an institutional

15   investor standpoint we regarded that, that initiative as

16   being a distraction and, you know, possibly dilutive in terms

17   of the corporate resources.  So, it wasn t just a matter of

18   waiving a conflict. Certainly speaking for myself, my fund,

19   my position as a director, I was quite comfortable encourag-

20   ing them to go off and pursue that.

21        **Q    Do you recall whether we talked about whether**

22   **legally Equaphor could have owned the patents had you all**

23   **decided that that was what you wanted?**

24        A    I think we talked about the fact that I thought

25   they could but that it might prejudice their ability to

Page 121

1    enforce them vis-a-vis others.

2       **Q    Okay.  Do you recall whether we discussed whether**

3    **there was anything else of a material nature that you felt**

4    **you hadn t been apprised of?**

5       A    We talked about that and I am sure that I assured

6    you that I didn t think that there was anything that we

7    hadn t been apprised of.

8            MR. McCARTHY: I don t have any more questions, Your

9    Honor.

10           THE COURT: Cross examination.

11                      CROSS EXAMINATION

12           BY MR. MISKEN:

13      **Q    Good afternoon, Mr. Doherty.  Are you paying any**

14   **consideration for the release under the asset purchase agree-**

15   **ment?**

16      A    I m sorry.

17      **Q    Under the asset purchase agreement, you obtained**

18   **a release from any cause of action.  Are you paying any**

19   **consideration in exchange for that release?**

20      A    No.

21           MR. MISKEN: I have no further questions, Your

22   Honor.

23                      CROSS EXAMINATION

24           BY MR. SHAPIRO:

25      **Q    Did I understand you, Mr. Doherty, that back in**

Page 122

1     07, you were of the view that Equaphor could legally acquire

2     the patents but it just wouldn t be a good business thing for

3     Equaphor to do that?  Is that the substance of your testimony

4     about what the  -

5         A    Yes.

6         Q    Okay.  Would you look at Exhibit I in front of you?

7     It s an email from Mr. Dechman.  It s dated September 26t at

8     the top and then halfway down there s a September 25 email.

9     Do you have that in front of you?

10        A    I do.

11        Q    In the September 25 email, if you d would look down

12    to paragraph one, little  b.   As a condition of the royalty

13    agreements KV must NOT   - capital letters, N-O-T  -  be

14    owned or associated with a competitor of the licensees and

15    therefore MTC cannot be involved.   Were you of the view that

16    that was not true?

17        A    I m not sure I remember that specific phrase.

18        Q    You didn t read the royalty agreements back then;

19    did you?

20        A    I don t know.

21        Q    Didn t you rely on Mr. Dechman for his advice about

22    the situation when you approved Kobayashi buying the patents?

23        A    I said I didn t know.

24        Q    You don t know?

25        A    I might have read them.

Page 123

1     Q     Okay.  Did you rely on Mr. Dechman s advice in

2  making a decision as a director to allow Kobayashi to

3  purchase the patents?

4     A     In part I relied on Mr. Dechman s; yes.

5     Q     At that time, was there any discussion about the

6  640,000-dollar royalty obligation accrued on Equaphor s

7  books?

8     A     That was discussed regularly in board meetings.

9     Q     And was it your understanding that Equaphor would

10  then owe that $640,000 to Kobayashi?

11     A     I m not sure.  We had provided for it.  We were

12  recognizing it as a liability with the  - we had been advised

13  that we could very well owe that.  The accountants made us

14  accrue it.

15     Q     You were also advised not to pay it, weren t you?

16     A     That s correct; but we were acknowledging the

17  liability and taking it seriously.

18     Q     And didn t Mr. Dechman say to the board that there

19  were grounds for arguing that you didn t owe the money, that

20  Equaphor didn t owe the money?

21     A     I can t tell you now exactly what he said.

22     Q     Okay.  And did you know at the time what Kobayashi

23  was going to pay to buy the patents from International Paper?

24     A     I m sorry.  Would you say that again?

25     Q     Did you learn at that time what  -

Page 124

1      A    What time?

2      Q    At the time you gave Kobayashi a waiver to buy the

3   patents from International Paper, did you know what the

4   financial terms were of Kobayashi s purchase of the patents?

5      A    I don t recall.

6      Q    You don t recall whether you knew or not?

7      A    That s correct.

8      Q    Do you think that s something you would have wanted

9   to know as a director in approving the waiver?

10          (Pause.)

11          BY MR. SHAPIRO:

12     Q    I mean, based on your experience in business.  You

13   have been a director of other companies; have you not?

14     A    Yes.

15     Q    Okay.  I know you can t recall four years ago and I

16   don t blame you.  I probably couldn t recall either.  But do

17   you think that s something that as a director you would have

18   wanted  - a director would want to know?

19     A    I m not sure that that s a determinative item.

20   You re asking what it was costing to acquire it?

21     Q    Right.  I m not saying it s determinative but  -

22     A    I don t think it has much to do with what we re

23   talking about here.

24     Q    I m not suggesting it is or isn t determinative but

25   in making the decision that the board did at that time, don t

Page 125

1   believe that s a relevant factor that a director would want

2   to know?

3       A     It was a very small item in relation to the

4   potential magnitude of the litigation and other things that

5   were attended to it.

6             In other words, I think you re asking me about the

7   cost of acquiring the licenses and  -

8       Q     I m asking you as of September 2007  -

9       A     Yes.

10      Q      - when Mr. Dechman came to the directors and said:

11   Equaphor is not allowed. It cannot be involved in owning the

12   patents as a condition of royalty agreements. I want to buy

13   it and I want you to waive any conflict of interest or any

14   claims there may be against me for buying it.  And you as a

15   director approved the waiver agreement that was given to Mr.

16   Dechman and then given to Stein Sperling, the law firm;

17   correct?

18      A     Yes.

19      Q     Okay.  And in deciding whether it was okay for

20   Kobayashi to buy the patents rather than maybe Equaphor

21   trying to buy the patents, wouldn t a director want to know

22   how much Kobayashi was paying for the patents?

23      A     I suppose so.  For all I know, I was told how much

24   they  - I don t know.  I told you, I don t recall the detail.

25   But I do know that the acquisition cost was prospectively

Page 126

1    only a small portion of the total outlay that would have been

2

3    necessary to pursue that avenue.

4        Q    Well, if you look at Exhibit I, the first paragraph

5    of the September 25 email, it says three lines from the

6    bottom that International Paper received $200,000 in

7    guaranteed payments plus 50 percent of the net royalties

8    after expenses.  Do you see that, sir?

9        A    Yeah.

10       Q    So, for guaranteed payment of $200,000, if

11   Equaphor had bought the patents it could have wiped out the

12   640,000-dollar royalty obligation plus any future royalties;

13   couldn t it?

14       A    I don t know whether it could or not.

15       Q    Did you ask Mr. Dechman  What going to happen with

16   the $640,000 on our books if you buy the patent?  Are you

17   going to try to collect it from us? ?

18       A    I don t remember.

19       Q    You don t remember if you did or you didn t?

20       A    That s correct.

21       Q    And if Mr. Dechman had said, sure as tooting I am;

22   I m going to go right after you for the $640,000, would you

23   have given him the waiver?

24       A    I don t know how to answer that.

25       Q    And ultimately, Equaphor paid $900,000-plus to

Page 127

1   **Kobayashi on account of the royalties due to the fact that**

2   **Kobayashi owned the patents; didn t it?**

3       A    We ve already talked about the derivation of that,

4   that number, and it really stemmed from the MSA.

5       **Q    Okay.  Well, do you recall Mr. Dechmen saying that**

6   **the $3.45 million that Equaphor paid Kobayashi for these same**

7   **patents  - 900-and-some-odd-thousand dollars of that was on**

8   **account of royalties that were owed to Kobayashi?  Do you**

9   **recall him testifying to that?**

10      A    Yes.

11      **Q    Was that your understanding in September of  09**

12  **when you approved these transactions, that of the check that**

13  **Equaphor was writing to Mr. Dechman or to Kobayashi that**

14  **$900,000 was on account of the royalty obligation?**

15      A    Yes; but that was, as we ve talked about before  -

16  I won t say artificially derived but it was a number that was

17  a by-product of the MSA obligation.

18      **Q    Well, it was the MSA obligation  -**

19      A    You know, it was a characterization that could be

20  made properly at the time.

21      **Q    It was the MSA obligation plus the 900,000-dollar**

22  **royalty obligation, wasn t it?  That s what Mr. Dechman**

23  **testified to.  Did you understand that or was that not clear**

24  **to you?**

25      A    Okay.

Page 128

1      Q      Do you want me to ask the question again?

2      A      You ve got me confused now.

3      Q      Okay.  You have been in the courtroom through last

4   week s hearing and this week s hearing; correct?  Do you

5   recall that Mr. Dechman testified that the $3.45 million was

6   made up of three components and one of them was the 900,000-

7   plus-dollar royalty obligation that he claimed Equaphor owed

8   to Kobayashi.  Did you hear that testimony?

9      A      Okay.  Yes.

10      Q      And were you aware of that when you approved these

11   transactions in September  09?

12      A      Yes.  Yes.

13      Q      You were.  Now, as I understand it, you were on the

14   board as a representative of a venture or a private equity

15   fund?

16      A      That s correct.

17      Q      And when had that fund been formed?

18      A      In 1992 or three.

19      Q      Ninety-two or three.  Okay.  So, in 2007, it was 15

20   years old?

21      A      That s correct.

22      Q      And what was the expected life of that fund when it

23   was formed?

24      A      Thirteen years.

25      Q      So, it was beyond its expected life?

Page 129

1    A   Well, actually, it had changed its form prior to

2    this time.  So, it was no longer a finite life limited

3    partnership.  It had become a C-type corporation.

4        **Q   How many investments did the fund make originally?**

5    A   Twenty-two; 23.

6        **Q   And how many were still outstanding as of 2007?**

7    A   Four or five.

8        **Q   And in 2009 how many were still outstanding?**

9    A   Three.

10       **Q   Three?  One of which was Equaphor?**

11   A   That s correct.

12       **Q   Now, you approved the decision of the board to file**

13   **a voluntary petition for bankruptcy in December 2010?**

14   A   Yes.

15       **Q   And you were aware at that time that if the company**

16   **filed for bankruptcy it would take the derivative claims that**

17   **had been alleged in the Delaware complaint by Mr. George and**

18   **Mr. Bamber out of the hands of the shareholders and in the**

19   **hands of the bankruptcy trustee, were you not?**

20   A   Yes.

21       **Q   And what was the difference in the financial**

22   **condition of the company in December 2010 from, let s say,**

23   **October 2010?  Was there any difference?**

24   A   Well, it was pretty well hamstrung, I guess, by the

25   derivative suit which impaired its ability to finance; and

Page 130

1    so, I guess it was more insolvent sort to speak.

2        **Q    It had been insolvent before that and became more**

3    **insolvent?**

4        A    Well, we talked about the fact that there were

5    these, you know, increasing legal fees for the patent litiga-

6    tion and the company actually explored whether there was some

7    way to bring further capital into the business to help

8    address those needs and the board determined that it could

9    not do so; and in my judgment, to a significant degree, it

10   was impaired by the existence of this litigation itself.  So,

11   the company really had no choice.  It had no way to pay its

12   bills.  It had no way to respond to the litigation.

13       **Q    Well, as of September 2009, when the transactions**

14   **were completed, this company had no operating business**

15   **anymore; did it?**

16       A    That s correct.

17       **Q    Other than whatever cash was on hand, the only**

18   **asset that the company had were these patents; correct?**

19       A    Correct.

20       **Q    And the company tried to raise money in July of**

21   **2010; did it not?  If you d look at Exhibit  - I m sorry.  Do**

22   **you recall that in July 2010, Mr. Dechman sent a letter to**

23   **shareholders, trying to raise money in a so-called Series G**

24   **offering?  If I can find it, I ll give it to you.  Exhibit F.**

25   **Is Exhibit F in front of you?**

Page 131

1          **(Pause.)**

2          BY MR. SHAPIRO:

3     **Q     Do you have it, sir?**

4          MR. SHAPIRO: I have an extra copy.  If I could

5     approach the witness.

6          THE COURT: Hand it to the court security officer.

7          MR. SHAPIRO: The court officer is bringing you a

8     copy of Exhibit F, Mr. Doherty.

9          BY MR. SHAPIRO:

10    **Q     You see that this is a letter addressed  Dear**

11    **Shareholder,  dated July 28, 2010?**

12    A     Yes.

13    **Q     And did you see this at the time it was sent out?**

14    A     I assume so.

15    **Q     You don t remember it?**

16    A     Not particularly or  -

17    **Q     If you ll turn to the second page, there s a head-**

18    **ing,  Series G Offering,  and it reads:  I have attached a**

19    **Series G preferred share offering term sheet that has been**

20    **approved by the board of directors.  Do you see that, sir?**

21    A     I m sorry.  Where am I looking?

22    **Q     On the second page.  There s sort of a heading,**

23    **partway down the page,  Series G Offering  in bold.**

24    A     Yes.

25    **Q     And it says,  I have attached a Series G preferred**

Page 132

1    share offering term sheet that has been approved by the board

2    of directors?

3         A    Yes.

4         Q    And if you look at the next page, there s the term

5    sheet.   And that proposed offering didn t succeed because

6    shareholders didn t respond and sign up to buy shares; isn t

7    that right?

8         A    That s my understanding.

9         Q    And that was before the derivative lawsuit was

10   filed; wasn t it, sir?

11        A    We already had a threatening letter from you prior

12   to the lawsuit.  So, the company was clouded by your actions

13   prior to this I can assure you.

14             MR. SHAPIRO: Your Honor, if I can just note Exhibit

15   B.  The lawsuit was filed August 13, 2010.

16             BY MR. SHAPIRO:

17        Q    Whatever threatening letter there was didn t deter

18   Mr. Dechman from making a proposal to the shareholders to

19   raise money through a Series G offering; did it?

20        A    That s correct.

21        Q    And the letter doesn t refer to a threatening

22   letter from me or a derivative lawsuit or any threat of a

23   lawsuit; does it, sir?  I ll let the record speak for itself

24   and the exhibit will speak for itself.  I withdraw the

25   question.

1        **At the time the board of directors approved the**

2    **purchase of the patents from Kobayashi for $3.45 million,**

3    **were you aware that there was litigation pending between**

4    **Carotex and Kobayashi?**

5            MR. McCARTHY: Objection, Your Honor.  I mean,

6    relevance.  The issue is, what was the trustee aware of?

7    These discussions with various interested parties  -

8            THE COURT: Well, but you partially raised the issue

9    in your examination, Mr. McCarthy, that at bottom these other

10   claims have no validity.  So, I guess he gets to explore that

11   they may have potential validity which you re ignoring.  So,

12   go ahead.

13           BY MR. SHAPIRO:

14       **Q    Do you need me to repeat the question?**

15       A    Please.

16       **Q    Were you aware of the Carotex-Kobayashi litigation**

17   **in September of 2009?**

18       A    I certainly became aware of it.  The specific point

19   in time, if  - I believe we had full disclosure; and so, if

20   there was litigation underway by then, we were told about it.

21       **Q    If you would look at Exhibit J in front of you, Mr.**

22   **Dechman s September 21, 2009 memo.  Do you have that in front**

23   **of you, sir?**

24       A    I do.

25       **Q    Did you receive this from Mr. Dechman on or about**

Page 134

1    September 21, 2009?

2        A    I must have.

3        Q    And the board voted to approve the transaction a

4    couple of days later; did they not?

5        A    Yes.

6        Q    And he starts out by saying:  Attached are

7    agreements relating to the sale of significantly all assets

8    of MTC.  This document provides some background, details of

9    the proposed deal and the resulting structure for MTC.

10            And then, if you ll turn over to paragraph three on

11   the second page, paragraph three discusses the sale of the

12   patents to Equaphor.  Do you see that, sir?

13       A    I do.

14       Q    And that was the information that you had as of

15   September 21, 2009?

16       A    I assume so.

17       Q    Okay.  And there s no mention of any litigation in

18   that paragraph; is there, sir?

19       A    It says what it says.

20       Q    Was this the first time you were advised of the

21   proposal to sell patents to Equaphor, the September 21 memo?

22       A    I can t tell you about specific days in September

23   2009.  We were aware of the restructuring but I can t talk

24   about any particular day or whether there was information

25   before this letter or after this letter.

Page 135

1    Q    You don t recall whether you had any information

2    before this letter or not?

3    A    I don t.

4         MR. SHAPIRO: No other questions.

5         THE COURT: Any redirect, Mr. McCarthy?

6                         REDIRECT EXAMINATION

7         BY MR. McCARTHY:

8    Q    Mr. Doherty, you referred to a letter during your

9    examination that you had received from Mr. Shapiro; is that

10   correct?

11   A    I did.

12   Q    And may I show you a copy of that letter?

13        THE COURT: We will mark it Trustee s Exhibit B.

14                         (Trustee s Exhibit B

15                         was marked for identification.)

16        MR. SHAPIRO: May I see a copy of that letter, Your

17   Honor?

18        (Pause.)

19        MR. SHAPIRO: I m sorry, Your Honor.  What s the

20   letter of that exhibit?

21        THE COURT: Trustee Exhibit B.

22        MR. SHAPIRO:  B.

23        BY MR. McCARTHY:

24   Q    Is this the letter you were referring to?

25   A    That s correct.

Page 136

1      Q    **Did you receive this letter prior to the July 28,**

2   **2010 from Mr. Dechman to the shareholders about the need to**

3   **raise capital?**

4      A    yes.

5           MR. McCARTHY: I would move  B  into evidence, Your

6   Honor.  I don t have any more questions of this witness.

7           THE COURT: It will be admitted.

8                          (Trustee s Exhibit B

9                          was received in evidence.)

10          MR. SHAPIRO: No further questions, Your Honor.

11          THE COURT: Okay.  Thank you for testifying.  You

12  may stand down.

13          MR. McCARTHY: I would like to call Mr. Spiva.

14          THE COURT: Sir, if you will please come forward and

15  be sworn.

16  Whereupon,

17                    CLARENCE E. SPIVA

18  was called as a witness and, having been first duly sworn,

19  was examined and testified as follows:

20                    DIRECT EXAMINATION

21          BY MR. McCARTHY:

22     Q    **Mr. Spiva, state your name and address, please.**

23     A    Clarence Edward Spiva.  The address is, 2204

24  Skylark Drive, Westminster, Maryland.

25     Q    **And what is your educational background, very**

1    **briefly?**

2        A    Accounting Degree from Virginia Tech.    Passed the

3    CPA exam in  72.  I spent a  - I m sorry.  Go ahead.

4        **Q    Okay.  And your work background?**

5        A    Twenty-two years in banking; various positions,

6    including two or three CFO positions; joined a venture firm,

7    Anthem Capital, in 1994.  So, I was with venture capital

8    until about three years ago.

9        **Q    And what was your position with the debtor in  07?**

10       A    In  07, I was the chairman of the board,

11   represented the fund that was with Anthem Capital.

12       **Q    What was the stock ownership of your venture**

13   **capital fund in  07?**

14       A    It was a Series F.  I m not certain.  I only

15   remember before we actually did some sales.  So, it was part

16   of that 70-some percent.

17       **Q    Do you recall a conversation that you and I had on**

18   **March 15**

                                **th of this year?**

19       A    Yes.

20       **Q    And do you recall what we talked about?**

21       A    Yes.  We talked specifically.  One of the things

22   was about whether or not we would have purchased the patents.

23   We talked about that; and I was probably the one that made

24   the blunt statement that you referred to last week and that

25   is: From my perspective, the company had no business pursuing

Page 138

1    a patent that we were going to have to sue to collect on the

2    patent, that that was not our primary business.  I ve been

3    there, done that and it doesn t usually come out well.

4        **Q    Do you recall whether we talked about whether if**

5    **it wanted to, legally Equaphor could have owned the patents?**

6        A    Yes, we talked about it.  We could do it legally.

7    Was it practical?  My perspective was no.

8        **Q    Okay.  And do you recall we talked about the issue**

9    **of whether there was anything of a material nature that you**

10   **did not feel that you had considered prior to the  - well,**

11   **in connection with the various transactions with Mr. Dechman**

12   **and his entities?**

13       A    There was nothing material that was left out for

14   me, from my perspective.

15       **Q    And do you have an understanding  - now, the vote**

16   **in  09 was three to one to abstain; correct?**

17       A    Yes.

18       **Q    Mr. Evans was the abstainer?**

19       A    Correct.

20       **Q    And do you have an understanding as to whether Mr.**

21   **Evans has since commented or stated anything in writing as to**

22   **why he abstained or whether he would have voted for it?**

23            MR. SHAPIRO: Objection, Your Honor.  Hearsay.

24            THE COURT: I ll sustain the objection.

25            THE WITNESS: So, I can answer that?

Page 139

1          MR. McCARTHY: No.

2          THE COURT: No, you cannot.

3          THE WITNESS: I couldn t remember what that  -  I

4     didn t know what that meant.

5          MR. McCARTHY: Okay.  I don t have any more

6     questions.  Thank you.

7          MR. SHAPIRO: Just a couple, Your Honor.  I m sorry.

8     Go ahead.

9                    CROSS EXAMINATION

10         BY MR. MISKEN:

11    **Q    Please turn to Exhibit 2 in the binder and in**

12    **particular page eight.  It s Bates 15  -**

13         A    I m sorry.  I can t hear you.

14    **Q    Page eight at the bottom of Exhibit 2 or Bates**

15    **stamped CAR00015.**

16         A    Again, where?

17    **Q    We re on Paragraph 8-A.**

18         A    Okay.

19    **Q    It says,  Releases and Covenants Not to Suit.  Do**

20    **you see that?**

21         A    Yes.

22    **Q    That paragraph proposes to grant you a release from**

23    **any cause of action that the trustee, debtor and the**

24    **bankruptcy estate may have; is that correct?**

25         A    Correct.

Page 140

1      **Q    And did you pay any consideration in exchange for**

2    **that release?**

3      A    No.

4           MR. MISKEN: All right.  I have no further

5    questions, Your Honor.

6           THE COURT: Mr. Shapiro.

7           MR. SHAPIRO: Just a few questions, if I may, Your

8    Honor.

9                          CROSS EXAMINATION

10           BY MR. SHAPIRO:

11      **Q    Mr. Spiva, can you see in front of you Exhibit I**

12    **which is the two emails from Mr. Dechman to the board, dated**

13    **September 26, 2007 at the top of the page and then September**

14    **25?**

15      A    Exhibit I?

16      **Q    Yes.  It s in front of you.**

17           MR. SHAPIRO: May I ask the court officer to take

18    another copy over, Your Honor?

19           THE WITNESS: Is this Bamber Exhibit I?

20           MR. SHAPIRO: Yes.

21           THE WITNESS: Okay.  I ve got it.

22           BY MR. SHAPIRO:

23      **Q    Do you recall receiving this email from Mr.**

24    **Dechman, dated September 25, 2007?**

25      A    I don t recall.

Page 141

1      Q    If you look at paragraph 1-B, do you recall I just

2   asked Mr. Doherty, asked him to read that which states,  As a

3   condition of the royalty agreements, KV must not be owned or

4   associated with a competitor of the licensees and therefore

5   MTC cannot be involved. ?  Do you recall being told that by

6   Mr. Dechman?

7      A    I don t recall that; no.

8      Q    Did you look at royalty agreements to make any

9   determination as to whether there were any legal agreements

10   that prohibited Equaphor from owning the patents?

11      A    When?

12      Q    September 2007.

13      A    Not in September that I know of.

14      Q    Well, you just testified in response to a question

15   by Mr. McCarthy that it was your view in 2007 that Equaphor

16   could have owned the patents legally.  You just testified to

17   that; did you not, sir?

18      A    Yes.

19      Q    What was the basis for that testimony?

20      A    That s what I recall, a discussion and I think it

21   went back to the summer of 2007.

22      Q    You don t recall Mr. Dechman telling you that MTC

23   could not be involved or own the patents?  You don t recall

24   that?

25      A    No.

Page 142

1      Q      And one of the reasons that you didn t want

2    Equaphor to buy the patents in 2007 is you did not want

3    Equaphor to get involved in pursuing patent infringement or

4    royalty claims?

5      A      I didn t want the company to get diverted from its

6    attention of its primary business to start pursuing a patent

7    litigation.   That s correct.

8      Q      And you also said that you ve been there before and

9    you didn t think that was a good thing to do; right?

10     A      That s correct.

11     Q      What wasn t good about it, the expense, the time or

12   what?

13     A      No.   Being dead right.

14     Q      Excuse me.

15     A      Being dead right.

16     Q      What do you mean being dead right?

17     A      Being absolutely correct that there was a patent

18   infringement but it ruined us with our primary customer.

19     Q      So, you had no opposition to Equaphor acquiring the

20   patents in 2009; is that right?

21     A      Then it became my primary business; so, no, I did

22   not.

23     Q      The primary business of enforcing royalty

24   obligations?

25     A      That s right.

Page 143

1      Q      **Were you aware of the Carotex litigation in**

2  **September 2009?**

3      A      The Carotex one?

4      Q      **Yes.**

5      A      I can t remember as to when I became aware of that.

6  I was only aware of one that I remember.

7      Q      **One litigation?**

8      A      PaperTech.

9      Q      **PaperTech.  You were aware of that?**

10     A      Yeah.

11     Q      **And at the time of the sale to Equaphor were you**

12  **told that Mr. Dechman believed he was close to a settlement**

13  **with PaperTech?**

14     A      Close to a settlement?

15     Q      **Yes; or that there was a settlement.**

16     A      I don t recall there was a settlement.

17     Q      **Well, what do you recall knowing about the**

18  **PaperTech litigation?**

19     A      I remember that they were under litigation with

20  PaperTech.  I did not know what the outcome was supposed to

21  be.

22     Q      **And that s all you knew about litigation?**

23     A      Yeah.

24            MR. SHAPIRO: Thank you.  No other questions.

25            THE COURT: Any redirect?

Page 144

1          MR. McCARTHY: Not from me, Your Honor.

2          THE COURT: Thank you for testifying, Mr. Spiva.

3          Okay.  Is that all you have as evidence?

4          MR. McCARTHY: That s all my evidence.  That s

5   correct.

6          THE COURT: Okay.

7          MR. SWAN: Your Honor, not so much of a  -

8          THE COURT: Are you going to present any evidence?

9          MR. SWAN: I ll present an alternative to the case.

10          THE COURT: Well, why don t we get all the evidence

11   in and then I ll hear argument.

12          MR. SWAN: I don t think we have any evidence.

13          MR. SHAPIRO: I have nothing further, Your Honor.

14          THE COURT: Well, since it s the trustee s motion,

15   the trustee gets to make argument first and then I ll let you

16   present your alternative.

17          MR. SWAN: Okay.

18          MR. McCARTHY: Okay, Your Honor.

19          When we started, I told the court what was going on

20   here.  There was a sale of assets and a compromise of mutual

21   claims and that s been explained in the testimony and the

22   evidence that s in front of you.

23          I also explained what the terms of the deal are and

24   I ll say that again very quickly.  The estate will get

25   $250,000.  The buyer, which is Kobayashi, must buy up at full

Page 145

1    value all of the scheduled, undisputed claims.  That s a

2    total of about $220,000.  Kobayashi will be subrogated to

3    those claims and then Kobayashi also must offer the Series F

4    interests that it doesn t already own, which is about 17

5    percent, a total of about $100,000 which represents 50

6    percent more than what had been previously, than what other

7    Series F shareholders such as Mr. Spiva s venture capital

8    fund, Mr. Doherty s venture capital fund cashed out at.

9          So, if the deal is approved, Kobayashi potentially

10   has a payout of about $570,000; and of course, it must also

11   fund the estate s costs of litigation with Carotex, including

12   any claim objection.

13         I told the court why I thought this was a

14   reasonable deal and I don t want to go back over everything

15   that I already did but there are a couple of salient points.

16

17         The dispute with Carotex clearly is a complicated,

18   expensive piece of litigation.  Carotex is saying the

19   debtor s patent rights are of no value.  So, that component

20   is something that they think I apparently could give away;

21   and I ve asked them to bid on it.  They weren t interested in

22   bidding on it.  And I asked the derivative shareholders if

23   they wanted to bid on the patent, and they weren t interested

24   in bidding on that.

25         We also have a shareholder derivative suit that is

Page 146

1    like the patent litigation, a hotly contested piece of

2    litigation; and contingency or no contingency, the issue here

3    is whether or not the trustee met a standard of

4    reasonableness in looking into these things, and based on who

5    I talked to and what I looked at  - heaven knows I may not

6    have come to the same conclusion that a judge in Delaware

7    would have come to after a full piece of litigation but based

8    on everything I saw, it looked to me like it could reasonably

9    result in no recovery.

10          So, we have two expensive pieces of litigation.  We

11   have Carotex saying the patent suit isn t worth anything.  We

12   have shareholders basically saying the patent suit isn t

13   worth anything.  Neither one of them wants to pay the trustee

14   any money to go away.

15          So, I have put this thing together which was an

16   effort, as I said in my opening statement, to balance

17   competing interests, and it is an alternative that definitely

18   results in substantial funds coming into the estate and

19   $530,000 of claims against the estate being waived and in the

20   estate sidesetting expensive litigation.

21          In fairness to Mr. Shapiro, he offered to do that

22   on a contingency basis but a hundred percent of zero is zero,

23   and I might end up with zero.  That weighed very heavily in

24   my considerations.

25          So, the question is, did I exercise my discretion

Page 147

1   reasonably?

2           I guess I said in my proffer which became my

3   testimony so I can argue it now, I spent 60 hours, just up

4   to the point of the deal, in working on this; and of course,

5   it s been more time since then.

6           I talked at length with Mr. Dechman and Mr. Fiore.

7   I talked with Jeff Schwaber who is here today.  He s with

8   Stein Sperling, and Bob Fletcher who is also here today; with

9   LeClair Ryan, and I considered an email from Joe Parisi who

10  is the attorney handling the Markman hearing.  Mr. Schwaber

11  and Mr. Fletcher are involved in the patent litigation, as

12  well.

13          I talked and emailed with Mr. Shapiro on a number

14  of occasions.  I talked with Mr. Adams about Carotex s

15  position, including the basis of its claims against the

16  debtor.

17          I mentioned in my testimony that the affirmative

18  claims by Carotex struck me as, you know, something perhaps

19  worthy of skepticism; but of course if they are -- I mean, if

20  there is anything to those claims then that s all the more

21  reason why the Series F shareholders ought to jump at this

22  deal because at least they get something out of my deal as

23  opposed to if Carotex has a four-million-dollar claim.

24          I reviewed balance sheets.  I reviewed schedules of

25  payments made during the year before the bankruptcy petition.

Page 148

1   I looked at attorney bills.  I looked at the bylaws.  I

2   looked at the asset purchase agreement, and I read the

3   shareholder derivative suit.

4          Believe me, Tom Shapiro did a very good job.  He

5   raised questions in my mind from time to time.  Whenever he

6   would raise a question in my mind, I would go back to Mr.

7   Dechman  - you saw his demeanor on the stand -- and he had

8   what appeared to be a plausible response to me; and then I

9   did a reality check on those plausible responses, and it

10   wasn t a very lengthy conversation but I did talk to both Mr.

11   Doherty and Mr. Spiva, and I asked them was there anything.

12          This question about the email that Mr. Dechman

13   wrote that suggests that Equaphor was unable to own these

14   patents turned out to be inaccurate; and so, that was one of

15   the specific questions I asked them and they both said to me,

16   no.  I think I said that in my testimony.  I hope I did.

17   I was trying to ask them questions about that in my own

18   examination of them. I also asked them if there was anything

19   material that they felt they didn t know about and they both

20   said, no.

21          So, that is the position I found myself in.  I

22   thought long and hard about all of this and I knew full well

23   that whatever I did was going to antagonize somebody, and

24   this is what I came up with.

25          There s no other feasible deal that s on the table.

Page 149

1   Well, maybe Mr. Swan is about to come up with something

2   that s going to make us all applaud but he hasn t yet.

3         There s no other deal that s on the table, no

4   feasible deal that will definitely result in payments to any

5   of the creditors, let alone the shareholders; and now we ve

6   got these four-million-dollar claims filed by Carotex, and

7   I ve told you what effect that will have if even a small

8   portion of it is good as to the Series F shareholders.

9         Carotex talked about fraudulent conveyances, did I

10   look into that carefully enough.  It just didn t seem to me

11   that that was a low-hanging fruit if everything that was done

12   was in accordance with valid contracts, with consideration,

13   and especially at a time when there  - you know, there s a

14   lot of doubt as to whether the debtor was even insolvent.

15   I mean, if you look at the balance sheets, it appeared that

16   they weren t.

17         So, every which way I turned away from this deal,

18   there was a costly or uncertain or both costly and uncertain

19   piece of litigation waiting for me.  So, I opted for a

20   certain global deal that potentially gets something for

21   everybody.

22         I ask the court to approve the deal on the basis

23   that it is a reasonable reconciliation of competing interests

24   in the case, that no one has come along with a better deal

25   that results in a certainty of claims being paid, money in

Page 150

1    the estate, $530,000 of claims against the estate being

2    waived, and that the alternatives are uncertain and

3    potentially expensive.

4            As I have mentioned several times, if the court

5    does approve the deal, I want to add some clarifying language

6    that the three paid-up licenses aren t affected.  The

7    trustee  - and I guess we would say something about any

8    license rights of Carotex, as well, and that the trustee is

9    releasing Whiteford Taylor from any avoidance claims because

10   that was a condition of their withdrawing their limited

11   objection even though I had gone through the payments to

12   professionals.  I thought they had a pretty good new-value

13   defense.

14           Finally, I would point out that throughout this

15   case, at least by the end of  09, Mr. Dechman and Mr. Fiore

16   are 83-percent equity owners of the company.  So, yes, I

17   suppose it might have benefitted them more to be dealing

18   through an entity in which they owned  - actually, I think it

19   was 80 percent as opposed to 83 percent.

20           But you know, considering everything, their

21   significant ownership of the company and all of the people I

22   talked to and all the other documents that I reviewed, I

23   submit that I acted within the ambit of my reasonable

24   discretion.

25           Thank you.

Page 151

1          THE COURT: Let me hear from Mr. Swan.

2          MR. SWAN: Thank you, Your Honor.

3          Rule 9019 cases require in evaluating settlement

4     four factors:  One is the consideration of the probability

5     of success in litigation.  Number two, consideration of the

6     difficulties if any to be encountered in collection.  Number

7     three, consideration of complexity of litigation involved and

8     the expense, inconvenience and delay associated with the

9     litigation, and, number four, consideration of the paramount

10    interest of creditors and a proper deference to their

11    reasonable views.  I ll take those factors in reverse order.

12          First, the paramount interest of creditors and a

13    proper deference to their reasonable views.  I emphasize

14    deference to creditors, the paramount interest of creditors.

15          It was striking that all of the trustee s testimony

16    was: I talked to Dechman.  Dechman told me this.  The debtor

17    told me this.  The so-called dog and pony show which I m sure

18    is an accurate description of what it was.

19          The trustee has only been considering the interests

20    of the debtor and its insiders and excluding the interest of

21    the creditors, Carotex, the shareholder claims.  That s not

22    the way this is supposed to work.  That s not appropriate.

23          Secondly, the complexity of the litigation and the

24    expense, inconvenience and delay.  That s easy.  The solution

25    there is the Shapiro firm which the trustee testified is

Page 152

1    willing to handle the case.  Complicated as it is, they re

2    willing to handle the case on a contingency and advance

3    expenses.

4             THE COURT: Well, there are two expensive pieces of

5    litigation.  One is the derivative suit.  The other is your

6    client.

7             MR. SWAN: Which they would be willing to handle;

8    but our walk-away offer that was attempted between hearings,

9    after the hearing last week, would take care of that because

10   Carotex would waive any claims against Equaphor.  More on

11   that later.

12            The third factor for settlement is difficulty in

13   collection.  The trustee testified that this was not a

14   consideration because the potential insider defendants could

15   pay.  So, that factor also weighs in favor of not releasing

16   them.

17            Finally, the probability of success.  There are, we

18   believe and Mr. Shapiro believes, significant claims against

19   the insiders, up to 14 million altogether, according to the

20   shareholder objections.  But 250,000 is just simply too

21   little settlement consideration for the releases.

22            The testimony I think confirms that the trustee

23   gave very little emphasis to the value of the Chapter 5

24   claims and what he would be giving up with those releases,

25   relatively little analysis of the documents, no analysis, he

Page 153

1   said, as to whether the insider claims could be subordinated

2   although I think he said in his testimony last week that they

3   likely could be subordinated.  The trustee simply, again,

4   deferred to the debtor on their evaluation of the case.

5          There s no explanation whatsoever as to why Stein

6   Sperling should be released for no consideration at all.

7   They are offering no separate consideration.

8          In fact, almost all the released parties are

9   offering no separate consideration for the releases.  So,

10  we submit there is no success with this sale to meet the test

11  in favor of settlement.

12         There s a significant public policy concern over-

13  riding all this.  The way bankruptcy cases are supposed to

14  work is that the trustees are supposed to use avoidance

15  actions, to call back improper payments, to benefit all

16  creditors particularly when the payments are to insiders.

17  That s why, for example, the preference look-back period is

18  one year with insiders and 90 days with respect to non-

19  insiders.  There s a policy to scrutinize insider

20  transactions.

21         The trustee should not sell assets to insiders

22  without heavy scrutiny.  That s why in many cases where sales

23

24  are larger transactions to insiders the courts will often

25  appoint an examiner to investigate the transaction because

Page 154

1    it s given more scrutiny.

2           Here the patents are being sold to the same entity

3    that sold the patents to the debtor for three and a half

4    million dollars less than two years ago.  Here the debtor in

5    2008 was an eight-million-dollar-a-year business that

6    proceeded to give away its assets to the insiders.

7           The facts are complicated but the bottom line is,

8    liquidating dividends were given to shareholders when there

9    were creditors.  This was all controlled by Mr. Dechman who

10   was the debtor designate in this case; but at least given

11   these transactions, he should have resigned that role.

12          This transaction cannot be approved and the estate

13   does have better alternatives.

14          The trustee has said that there was an opportunity

15   for Carotex to bid on the patents.  That s not really the

16   case.  The sale was certainly not set up to receive

17   alternative bids.  This is being done as a private sale.

18          So, after the hearing last Tuesday, we explored

19   some ideas with the trustee.  He deferred to Kobayashi.  So,

20   we weren t able to get anything done.

21          But I talked to my client over this weekend and

22   this morning.  We have an offer.  It s not competing bids,

23   sort to say, but it s something designed to match the

24   Kobayashi offer without the insider releases; and Mr.

25   Dechman s testimony, by the way, was that Kobayashi is not

Page 155

1   willing to purchase the patents unless he gets the releases.

2   Well, we are.

3          We will pay $250,000 for the patents, including

4   license agreements, including the right to recover for all

5   past infringements.  In other words, we will pay $250,000 for

6   the patents and the patent rights.

7          Number two, the Stein Sperling preference that the

8   trustee wants to release, if he doesn t want that we do; and

9   we can figure out how to structure that.  We would love to

10  have standing to pursue that preference case.  If that s not

11  possible, we can figure out a way to do it: Put it into a

12  trust where we get assignment of the proceeds but as long as

13  we have some control over the litigation, again preferably

14  standing to pursue it ourselves.  If the trustee doesn t want

15  it, we want it.

16         Third, we will waive our claims against the estate.

17  We filed unliquidated claims.  We estimated them at $4

18  million or up to $4 million on the proof of claim filing. We

19  will waive those so there s no issue with an estate expense

20  of defending my client s claims.  We ll give those up.  No

21  releases.

22         So, the estate with Mr. Shapiro on contingency or

23  some other way of doing it can pursue the Chapter 5 actions

24  against Monitoring Technology, Mr. Dechman and all the rest;

25  Kobayashi.

Page 156

1              So, again, it s not an auction.  It wasn t set up

2    as an auction.  It s not a competing bid.  This is merely

3    achieving a result that matches the sale consideration with

4    this deal but keeps the most valuable assets of the estate,

5    the Chapter 5 actions in the estate, and it eliminates the

6    public policy concerns, the overall outrageousness of the

7    insider releases.  I don t think anyone could put a value on

8    that but I don t think any sale could be approved that gives

9    those away.

10             Thank you.  Any questions?

11             THE COURT: Not at this point.

12             MR. SWAN: Thank you.

13             THE COURT: Thank you.

14             Mr. Shapiro.

15             MR. SHAPIRO: I want to thank you for Your Honor s

16   patience.  I know we ve gone way over the time you said you

17   wanted to devote to this.

18             I don t want to suggest any lack of confidence in

19   my opposition to the motion but I do want to raise one point,

20   Your Honor, in the event Your Honor doesn t reject the

21   motion.  I have to do that for my clients.  They ve

22   offered  - and Mr. McCarthy keeps referring to this  - to buy

23   out the minority Series F interest for $100,000 which is

24   really a pittance compares to what my clients  - and I

25   represent a number of Series F holders, not just Mr. George

Page 157

1    and Mr. Bamber.  But the offer is, of course, conditioned on

2    the sale being approved and Mr. Dechman, et cetera giving up

3    their releases.

4           They have recused my request that the offer be

5    kept open until after the court rules on this; and if the

6    court rules against us then I guess the white flag goes up

7    and my clients would go ahead and surrender their shares.

8    But we shouldn t be put to the Hobson s choice of having to

9    make that election before Your Honor has ruled because that s

10   certainly not their choice.

11          Their choice is they want to go forward with the

12   derivative litigation.  It would not be derivative at that

13   point.  It would be a trustee s litigation.  They ve put

14   together a war chest to do this and they really feel very

15   strongly about it, and I feel I should raise that.

16          I would ask that the court insist on that as an

17   amendment to this agreement if the agreement does get

18   approved.

19          It seems to me, Your Honor, and you obviously

20   brought it up a moment ago, that the only possible  - and I

21   don t say it is a justification but the only possible

22   justification for this deal is that Mr. McCarthy is in a

23   difficult position of having this expensive Carotex

24   litigation without the funds to defend it.

25          But the fact of the matter is that he never

Page 158

1   approached Carotex or never explored with Carotex the idea

2   of both parties walking away.

3          You ve heard Mr. Spiva s testimony.  It certainly

4   would be in the interest of this company to agree with

5   Carotex: We ll drop all our claims against you.  You drop all

6

7   claims against us.  And if that were to happen then it s

8   there for the trustee to take.  It s there for the taking,

9   either a walk-away or the 250,000-dollar offer.

10          If you were to pursue that option and that s an

11   available option then the only justification for this

12   transaction, that I have to find a way to defend the Carotex

13   litigation, simply disappears.

14          This company has no obligations, no creditors other

15   than the very law firms who have been defending Mr. Dechman

16   and Kobayashi and Equaphor jointly and who have been billing

17   all of their work for the past year to the tune of some

18   $800,000 to Equaphor. I mean, talk about an injustice to

19   this debtor, to this estate; and Mr. McCarthy acknowledged

20   that he never really looked into whether or not Kobayashi and

21   Dechman were paying for their legal fees, or any part of

22   these legal fees, and Mr. Dechman acknowledged on the stand

23   that they had not.

24          So, you ve heard all about the Management Services

25   Agreement and the sale incentive fee.  I won t repeat that

Page 159

1   but I think it s a very important part of this whole

2   situation and it s very important to my clients, just to

3   review the unbelievable history of the patents and how this

4   company has been abused from beginning to end.

5          Mr. Dechman bought the patents for $200,000 plus

6   the obligation.  If he collected royalties, he had to pay 50

7   percent of the royalties after deducting the expenses for

8   collecting them.  So, $200,000, and it would have wiped out a

9   640,000-dollar royalty obligation, at the time when this

10  company had money and could easily have paid that.

11         And at the end of the day, Mr. Dechman who took the

12  position that under the most favored nation provision, the

13  company didn t owe the money, and recommended the company not

14  pay the money to International Paper which had not pursued

15  the money  - two years go by.  He increases the royalty

16  accruals saying, you now owe my company $900,000, and he

17  extracts $900,000 from this company in September 2009 as part

18  of this series of transactions in which he unloaded the

19  patents onto Equaphor.

20         I asked Mr. Dechman on the stand: You had a win-win

21  situation, didn t you, if at the time you sold the patents to

22  Equaphor  - you got the PaperTech settlement which was in the

23  works and you had hoped that Carotex would follow suit.  Then

24  the settlement with Carotex  - the proceeds would be paid to

25  Kobayashi under the terms of the patent purchase agreement

Page 160

1  that he admitted, included the provision  - not only was

2  Kobayashi paid three million, 450, but Kobayashi got paid

3  anything that was collected in the next year.

4        So, the $690,000 from PaperTech was paid over to

5  Kobayashi.  That takes you up to four and a half million

6  dollars, a little over four and a half million dollars, plus

7  if they recovered something from Carotex that money would go

8  to Kobayashi.

9        But if the hope and expectation did not come to

10  past and they continued to be embroiled in this litigation

11  then they managed to offload the litigation expense onto

12  Equaphor, and it adds up to some 800-and-something thousand

13  dollars that Equaphor has paid, and Mr. Spiva, the director,

14  approved this without even knowing about the Carotex

15  litigation.  This was a director who was of the view: You

16  don t want anything to do with patent litigation.  I ve had

17  bad experience with it in the past.  That s why I didn t want

18  this company to buy the patents in the first place and I

19  blessed Kobayashi buying them.  And he either just overlooked

20  that because he does whatever Mr. Dechman wanted or he was

21  ignorant of it and it wasn t disclosed to the directors that

22  they were acquiring a real albatross.

23        Equaphor was never a party to the Carotex litiga-

24  tion.  It was only when Mr. Dechman or Kobayashi sold the

25  patents to Equaphor.  Then they moved to substitute Equaphor

Page 161

1    as a party and Carotex filed a second amended declaratory

2    judgment action which is in their exhibit book, which added

3    Equaphor as a defendant.

4           So, they managed to do this win-win situation and

5    burden this company, which had no operating business anymore,

6    no interest in the patents, no use for the patents, with the

7    expensive Carotex litigation.

8           What really adds insult to injury, Your Honor, is

9    according to Mr. Dechman s own memo  - this is Exhibit F, a

10   letter to the shareholders  - this company was insolvent in

11   July of 2010.  The language is right in there, on the second

12   page.

13          Mr. Dechman also wrote in this July 28, 2010

14   letter, Exhibit F, and it says,  If the company is unable to

15   obtain capital it will be deemed insolvent and will cease

16   operations.

17              Under the terms of the Kobayashi note  - that s

18   the 500,000-dollar note that was part of the patent sale  -

19    the insolvency and payment default will trigger a reversion

20   of the patents back to Kobayashi.  So, apparently Kobayashi

21   could have taken the patents back.

22          A derivative suit gets filed against them in

23   August, August 13th.  We have a settlement meeting in October.

24

25   I get together with my clients.  I make a formal demand in

Page 162

1    November.  They take it up at a December 7 board meeting.

2    The minutes are now an exhibit.  They take it up.  They

3    characterize the demand as outrageous and start exploring

4    bankruptcy.

5          Then they put this company into bankruptcy and no

6    witness could say that this company is in any different

7    financial condition in December than it was previously.

8          They put it into bankruptcy for the purpose of

9    trying to avoid the derivative litigation when they could

10   have taken the patents back themselves, and they forbore

11   from doing that so that Equaphor was continuing to pay the

12   bills.

13         Now they have this agreement where they re going to

14   get the patents back with the benefit of a million dollars in

15   legal fees having been paid and the litigation that much

16   further along.

17         So, sort of the proof in the pudding, to tie all of

18   this together, is: Mr. McCarthy testified they would not

19   purchase the patents unless they got a release on the

20   derivative claims.  I mean, it just gets very obvious what

21   the game is here.

22         This company would have been much better off if

23   back in September 2009  - and I say, I think the testimony

24   makes it clear that there was not a sale of all or

25   substantially all of the assets.  They sold the business to

Page 163

1   Cognex.  The board rejected the idea that there could be more

2   than one transaction to make up the sale, to qualify for the

3   sale incentive fee; and then they buy the rest of the assets

4   themselves and say, aha, at a bargain basement price, at a

5   million-five for 70 percent of the business.  And they say:

6   Well, now we ve sold all the assets.  So, we re entitled to

7   the sale incentive fee.  And it reverse engineers and that

8   justifies the million and a half purchase price.  It

9   justifies giving you the patents and we take $3.45 million.

10          They could have just taken the three million, 450

11   and kept the patents and this company would still have had

12   another million dollars in the bank that it could have

13   distributed to shareholders.  But no.  They ve unloaded all

14   of the patents for all the reasons that I ve just explained.

15          The thing now comes full circle when they say, we

16   want the patents back but only if you release us from the

17   derivative claims.

18          They could get a release from the derivative

19   claims, take the patent back, agree to the same walk-away

20   with Carotex and just laugh all the way to the bank.

21          I would ask Your Honor for all these reasons to

22   reject the motion.

23          Thank you.

24          MR. REYNOLDS: Your Honor, if I may just address the

25   court briefly. I m not going to reiterate what Mr. McCarthy

Page 164

1    stated previously in his closing but I would like to address

2    the issue of this offer that has just come to light literally

3    at the eleventh hour.

4           This is an offer that Carotex could have made weeks

5    ago, if not from the beginning of the case.  They ve known

6    about the trustee s discussions with my client for several

7    weeks.  They filed a motion for relief from stay.  They have

8    been the ones that have been pushing the schedule here,

9    saying that the court has to lift the automatic stay so that

10   we can go back up to New York and litigate the validity of

11   the patents and the claims.

12          They filed a four-million-dollar claim on Friday on

13   behalf of ECS; they filed another four-million-dollar claim

14   on behalf of Carotex on Friday, and then today at the

15   eleventh hour come in with an offer of $250,000.  It s not

16   a competitive offer with what the trustee has brought to the

17   court.

18          All they re offering is $250,000 and a waiver of

19   their claim.  What Kobayashi has offered is $250,000.  Their

20   claims are gone.  Kobayashi undertakes the administrative

21   expenses, the estate s administrative expenses to pursue the

22   claim litigation up in New York.  That $250,000 remains as a

23   pot of money for the payment of the claims in this case and

24   the trustee does not come out of pocket in terms of

25   litigating up in New York, and we will have a resolution as

Page 165

1   to what the genuine claim for Carotex is.

2        It s rather gamesmanship at this point to come in

3   at this late moment with this offer.  It is not a comparable

4   offer in connection with what Kobayashi has made.  The

5   Kobayashi offer keeps the $250,000 in the estate and allows

6   for the litigation of the Carotex claim.

7        It s clear from the trustee s testimony that he has

8   investigated all of these issues, that he has talked not just

9   to the Kobayashi affiliates but he has talked with Mr.

10   Shapiro; he has talked with the Carotex and the ECS counsel;

11   he has looked into the solvency issue; he has looked into the

12   Chapter 5 claims, and he has decided that this is a fair

13   purchase for the assets.  It allows or eliminates administra-

14   tive expenses in this case.

15        Your Honor, it s a fair offer.  The court should

16   accept the offer.

17        If the court is interested in the Carotex offer, we

18   should be given an ability to respond to that offer; but at

19   the end of the day, the Kobayashi offer is the fair offer and

20   it is the one that this court should accept.

21        Also, Your Honor, what has also been raised in

22   terms of an issue of good-faith purchaser  - and Kobayashi,

23   if the court approves the sale, would be a good-faith

24   purchaser and the court should enter an order allowing them

25   to be deemed a good-faith purchaser.

Page 166

1          The case law provides, and I m citing the Kibbis

2     case at 764, F.2nd, 1019 out of the 4th Circuit in 1985, that

3     in order to destroy the good-faith purchaser position there

4     would have to be misconduct that is tantamount to fraud,

5     collusion between the purchaser and other bidders and the

6     trustee or an attempt to take grossly unfair advantage of

7     other bidders.  None of that has happened in this case.

8     There has been no evidence offered from any other party.

9     There has not been any bidder in this process prior to this

10    for collusion to occur.

11         So, my client, Kobayashi, would be a good-faith

12    purchaser under the terms of this agreement.  We would ask

13    that the court, if the court approves this sale, allow for

14    them to be deemed a good-faith purchaser.

15         THE COURT: This matter is before the court on a

16    motion by the Chapter 7 trustee to approve a sale of assets

17    and compromise of claims.

18         The debtor in this case, Equaphor, Inc., filed a

19    voluntary Chapter 7 petition in this court on April 26, 2011

20    and Kevin McCarthy, an experienced trustee, was appointed as

21    a Chapter 7 trustee.

22         At the time the case was filed, Equaphor was

23    involved in two pieces of litigation.  One was related to

24    patents although there are monetary claims for alleged misuse

25    of patents with two companies called Carotex, Inc. and Event

Page 167

1   Capture Systems in the Southern District of New York.

2            This litigation had actually originally been

3   brought against an entity called Kobayashi Ventures, LLC but

4   in the middle of the litigation Kobayashi transferred or sold

5   the patents to the debtor as part of a larger transaction,

6   very complicated  - I have heard a lot of testimony here  -

7   that effectively took place in two stages, 2007 and 2009.

8            The patents in question had originally belonged to

9   International Paper and the debtor here was a licensee of the

10   patents, and there was some dispute over the amount of

11   royalties owed and at that time the board of directors

12   allowed the insiders of the company to set up this separate

13   entity, Kobayashi Ventures, LLC, to acquire the patent from

14   International Paper.

15            As part of the subsequent transaction, the assets

16   of the debtor were sold off.  Part of it was sold to a third-

17   party purchaser, Cognex, and the remaining assets were sold

18   to an entity again set up by the insiders called Monitoring

19   Technology, LLC, leaving the debtor here with no assets.  It

20   had about $500,000 in cash, according to the evidence that

21   has been presented, but it then acquired the patents which

22   were the subject of this increasingly expensive litigation up

23   in New York so that all it had effectively were the

24   liabilities related to the patent litigation which was then

25   heating up.

Page 168

1          A lot of this led to the second piece of litigation

2     and that is that two of the shareholders of the corporation,

3     Harry George and Frederick Bamber, brought a shareholder

4     derivative suit against the directors and officers.  I forget

5     whether Kobayashi was a defendant in that matter but it

6     doesn t really matter.

7          Immediately, apparently, the targets of the

8     shareholder derivative suit demanded indemnification from

9     the debtor under its bylaws and the debtor found itself

10    without money and unable to litigate either the New York

11    patent litigation or to continue providing indemnity to its

12    officers and directors; and accordingly, the board voted to

13    authorize a Chapter 7 filing.

14         Then the same folks who are the targets of the

15    derivative suit have put together an offer to the trustee

16    which is presently before the court to purchase all of the

17    patent rights for $250,000, as well as to purchase from him

18    all of the shareholder derivative claims.  Of course, upon

19    the filing of the Chapter 7 petition, any derivative claims

20    really pass to the Chapter 7 trustee.  So, the trustee has

21    proposed to sell both of those, the shareholder derivative

22    claims and the patent claims, back to Kobayashi, the very

23    entity that sold it to the debtor.

24         But coupled with the sale is a sweeping set of

25    releases of anyone who has ever had any connection with the

Page 169

1   debtor, releases of the debtor s attorneys who represented it

2   in the patent litigation, releases of all the directors and

3   folks connected with the shareholder derivative suit.

4           Now, I really have a great deal of admiration for

5   what Mr. McCarthy has attempted to do here.  I think based on

6   the testimony, he has looked at the whole situation; and if

7   the proposed settlement were to be judged purely on economic

8   grounds, putting aside the last-minute offer made during

9   closing argument by Carotex to purchase the patent claims

10  alone without any releases for $250,000, putting that aside,

11  I think that you would have to say, judging from a purely

12  economic point of view, that Mr. McCarthy has put together a

13  package which may not entirely succeed but certainly attempts

14  to balance the competing interests in the case.

15          My fundamental problem though is, I think the scope

16  of these releases is just contrary to public policy, that

17  Congress never intended that Chapter 7 filings could be used

18  as a method by which targets of a shareholder derivative suit

19  could take the company into bankruptcy and then buy those

20  claims outside of bankruptcy.

21          Corporations don t get a discharge in bankruptcy

22  and nobody else gets to ride on a discharge even if one is

23  granted but here everybody is getting releases who arguably

24  has any liability to the estate and I just think that that

25  was not what Congress intended Chapter 7 to accomplish.

Page 170

1        I think this comes close to a bad-faith filing, to

2   be very frank; and one of the things I have considered is

3   whether I should sua sponte dismiss this case as a bad-faith

4   filing but I m not going to do that but I am also not going

5   to approve this proposed sale and compromise.

6        So, I will prepare the order denying the trustee s

7   motion to approve the sale.

8        I have to say that the last-minute offer by Carotex

9   to purchase the patent claims which would eliminate the only

10  source of cash drain on the estate because counsel for the

11  derivative suit plaintiffs has agreed, if the trustee is

12  willing, to represent the estate on a contingency-fee

13  basis  - if the Carotex matter were settled by Carotex s

14  purchase of the patents then the dilemma the trustee has

15  found himself in, and it has been a real dilemma, of being

16  party to some very expensive litigation without any ability

17  to fund it would just simply go away.

18        I was actually prepared to make a final ruling on

19  the relief from stay but I think that I probably ought to

20  give the parties at least two weeks to determine whether the

21  trustee wants to accept Carotex s offer which if accepted

22  would eliminate any need for the Markman hearing to go

23  forward in New York and thus resolves the relief from stay,

24  as well.

25        So, what I m going to do on the relief from stay,

Page 171

1    I am going to continue that over to my May 18 relief from

2    stay docket at 9:30 and we will see where we stand then.

3              We will stand adjourned.

4              (Whereupon, at approximately 4:15 p.m., the

5    proceedings were adjourned.)

6                        *  *  *  *  *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 172

UNITED STATES BANKRUPTCY COURT

T R A N S C R I B E R ' S     C E R T I F I C A T E

Diversified Reporting Services hereby certifies that:

(A) The foregoing pages represent an accurate and complete

transcription of the proceedings, before the United States

Bankruptcy Court, the Honorable Stephen S. Mitchell, Judge,

presiding, in the matter of EQUAPHOR INCORPORATED (debtor),

and (B) these pages constitute the original transcript of the

proceedings.

Diversified Reporting Services, Inc.

1101 16th Street, NW

Second Floor

Washington, D.C.  20036

Court Reporter/Transcriber