UNITED STATES BANKRUPTCY COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

ALEXANDRIA DIVISION


- - - - - - - - - - - - - - - - - x

IN RE: EQUAPHOR INCORPORATED,        : Case No. 10-20490-SSM

                                     :

          Debtor.                    :        (Chapter 7)

- - - - - - - - - - - - - - - - - x


                    Tuesday, April 26, 2011

                    U.S. Bankruptcy Court

                    Alexandria, Virginia


     The above-entitled matter came on to be heard before

THE HONORABLE STEPHEN S. MITCHELL, Judge in and for the

United States Bankruptcy Court, for the Eastern District of

Virginia, Alexandria Division, beginning at approximately

9:33 o'clock, a.m.


                    * * * * *

APPEARANCES:


      On behalf of the Debtor:


         STEVEN RAMSDELL, ESQUIRE



      On behalf of Chapter 7 Trustee:


         KEVIN McCARTHY, ESQUIRE


      On behalf of Fredrick Bamber and Harry George:
         JAMES SCHROLL, ESQUIRE
         THOMAS G. SHAPIRO, ESQUIRE


      On behalf of Kobayashi Ventures, LLC:
         JAMES REYNOLDS, ESQUIRE
         DEANNA PETERS, ATTORNEY AT LAW


      On behalf of Whiteford Taylor & Preston:
         CHRISTOPHER JONES, ESQUIRE


      On Behalf of Carotek, Inc. And Event Capture
         Systems, LLC:


         DAVID SWAN, ESQUIRE
         KENNETH MISKEN, ESQUIRE
         THAD ADAMS, ESQUIRE (via telephone)


                   * * * * *

C O N T E N T S

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| KEVIN McCARTHY | | 50 | | |
| | | (Misken) | | |
| | | 95 | | |
| | | (Shapiro) | | |

E X H I B I T S

| | MARKED FOR IDENTIFICATION | IN EVIDENCE |
|---|---|---|
| Carotex No. 2 | | 51 |
| Carotex No. 10 | | 76 |
| Carotex No. 11 | | 84 |

1                P R O C E E D I N G S

2              THE COURT: We will go ahead then and take up

3     the Equaphor matters.

4              THE CLERK: Items number one and two, Equaphor

5     Incorporated, Case Number 10-20490.

6              MR. McCARTHY: Good morning, Your Honor.  Kevin

7     McCarthy, the trustee and the attorney for the trustee.

8              MR. SCHROLL: Good morning, Your Honor.  James

9     Schroll and I'm appearing on behalf of Harry George and

10    Fredrick Bamber.  I'm also moving the admission of Thomas

11    Shapiro, pro hac, who will be addressing the court today

12    with the court's permission.

13             THE COURT: Okay.  I'll go ahead and grant the

14    motion, Mr. Schroll, for pro hac vice admission.  If you will

15    please submit an order.

16             MR. SCHROLL: Thank you.

17             MR. RAMSDELL: Good morning, Your Honor.  Steven

18    Ramsdell for the debtor.

19             MR. REYNOLDS: Your Honor, James Reynolds on

20    behalf of Kobayashi Ventures, LLC.  Also with me is Deanna

21    Peters.  She is counsel for the party defendants and the

22    counterclaimants in the Carotex case.  She has previously

23    been admitted to the court.

24             THE COURT: Right.

25             MS. PETERS: Good morning, Your Honor.

Page 5

1          THE COURT: Good morning.

2          MR. JONES: Good morning, Your Honor.  Chris Jones

3    of Whiteford Taylor & Preston here on behalf of my firm.

4          MR. SWAN: Good morning, Your Honor.  David Swan

5    for Carotek and Event Capture Systems.  With me is Ken

6    Misken, and on the phone should be Thad Adams.

7          MR. ADAMS: Yes.  This is Thad Adams.  I'm here,

8    Your Honor.

9          THE COURT: Okay.  Thank you.

10         Of course, I have read all the pleadings that have

11   been filed in this case. So, I think I understand the general

12   area and of course I guess the issue, Mr. McCarthy, is  - the

13   purchase price is actually the least of the issues.  The real

14   issue is the cleansing bath that the purchaser and everyone

15   connected with them would get if I approve this proposal.

16   Go ahead.

17         MR. McCARTHY: Your Honor, this is a sale of assets

18   and a compromise of mutual claims.  The assets being sold are

19   patent rights and the claims being compromised are actually

20   six and they go back and forth.

21         First, we have the shareholder derivative suit

22   that was brought against the debtor and current and former

23   directors and James Dechman and John Fiore, and those are

24   really the two main people that you'll hear about, and then

25   two entities that are controlled by James Dechman and John

Case 10-20490-SSM    Doc 71-2    Filed 06/08/11    Entered 06/08/11 11:41:38    Desc
Exhibit B - Hearing Transcript dated April 26, 2011    Page 6 of 108

Page 6

1    Fiore.

2           That shareholder suit is being compromised.  It's

3    going away.  Any other claims against the same defendants in

4    that suit are being compromised and going away.

5           Then going in the other direction, there are

6    scheduled and at this point undisputed claims that total I

7    think about $534,000 that are against the estate by one of

8    those Dechman-Fiore-controlled entities.

9           Like I said, I don't need to remember precisely

10   the name.  You're going to hear Kobayashi today.  That's

11   the technical buyer, and there is also Monitoring Technology,

12   LLC.  That's another entity.  I forget which of those  -

13   maybe Monitoring has the actual claim against the debtor

14   that totals about $534,000.  That's going away.

15          Any other claims by the defendants in the share-

16   holder derivative suit that are against the estate are going

17   away.

18          At the moment, some of them, maybe all of them

19   have filed indemnification claims because under the bylaws

20   they have that right if they are found to have been in good

21   faith in the actions that they are suited on in the share-

22   holder derivative suit.  So, they filed contingent

23   indemnification claims.  Of course, those would go away, as

24   well, if the deal is approved.

25          Then there's number five.  It's a preference claim

1   against Stein Sperling.  Stein Sperling got a total of about

2   $249,000 during the preference period.  There would be some

3   to value.  There would be some ordinary-course defense.  But

4   that's, you know, a significant claim, hefty claim, I

5   believe.

6           Then there is  - and I didn't think there was a

7   preference claim against Whiteford Taylor but Whiteford

8   Taylor filed what I would call and I think it was called a

9   limited objection; and as I understand it, they're here today

10  to say that they're going to withdraw their objection

11  provided that any order approving the deal include a release

12  of any preference claim against Whiteford Taylor.  I have no

13  problem with that.  I didn't think there was a preference

14  claim against Whiteford Taylor.  I thought they had a valid

15  defense.

16          Okay.  So, that's the sale of the assets.  That's

17  the compromise of the claims.

18          Now, the terms of the deal.  The estate gets

19  $250,000 to put in the pot and the buyer which is technically

20  Kobayashi also has to buy up at full value all of the

21  scheduled, undisputed claims.  It's a total of about

22  $220,000, and then Kobayashi gets to be subrogated to those

23  claims.  Kobayashi also must offer the Series F shareholders

24  interest that it doesn't already own.  It owns about 83

25  percent of that series already and there's about 17 percent

1   left.  They have to offer to buy that, the remaining shares

2   for about 50 percent more than a prior offer that they had

3   made some time ago, I think within the last two or three

4   years.  This totals about $100,000 to the 17 percent.

5           So, if the deal is approved, Kobayashi must

6   potentially pay out about $570,000.  That's  -

7           THE COURT: Well, does it really because if it

8   buys up $220,000 worth of claims but has a claim back against

9   the estate, doesn't it just take the money out of one pocket

10  and receive it back in another on a proof of claim?

11          MR. McCARTHY: Yes.  That's right.  If there are no

12  other claims, they simply step into the shoes of the lawyers

13  and someday after administrative expenses are paid and any

14  other claims are taken care of, they would get paid.  That's

15  correct.

16          But the reason I think this is a reasonable deal:

17  There are three competing interests in this case.  One is

18  Carotex which is on the opposite side of the patent

19  litigation.

20          Carotex hasn't filed a claim yet but they are

21  a scheduled, disputed creditor, and there's still a little

22  bit more time in which they could file a claim.  So, that's

23  one competing interest.

24          Then there are the other unsecured creditors,

25  mostly the law firms; and of course, from their point of

Case 10-20490-SSM   Doc 71-2   Filed 06/08/11   Entered 06/08/11 11:41:38   Desc
Exhibit B - Hearing Transcript dated April 26   2011   Page 9 of 108

Page 9

1    view, they are being taken care of here.

2           Then there's the Series F shareholders which,

3    again, are the only shareholders we're talking about.  I

4    think that's because under the corporate structure there's

5    some huge liquidating preference such that it would never be

6    reached, such that only the Series F shareholders are going

7    to get anything upon a liquidation anyway.

8           Now, the dispute with Carotex.  It's a complicated,

9    expensive litigation.  It has already cost both sides

10   hundreds of thousands of dollars in legal fees, probably more

11   than a million dollars. Carotex has claims against the debtor

12   in that dispute and vice versa.

13          At bottom though, Carotex says it doesn't owe

14   anything to the debtor by virtue of the debtor's patent

15   rights and the debtor says the opposite.

16          Now, as I understand it, if Carotex has a claim

17   against the debtor  - because Carotex is not saying they

18   own the patent.  If Carotex does have a claim against the

19   debtor it is based in whole or in part on the debtor sending

20   a letter to its customers at some point, to Carotex's

21   customers saying, you know, Carotex is infringing on our

22   patent and we don't like that, and that made the customers

23   stop doing business with Carotex, and there would be some

24   kind of damage there.

25          Carotex does have a patent which as I understand it

Case 10-20490-SSM   Doc 71-2   Filed 06/08/11   Entered 06/08/11 11:41:38   Desc
Exhibit B - Hearing Transcript dated April 26, 2011   Page 10 of 108

Page 10

1   is presumed valid, and you can see how  - I'm sorry.  I said

2   it wrong.  Equaphor has a patent which is presumed valid

3   and you can see how Equaphor, you know, would assert that

4   nobody has a right to infringe on its patent and put other

5   people on notice that might be involved in that process.  At

6   least that would be Equaphor's position.

7        The debtor has already obtained, as I understand

8   it, a non-final judgment such that it could be rejiggered

9   by the court up in New York in this extensive piece of

10  litigation for $101,000.  That's part of the patent

11  litigation.  So, it already has that.

12       In general, Carotex says the debtor's patent rights

13  are of no value.  I asked Carotex to bid on the patent.  It

14  wouldn't. It didn't want to.  It says, they're of no value.

15       Now, the other unsecured creditors, as I said, are

16  mostly law firms.  They're being paid in full as part of this

17  deal.  They're happy, of course.

18       Aside from them, there are two other filed claims.

19  Remember Carotex hasn't filed a claim yet but there's a

20  little bit more time.  One is a small claim by American

21  Express.  It's 300-and-something dollars.  I'm told that has

22  already been paid.  So, presumably that will be withdrawn or

23  go away in some fashion.  The only other claim is a

24  preference claim for about $19,000 by a litigation trustee

25  for a debtor by the name of Quebecor, Q-u-e-b-e-c-o-r.  These

1  were equipment lease payments that were made to Equaphor

2  during the preference period.  I haven't really analyzed it.

3  There's certainly some new value there because there were

4  rental payments that weren't being made on time up to the

5  point of the bankruptcy and there may be some ordinary

6  course, as well.

7       You know, I can't tell the court that one is going

8  to go away but I can tell the court there's a pretty good

9  chance that that one will go away or be compromised in some

10 fashion.

11      So, I've talked about Carotex as a competing

12 interest.  I've talked about the other unsecured creditors

13 as a competing interest.  Then we have the third group of

14 competing interest which is the Series F shareholders who

15 Mr. Shapiro is here to talk about in a bit.  Again, they

16 own about 17 percent of the only relevant class of stock

17 in the debtor and the proposed purchaser, Kobayashi, which

18 is controlled by Jim Dechman and John Fiore, the two names I

19 mentioned earlier, owns about the other 87 [sic] percent of

20 that class.

21      Now, right now, I have about $48,000 on hand and I

22 expect another $7,000 in refunds from Illinois which is

23 having its own financial difficulties but presumably some day

24 I'll get that.

25      So, if the deal is approved, I will have about

1   $300,000 on hand and the only claimants against that will be

2   Carotex, if it files a claim and if the claim is allowed, and

3   a 19,000-dollar preference claim that as I said will probably

4   be objected to and most likely either disallowed or

5   compromised; and then, against that 300,000 also will be

6   220,000, approximately, of subrogated claims by Kobayashi,

7   the purchaser, by virtue of having paid off the law firms,

8   and then the Series F shareholders behind all of those

9   creditors of which Kobayashi already owns 83 percent.

10       So, what I've tried to do is balance the competing

11   interests here in as practical a way as I could under the

12   current circumstances.

13       Now, the patent attorneys that I talked to that

14   are currently representing Equaphor have expressed a lot of

15   doubt about carrying forward the patent litigation with only

16   the amount of money now on hand.  They don't think it will be

17   enough.

18       The court has heard argument about this Markman

19   hearing that we bankruptcy lawyers know nothing about but

20   apparently is very complicated and very expensive.

21       Carotex disagrees and says: No problem.  We will

22   agree not to spend more than $10,000 on our side.  But you

23   know, I've got to defer to debtor's own attorneys here as

24   they see it, and certainly Carotex has some interest in

25   handicapping, maybe lots of interest in handicapping the

Page 13

1    debtor's ability to pursue the patent litigation.

2            So, it's really not clear how the estate goes

3    forward with patent litigation if it is left to its own

4    resources; and then Carotex, of course, is saying the patents

5    aren't worth anything, and the objecting Series F

6    shareholders are saying that the patents aren't worth

7    anything now or anything very much now.  They may have been

8    worth something at one time but not now.  So, what am I

9    supposed to do?

10           Yet this deal gets all, again, all of the undis-

11   puted scheduled claims paid.  It also protects the estate

12   against potentially burdensome litigation costs.  I didn't

13   want to be left trying to deal with the Carotex claim for a

14   whole lot of money and not knowing anything about patent

15   litigation.

16           So, under the agreement, Kobayashi has agreed to

17   pay the trustee's reasonable litigation costs which include

18   any objection to Carotex's claim in this court at no cost to

19   the bankruptcy estate.

20           So, if Carotex does end up having a large claim

21   against the estate after fully funded litigation on both

22   sides  - Carotex can spend what it wants.  Kobayashi can

23   spend what it wants.  Then there will be a pot of $300,000

24   to deal with it on a pro rata basis which is a lot more than

25   what I have now.

1      Now, the Series F shareholders also get something.

2   The ones who haven't accepted yet  - and as I understand it,

3   some portion of that, maybe 23 percent of that 17 percent

4   have accepted.  Some of them have already accepted.  Of

5   course, it's contingent on the court approving the deal.  So,

6   in a way, that's not very compelling that they're falling in

7   line.

8      The ones who did not previously accept an offer to

9   be bought out, they have a renewed opportunity to sell their

10  interest for 50 percent more than the Series F shareholders

11  that previously sold their interest, again within the last

12  two or three years to Kobayashi, and they'll get about a

13  hundred thousand dollars.  It's not what they want but it's

14  something. I strenuously argued to get them something to

15  try to balance the various competing interests.  The

16  shareholder derivative suit will be settled.

17      It is very true that there is an alternative

18  here.  Mr. Shapiro, who seems very expert to me, very

19  capable, has offered to carry forward the suit on a purely

20  contingency basis and ordinarily the trustee would jump at

21  the deal and say, what have I got to lose here?  But here,

22  the deal would cost the estate a certain $250,000; greatly

23  delay the payment of the undisputed secured claims.

24      Now, the derivative shareholder suit which I've

25  read is extremely detailed, you know, which gives it an aura

1   of authenticity in my mind; but I've been through

2   those allegations at some length with Mr. Dechman and Mr.

3   Fiore and they have extremely detailed rebuttals to those

4   allegations.  That would be a hotly contested piece of

5   litigation that, contingency or no contingency, based on

6   everything I've looked at, appears to me could reasonably

7   result, not inevitably but reasonably result in no recovery

8   at all; and like Carotex, the objecting Series F shareholders

9   say the patents have little value.

10          I've asked the Series F shareholders if they want

11   to bid on the derivative suit and they declined.  So, Carotex

12   is not going to bid on the patent litigation which it's most

13   interested in and the shareholders are not willing to bid on

14   the derivative suit which they're most interested in.

15          That's why I think the deal is reasonable. Let me

16   address the objections.

17          Carotex says the trustee didn't ask enough

18   questions at the 341 meeting.  I take issue with that but I

19   can tell the court, the 341 meeting lasted an hour and 12

20   minutes.  That may not be a record for a 341 meeting but it

21   went on for quite a while.  I listened to part of it last

22   night; and I did ask for documents, including balance sheets

23   at that meeting, and I've certainly asked for other documents

24   since then.

25          They used the word  cursory  at one point in their

Case 10-20490-SSM   Doc 71-2   Filed 06/08/11   Entered 06/08/11 11:41:38   Desc
Exhibit B - Hearing Transcript dated April 26, 2011   Page 16 of 108

Page 16

1    objection.  So far, through the date of the motion being

2    filed, I've got about 60 hours in on this case.  I may not

3    have done it right but it hasn't been cursory.

4         Now, Carotex says that the compromise should be

5    denied because releases are getting acquired for little

6    consideration.  Well, the releases here were required as part

7    of the overall deal.  It was a package deal.  It included the

8    sale of the patent rights that both Carotex and the objecting

9    shareholders say are of no or little value.

10        I tried at one point, at Mr. Shapiro's wise

11   suggestion that I try to break it into pieces about how much.

12   This offer started at $50,000; and I asked Mr. Reynolds who's

13   representing Kobayashi, can you guys break it up between the

14   two segments, the derivative suit and the patent suit?  And

15   they broke it up at that point at ten and 40, and then they

16   put it back together and we ended up with our global deal.

17   But right now, it's a global deal.  It's, you know, take it

18   or leave it.

19        As I said, Carotex didn't want to bid on the patent

20   rights.  The shareholders didn't want to bid on the

21   derivative suit.  So, this may not be a perfect deal but

22   neither Carotex nor the shareholders have provided an

23   alternative to the trustee that would definitely result in

24   substantial funds coming into the estate; $530,000 of claims

25   against the estate being waived.

Page 17

1          Now, there are several specific claims that Carotex

2    takes issue with as having been resolved in the compromise

3    which is part of the overall package.  The first is Stein

4    Sperling.

5          I think there is a real claim against Stein

6    Sperling for some amount but certainly not for $249,000.

7    There's some new value.  Certainly they raised the ordinary

8    course defense.  That's not a mathematical defense.  It's a

9    little bit harder to assess but there's something in there.

10          But this could easily end up being a case where

11   all the unsecured creditors get paid in full which undermines

12   the preference case; and as I already said, this was a

13   package deal.  In order to get good things for the estate, as

14   I perceive it, I had to agree to this.

15          I understand Stein Sperling may be well and it

16   probably is giving up something, as well, because Kobayashi,

17   remember, agreed to fund the litigation at no cost to the

18   estate.  I think they've made a deal with Stein Sperling that

19   Stein Sperling will handle that at little or no cost to

20   Kobayashi.

21          But anyway, Stein Sperling is kind of on the

22   hook, at least indirectly, through this compromise by which

23   they're being released.

24          Carotex also complains about fraudulent transfer

25   actions for admittedly large amounts that are paid to

1   entities that are controlled by Jim Dechman and John Fiore.

2   These are in the statement of financial affairs.

3           Now, the characterization of fraudulent transfer

4   actions is Carotex's, not the debtor's.  The payments, as I

5   understand them, were in accordance with the deals that were

6   struck between the entities that got paid and Equaphor, and

7   in accordance with the deals that were approved by Equaphor's

8   board of directors.  That kind of implicates what's in the

9   shareholder's derivative suit which I'll address shortly.

10          But to try to undo those deals, rightly or wrongly,

11  would have been expensive and uncertain unless handled on a

12  contingency basis; and of course, the shareholder derivative

13  suit does try to undo those deals from a different

14  standpoint, breach of fiduciary duty.  But as I said, I'll

15  get to that in a minute.

16          Carotex also says I didn't market the assets; and

17  I assume by that they mean the patent rights, the patent

18  rights that they say have little or no value.  Carotex

19  certainly knew about it, knew about them and refused to bid.

20

21          There's another entity called Papertech which is

22  one of the limited groups of companies that use this

23  technology.  They bid $60,000.  They're well aware of where

24  we are and have not increased that bid.

25          Anyone can still bid.  No one has and no one except

1   Papertech has even tried.  It's a very small group of

2   entities, apparently, that likely would have an interest in

3   these patents from what I've been told by Equaphor's own

4   patent lawyer and also from the objection that was filed by

5   Carotex.

6        Remember Carotex was asking the court and still is

7   asking the court to lift the automatic stay so it can hurry

8   up and continue the litigation in New York.  Well, the offer

9   that started out here at $50,000 and now is up to what I have

10   described earlier, it created a narrow time frame in which to

11   make a deal and was conditioned upon the stay not being

12   lifted.

13        I have heard nothing from any of the objecting

14   parties that makes me think I could do better than trying to

15   sell the patent rights for what is included in this deal.

16        Let me talk about the objecting shareholders. They

17   say the derivative suit is a valuable asset that should not

18   be settled, at least on these terms; and I say again, as with

19   Carotex and the patent rights, they're not willing to offer

20   anything to estate except a contingency fee arrangement to

21   pursue that suit, and I've already said this is a hotly

22   contested suit.

23        But there are some specific allegations, are some

24   specific allegations, and here's how the defendants would

25   respond.  The shareholders say, the defendants who again are

Page 20

1    Dechman, Fiore, former and current directors, and then two

2    entities controlled by Dechman and Fiore  - the shareholders

3    say the defendants in the derivative suit breached their

4    fiduciary duty or at least the directors did to the debtor

5    when they made agreements in September of 2007 under which

6    the debtor entered into a management services agreement which

7    may be referred to from time to time as the MSA in the papers

8    that have been filed and a sale-incentive fee.

9          Now, this agreement was made by apparently

10   experienced, savvy, venture-capital investors who controlled

11   the board and were independent of management.  I spoke with

12   two of them before making the deal that is now before the

13   court.  I can remember one in particular saying: Patents is

14   not something we thought was a good thing for this company,

15   was not a core matter for the company, and we were happy to

16   let these guys collect the patents, pay the patents, buy the

17   patents from International Paper back in 2007 and enter into

18   these deals where they would have a strong incentive to sell

19   the company for enough money to get us out and pay us

20   something that we thought was reasonable at the time.

21          I'm not sure but I was told that two of the

22   directors, maybe the same two I talked to, would be here

23   today to support the agreement.  Of course, they're also

24   getting off, you know, getting a release out of the

25   derivative suit.

Page 21

1          The shareholders argue that the company had no

2    legal representation when these deals, the agreements were

3    made in September of 2007.

4          I'm told that Whiteford Taylor did represent the

5    company back there in connection with these agreements; and

6    again, the two agreements are  - maybe I didn't say the one.

7    Or no.  I said MSA for Management Services Agreement.  That's

8    the one under which there would be money paid for managing

9    the company, basically, on an annual basis.

10         But there's also the sale-incentive fee and the way

11   that one worked was: There was a formula and the formula  -

12   you know, I don't need to get into the details of it but

13   basically it involved the free cash flow of the company and

14   the net value of the company and if the company was sold for

15   enough money to pay whatever the value was as determined by

16   this formula plus an investor premium  - that's the amount

17   investors wanted to get back for having sold the company  -

18   then whatever was above that was a sale-incentive fee.  So,

19   you guys sell this company for you know, twice what we think

20   it might be worth now, projecting forward two years. You get

21   to keep it all. That's how it worked.  It was an incentive to

22   sell for as much as possible for the guys who would benefit

23   from it, namely Dechman and Fiore, and then the investors

24   would have their full premium.

25         Mr. Shapiro would tell you that capped it.  It did

1   cap it; but they are a board of directors that at that time

2   were independent of management, and that's the deal that they

3   made.

4          So, those were the deals made in 2009, sale-

5   incentive fee and  - well, the patents, you know, were:

6   Basically, I think the patents were acquired by Dechman

7   and Fiore's company back in 2007.  The directors said, that's

8   okay.  And then the directors made this deal with Dechman

9   and Fiore, Management Services Agreement and the sale-

10  incentive fee.

11         Now, in 2009, things kind of came to a head.

12  Dechman and Fiore had been trying to sell the company for

13  years and they'd had on-again, off-again negotiations with

14  Cognex, C-o-g-n-e-x.  It's a publicly-traded company.  And

15  they were told, at least I'm told they were told that they

16  had to make a deal very quickly or there would be no deal.

17  Cognex had a trade show coming up.  They wanted to announce

18  the deal.

19         Part of that deal  - and I put some stock in

20  this  - was a non-compete agreement by Dechman and Fiore.

21  The debtor obviously had no right to make Dechman and Fiore

22  agree to a non-compete agreement with any third party.

23         So, in 2009, the board approved a sale to Cognex,

24  Cognex, of part of the business, and a sale of most of the

25  rest of the business  - and this is the part the shareholders

Page 23

1    don't like  - to the Dechman-and-Fiore-controlled entities.

2          So, they didn't sell it to a third party as may

3    have been envisioned originally back in  07.  But Dechman

4    and Fiore say, well, what difference does it make because we

5    were going to get everything above a certain amount anyway?

6          So, technically, you could say this latter was a

7    reworking of the arrangement because it wasn't a sell to a

8    third party.  It was a sale of two-thirds of the businesses

9    to Dechman and Fiore.

10         Why did they do that this way?  Well, from their

11   point of view, they would say, it didn't matter because after

12   a certain point as far as the company was concerned it got

13   what it got and we would have gotten the rest anyway; and Mr.

14   Dechman is here.  He can testify about the details of this,

15   if necessary, to explain to the court without adjudicating

16   the matter that at least the trustee had a reasonable basis

17   for thinking that the deal in 2009 had some basis, some

18   reasonable basis for it.

19         The shareholders again say:  Well, it doesn't

20   matter.  The assets weren't sold to third parties, and

21   therefore the sale-incentive fee never became applicable.

22   But the directors in  09 approved that deal. Admittedly, this

23   is part of the shareholder derivative suit: Directors, you

24   shouldn't have done that.

25         But Dechman and Fiore had been shopping the company

Page 24

1    for years, as I said, and as far as they knew  - they have

2    told me, only Cognex was around to do the deal that was

3    available to a third party, and that was only for part of the

4    business.  So, what do you do with the rest of the business?

5    This is what they did.

6          There may be a disagreement about the math and

7    whether the formula worked out exactly as it was calculated

8    according to Dechman and Fiore.  But I think the main dispute

9    is over whether or not the deal applied in the first place

10   because the company was not sold to a third party and,

11   therefore, the shareholders would say the sale-incentive

12   fee was not triggered.  But again, it was approved by the

13   board at that time.

14         In  09, as part of this selling part of the

15   business of Equaphor to the Dechman-and-Fiore-controlled

16   entities, the debtor bought the patents now in dispute for

17   what was on paper, $3.4 million but which was in fact  - and

18   that caught my eye.  Now we're selling it back to you guys

19   for whatever it is, $250,000, and we paid $3.4 million a

20   couple of years ago?  Well, it was in fact a satisfaction of

21   accrued salary, accrued royalties and sales commission.

22         So, what struck a trustee and certainly continues

23   to strike the shareholders as a big mismatch between the

24   purchase price two years ago and the repurchase price now

25   has what in my mind is a reasonable explanation; and those

Page 25

1    deals allowed the debtor to turn around and make a 5.2-

2    million-dollar liquidating distribution to none other

3    than the Series F shareholders of which admittedly the

4    Dechman and Fiore entities were 83 percent interest, held an

5    83-percent interest at that time.

6              I mean, I can't say the suit does not have merit

7    but I think I can say that the suit could lose.

8              I have considered a lot of details here; and again,

9    Mr. Dechman will get on the stand, and he can do a much

10   better job than the trustee at explaining why things were

11   done and why they were kosher and why he wouldn't have done

12   them if they weren't on the up-and-up, and that sort of

13   thing.

14             But a loss in the suit would not only result in no

15   recovery for the estate, it would increase the claims against

16   the estate because, as I mentioned earlier, the bylaws say

17   the debtor must pay legal expenses incurred by directors who

18   act in good faith.  Now, it may be prepetition claims but

19   they are still claims against the estate.

20             So, those go away if the suit goes away; and those

21   are the contingent, indemnification claims that were filed by

22

23   the people. Some of the people are getting released if the

24   deal is approved.

25             To sum up, I ask the court to approve the deal on

1    the bases that, in the trustee's judgment it is a reasonable

2    reconciliation of competing interests, of parties and

3    interests; that no one has come along, despite some requests,

4    with a better deal; that it results in the certainty of

5    general unsecured claims that aren't disputed being paid, and

6    the certainly of money in the estate and the certainty of

7    about $530,000 of claims against the estate being waived, and

8    that the alternatives are uncertain and potentially

9    expensive.

10         Now, if the court does approve the deal, there's

11   a little bit of clarifying language I need to add to the

12   order.  There are, as it turns out, three paid-up licenses

13   that we intended to protect and there's such broad language

14   in the patent rights that  - Papertech contacted me and we've

15   worked it out but I want to add Papertech, Honeywell and

16   there's one more, and I've got that language ready to go.

17         Then, as I understand it, Whiteford Taylor is ready

18   to withdraw its objection provided that I add in language

19   that gives them a preference release, as well, the way Stein

20   Sperling is getting a preference release.  I have no problem

21   with that.  I didn't think there was a claim against

22   Whiteford Taylor.

23         I did go through all the payments that were made

24   during the various preferences periods with the debtor and

25   Stein Sperling was the only one that I thought was worthy of

Page 27

1   being pursued in the first place.

2          Thank you, Your Honor.

3          THE COURT: Okay.  Let me hear from counsel for

4   Mr. George and Mr. Bamber first.

5          MR. SHAPIRO: Mr. Shapiro, Your Honor.  Thank you

6   for the opportunity to speak.  I don't know whether testimony

7   is being offered.

8          THE COURT: I thought this was open statement.

9          MR. SHAPIRO: Okay.

10          Your Honor, with all respect, I have to say this

11   bankruptcy filing and the agreement that has been proposed

12   is part of a  - not that Mr. McCarthy is part of it.  He's

13   appointed trustee  - but is part of a long-standing pattern

14   of the two managers entrusted with the management of this

15   company, Mr. Dechman and Fiore, arranging things, to use a

16   neutral term, to their benefit, to the detriment of the

17   shareholders; and Mr. McCarthy has gone through some of the

18   history, and I'll try to just go through it very briefly.

19          The first step was this Management Services

20   Agreement which had in it a sale-incentive fee which said

21   there's a certain formula, not based on what the reasonable

22   value of the business was but it was a formula that Mr.

23   Dechman and Fiore came up with and the directors agreed to

24   it, as they have agreed to everything Mr. Dechman has asked

25   for.

Page 28

1          I don't have a quarrel with the fact that they

2    would be given some incentive for selling the company and

3    that they're compensated for managing the company but I

4    think under Delaware law where you put a ceiling on what the

5    shareholders can get and anything that's paid above that

6    ceiling goes to the managers was unjust enrichment and a

7    breach of fiduciary duty to have an agreement like that.

8          For example, depending on what the business was

9    sold for, Mr. Dechman and Fiore could get many times what the

10   shareholders could get who have invested millions of dollars

11   of their money into this company over a period of years.

12         I represent Mr. George and Mr. Bamber who were

13   chosen among a larger group to be the plaintiffs in the

14   derivative action.  I represent 16 minority shareholders

15   who I believe owned approximately 20 percent of the Series F

16   shares.  They also own other classes of stock, including

17   common stock.

18         I can agree with Mr. McCarthy that the liquidating

19   preference that's in this Series F terms means that the

20   Series D, E, B, C, I think A, and the common shareholders

21   really don't stand to gain anything.  So, it's the Series F

22   shareholders who really have the shareholder interest in this

23   case.

24         So, that was the first step and not the worst step.

25   But at the same time in 2007  - and I should also say, Your

Page 29

1    Honor, that Whiteford Taylor at that time was representing

2    the company and then sort of jumped ship and started - I'm

3    sorry.  Stein Sperling was representing the company and

4    jumped ship and started representing Mr. Dechman and Fiore

5    and an entity which they created which is now called

6    Monitoring Technology; and the company, as I understand it,

7    did not have any independent legal counsel at the time the

8    Management Services Agreement was presented to the board and

9    the board approved it.

10          At approximately the same time, Mr. Dechman and

11   Mr. Fiore approached the board and said, we have been

12   negotiating with International Paper Company, a large public

13   company which was the patent holder for patents that the

14   company had a license for and which were part of its

15   business.  This is a high-tech company for monitoring

16   processes in the paper industry and things of that sort.

17          Sorry I have to get into this detail but it is

18   important.

19          The license to Equaphor as well as to other

20   licensees had what's known as a most favored nation provision

21   which is that you pay this, royalties on this schedule, but

22   you won't have to pay any more royalties than we've agreed to

23   with any other licensee; and there was some argument at the

24   time that International Paper had agreed to something with

25   some other licensee and therefore royalties were not owed.

Page 30

1            There was a 640,000-dollar liability on Equaphor's

2     balance sheet for the amount of royalties that were owed but

3     for the most favored nation provision; and for whatever

4     reason, International Paper wasn't pressing for payment of it

5     but that was a liability on the balance sheet.

6            Mr. Dechman at that time in a written communication

7

8     told the board that Equaphor was not permitted to own the

9     patents which was false.  There's no provision in any

10    agreement that prohibited Equaphor from owning the patents;

11    and he bought the patents through a straw for a down payment

12    of $75,000 plus a percentage of any royalty payments that

13    were received, and I think there was a total minimum payment

14    required of $200,000.  But if they didn't press anyone else

15    for royalties and  - well, any other money that had to be

16    paid to International Paper would be 50 percent of royalties

17    collected after deducting expenses.

18            So, the total cost was $200,000; and the directors

19    have told me at a settlement meeting we had  - and it's been

20    argued that there were reasons that Equaphor didn't really

21    want to own the patents, be in the business of owning these

22    patents.  But for a maximum of $200,000, Equaphor could have

23    eliminated any dispute over this $640,000 in royalties.

24            One of the directors has told me that when this was

25    presented to the board by Mr. Dechman that Mr. Dechman  -

Page 31

1    it was said: What about the $640,000? Are you going to turn

2    around and say we owe you the $640,000 if you now own the

3    patents?  And he indicated in words or substance, don't worry

4    about it.   Well, not only did they have to worry about it

5    but over the course of the next two years, Mr. Dechman, who

6    ran the company and was in charge of the company, caused the

7    company to increase their royalty liability to a little bit

8    over $900,000; and at the end of the day, when these

9    transactions Mr. McCarthy described in 2009, $900,000 was

10   taken from the shareholders on account of alleged royalty

11   obligations to Equaphor.

12          So, the second claim in the derivative action is

13   that it was a breach of fiduciary duty for Mr. Dechman to

14   appropriate this patent opportunity for himself; and as it

15   turned out, rather than paying $200,000 to International

16   Paper, Equaphor has paid $900,000 to Mr. Dechman.

17          Then we come to September of 2009.  It's the first

18   I've heard that there was a hurry to get a deal done with

19   Cognex because there had been negotiations with Cognex for

20   many months, from early in 2009, and I think a deal was

21   agreed to in principle in June of 2009.  And I'm not quite

22   sure.  I think the due diligence process or whatever held up

23   concluding the deal; but it had been discussed for a long

24   time, and originally Cognex was going to buy the entire

25   company and then, according to what Mr. Dechman has told the

Page 32

1    board, Cognex wanted to buy only one of three business lines

2    that the company had.

3          What's really critical here to this whole sale-

4    incentive fee argument that Mr. Dechman comes up with is that

5    what was sold to Cognex was about 30 percent of the business;

6    and this is laid out in a memorandum that Mr. Dechman had

7    given to the board.

8          So, 30 percent was sold to Cognex for $5 million;

9    70 percent of the business in terms of revenue income, more

10   than 70 percent of the actual assets, were retained by

11   Equaphor.

12         Now, the sale-incentive fee set out in the

13   Management Services Agreement which is an exhibit to the

14   opposition that's before the court, the language in it.

15   It defines  sale  as a sale of all or substantially all of

16   the assets of the company; and I looked into Delaware law.

17   This is a Delaware corporation.  Under Delaware law, you

18   really have to sell pretty much all the company to be all or

19   substantially all.

20         So, the sale to Cognex did not trigger a sale-

21   incentive fee.  It was a sale of 30 percent of the business,

22   not all or substantially all of the business according to a

23   contract that Mr. Dechman had drafted or his lawyers had

24   drafted and which was presented to the board.  This was his

25   language, his terms.

Case 10-20490-SSM   Doc 71-2   Filed 06/08/11   Entered 06/08/11 11:41:38   Desc
Exhibit B - Hearing Transcript dated April 26   2011   Page 33 of 108

Page 33

1          So, for Mr. Dechman to then turn around and say:

2     I'm owed a sale-incentive fee and therefore there's a maximum

3     of what the shareholders can receive and everything else

4     comes to me.  So, I'm going to then turn around and buy 70

5     percent of the business for $1.6 million, and I'm also going

6     to sell you these patents which I told you two years ago you

7     weren't allowed to own for $3.4 million.  And why would he

8     sell the patents to Equaphor which no longer had any

9     operating business, had no use for the patents because Mr.

10    Dechman was buying the remainder of the business, 70 percent

11    that Cognex didn't buy?

12         So, Equaphor had no operating business left whatso-

13    ever. It was out of business.  A hundred percent of its

14    operating businesses was sold.  Why in the world would it

15    want these patents?  And if this was, I think as he had said

16    before, the 3.4-million-dollar purchase price for the patents

17    that were useless to Equaphor  - instead of selling the

18    patents to Equaphor for $3.4 million, why didn't he, if he

19    is entitled to the money, just let Equaphor pay him the $3.4

20    million?

21         Well, at the time the patents were sold, Mr.

22    Dechman's company, Kobayashi Ventures, which was created for

23    the purpose of acquiring the patents  - Mr. Dechman and Mr.

24    Fiore together.  They were embroiled in, apparently, very

25    expensive, protracted litigation with Carotex, a very

Case 10-20490-SSM    Doc 71-2    Filed 06/08/11    Entered 06/08/11 11:41:38    Desc
Exhibit B - Hearing Transcript dated April 26, 2011    Page 34 of 108

Page 34

1    substantial company which is a licensee of the patents and

2    another smaller company called ECS.  And they got involved in

3    the litigation because Mr. Dechman  - while his company,

4    Kobayashi, owned the patents, Mr. Dechman had pressed a

5    patent infringement royalty claim against Carotex and

6    apparently had written letters to Carotex customers, and I

7    haven't seen the letters but I gather they're threatening in

8    some fashion that, you know, you're producing product using

9    these patents that I own, I, Dechman, Kobayashi, own and you

10   don't have the right to be doing this.

11         Carotex's lawyers are here and they'll correct me

12   if I'm wrong because I'm no expert in the Carotex litigation

13   but as I understand it the damage claim  - first, let me just

14   back up.

15         Carotex, after getting demands from Mr. Dechman and

16   Kobayashi, filed its own declaratory judgment action against

17   Mr. Dechman and Kobayashi saying the patents are invalid or

18   we're not infringing them or what have you; and then, Mr.

19   Dechman and Kobayashi filed counterclaims against Carotex.

20   Things went on.  Lots of money, apparently, was spent on

21   legal fees; and Carotex also asserted a damage claim against

22   Mr. Dechman and Kobayashi on account of the letters, as I

23   understand, as the basis of the damage claim. Equaphor was

24   not involved in the litigation at all.

25         So, back to my question.  Why did they sell the

Page 35

1    patents to Equaphor rather than just taking the $3.45

2    million?  Well, when they gave the patents to Equaphor, Mr.

3    Dechman then moved to have Equaphor substituted as an

4    additional party in the Carotex litigation, to be represented

5    by his law firm, Stein Sperling, which had been representing

6    Kobayashi and Mr. Dechman in the patent litigation all along.

7

8         Equaphor is now a party to this patent litigation.

9    Carotex turns around  - this litigation had been going on for

10   two years without Equaphor being involved.  When Equaphor is

11   added as a party plaintiff, because it now owns the patents

12   and the patent rights, Carotex amends its complaint and adds

13   Equaphor as a defendant in the litigation, on the damages

14   claim.

15        Mr. McCarthy said, well, Equaphor was a defendant

16   in that litigation because of letters that Mr. Dechman had

17   sent to customers of Carotex, as I've just described, but

18   Mr. Dechman sent those letters at a time when he and

19   Kobayashi, as I said, owned the patents.

20        Carotex, as lawyers will do, said:  Equaphor is

21   also a defendant.  We're suing them for damages because Mr.

22   Dechman was acting as an agent of Equaphor when he did this.

23        So, Mr. Dechman has very cleverly gotten Equaphor

24   involved in the litigation and low and behold the legal bills

25   are now charged to Equaphor rather than to Kobayashi and Mr.

1   Dechman; and Equaphor has paid something close to a million

2   dollars in legal fees for this litigation.

3          Very interesting, when Mr. McCarthy describes all

4   the claims against this estate, all the claims arise from the

5   patent transactions.  The 500-and-something-thousand-dollar

6   claim that Kobayashi has was part of the 3.45-million-dollar

7   purchase price.  It was two million, nine-fifty paid in cash;

8   500,000 paid by a note which offset when Cognex bought 30

9   percent of the business from Equaphor.  The 500,000 note is

10  part of that purchase price which was due in a year and then

11  the Kobayashi note was due shortly after that.  So, that's

12  arising from the patent sale.

13         The law firm claims.  The only other creditor

14  claims here other than AmEx for $300 are the law firms, three

15  law firms that represented Kobayashi and Mr. Dechman in the

16  patent litigation and then after Equaphor got embroiled in

17  the litigation represented Equaphor jointly.

18         Why were all the legal bills then transferred

19  from Kobayashi to Equaphor, 800-and-some-odd thousand in

20  legal bills through November of last year?  And then we have

21  these unpaid bills that add up to about I think $180,000 for

22  the patent litigation.  Why is Equaphor paying all of those

23  bills?  And one of the things I ask Mr. McCarthy is, would

24  you inquire into those bills and why they were billed to

25  Equaphor and not to Kobayashi?

Case 10-20490-SSM   Doc 71-2   Filed 06/08/11   Entered 06/08/11 11:41:38   Desc
Exhibit B - Hearing Transcript dated April 26, 2011   Page 37 of 108

Page 37

1        There's about 230-something-thousand dollars in

2    three or four law firms that have scheduled claims, and the

3    180-something thousand is on account of the patent litigation

4

5    and the other 30-plus thousand dollars is for representation

6    of defendants in the derivative litigation.

7        So, there are no claims other than the law firm

8    claims in this bankruptcy.  So, why is this company in

9    bankruptcy?  The company's financial condition is no worse

10   than it ever has been.  It hasn't operated a business since

11   September of 2009.

12       Well, the last thread here, if you will, is that

13   in August of this year on behalf of 16 shareholders

14   represented by two of them who have chosen to be the

15   plaintiffs, Mr. George who was a director of this company a

16   long time ago and resigned from the board many years ago, I

17   filed a derivative in Delaware, Delaware chancery court,

18   this being a Delaware corporation.

19       I was asked if we could hold off on the litigation

20   and see if we couldn't talk and try to settle the case.  So,

21   we did.  The time for defendants to answer was rolled over

22   and rolled over in extensions; went down to Wilmington,

23   Delaware for a meeting with Mr. Dechman, Mr. Fiore and their

24   counsel in October of 2010, and basically it was not a

25   settlement meeting.  I was presented with a dog and pony show

1   as to why they had done nothing wrong and the shareholders

2   should go away; and I spent a lot of time analyzing this,

3   many months analyzing this, and I wasn't going to go away

4   because they said I should go away.

5          So, it was left that I would make a formal demand

6   on them for a specific settlement, compromise figure, which I

7   did in November; and then I was told by their counsel, well,

8   the board of directors will have to consider this.

9          So, the board had a meeting on December 7th and

10  the minutes of that meeting are in an exhibit to the

11  opposition.  They had a meeting on December 7th and they

12  characterized the settlement proposal as outrageous and then

13  discussed bankruptcy and said, if there's a bankruptcy, it

14  will be up to the trustee to decide whether or not to

15  continue the litigation.

16         Of course, it's well known that shareholders lose

17  standing to bring a derivative claim once the company goes

18  into bankruptcy because you now have an independent trustee

19  in charge of the affairs of the company rather than a board

20  which was controlled by people that I was suing for the

21  wrongdoing that they did to this company.

22         And sure enough, they decided to put the company

23  into bankruptcy; and I think ten days after that meeting,

24  the company was put into bankruptcy.  I would say a primary

25  purpose of the bankruptcy at that time was to attempt to

1    avoid liability in a derivative case which is exactly what

2    they will achieve if this settlement is approved.

3         So, they have transferred the patents to the

4    company, offloaded litigation expenses to the company to the

5    tune of close to a million dollars.  The company has run out

6    of money to continue paying the legal fees and then they put

7    the company into bankruptcy so they can conveniently take

8    the patents back.  They own all the claims now or will own

9    all the claims if this settlement is approved that Equaphor

10   has spent a million dollars on, and they walk away scot-free,

11   and I think it's just an abuse of the bankruptcy process.

12        It has been abuse of this company for them to do

13   these things to the company and then walk away with a

14   complete release.

15        Thank you.

16        THE COURT: Okay.  Let me hear from Carotex.

17        MR. SWAN: Good morning, Your Honor.  David Swan

18   for Carotex.  I'll take a step back, I suppose.

19        Very early in this bankruptcy case, Carotex and

20   ECS filed a motion for relief from stay so that the Southern

21   District of New York could complete claim construction in

22   the patent litigation and everyone agreed to have that claim

23   determined where it's pending, not here but in the Southern

24   District of New York.  The stay was extended, however, twice

25   because we were told that Kobayashi required the stay to be

1    continued as part of this offer.

2            So, we're here today to, number one, introduce

3    evidence to make a prima facie showing of the claim, not to

4    prove the claim but to prove that we're creditors with

5    substantial claims.

6            The trustee does not get the benefit today of

7    pretending that Carotex and ECS are not creditors.  The

8    trustee cannot, as the motion says, consider only the

9    interests of scheduled, undisputed claims and how far the

10   settlement goes to pay scheduled, undisputed claims.

11           It's terribly ironic that because the trustee at

12   the demand of the buyer has opposed the stay relief to

13   liquidate claims that we don't know exactly what the extent

14   of the claims are.

15           Second, as to the sale, we're interested in hearing

16   evidence from the trustee regarding his diligence and we will

17   challenge his judgment that this deal is in the best interest

18   of the estate.

19           There are two, as you've heard, generally two

20   aspects to this transaction.  There's the patent sale piece

21   and then the releases.  I guess I could say that if it was

22   just the patents that were being sold for $250,000 and it was

23   a straight asset transaction with no releases, we probably

24   wouldn't be here objecting.

25           There appears to have been little marketing, no

1    real sale process or valuation of the patents; but

2    nonetheless, $250,000 might be fair consideration if it was

3    just the patents.  But the problem is the releases from the

4    estate, causes of action.  They're not really disclosed in

5    the motion itself.  They're found in section eight of the

6    asset purchase agreement and the released parties include

7    Kobayashi, the buyer, of course, but then also Mr. Dechman,

8    Mr. Fiore, Monitoring Technology, LLC, Molly Hale, J.B.

9    Doherty, Edward Spiva.  All of these parties are getting

10   released from the estate and six of the seven of them aren't

11   paying any consideration at all.

12          The release covers all of the causes of action,

13   known and unknown, including Chapter 5 claims.  So, that

14   would include fraudulent transfers.  It would include the

15   preferences.

16          Again, these are not explained in the motion and

17   the releases are not disclosed in the motion.  They're found

18   in the asset purchase agreement.

19          There's also a separate release which we need to

20   get into for Stein Sperling which received a 249,000-dollar

21   preference.  That one is explained in the sale motion; but

22   like Dechman, Monitoring Technology and the others, Stein

23   Sperling is not paying any settlement consideration for its

24   release.  In fact, it's getting its claims, unsecured claims

25   paid in full.

Page 42

1          But again, back to the fraudulent transfers.  It's

2     what we think is the estate's major asset.  The framework was

3     laid out in the bankruptcy schedules but the color of it or

4     the meat to the bones was laid out in the shareholders' sale

5     objection.

6          On September 30, 2009, Equaphor, Kobayashi,

7     Monitoring Technology and so forth, the Dechman enterprise,

8     undertook a series of transactions to take Equaphor from an

9     eight-million-dollar revenue business to effectively zero and

10    to give away at least $10 million in business assets to

11    insiders and also to give away its remaining cash and as a

12    result they acquired the patents and the patents' litigation

13    without having any assets to satisfy any sort of judgment my

14    client could get.

15         So, what this transaction really is for today, in

16    our view, is a cheap settlement designed as a sale.  And how

17    do we know that there's real value in the Chapter 5 and the

18    other causes of action?

19         There is here today a firm that's willing to serve

20    as special litigation counsel on a contingency and no costs

21    to the estate.

22         The only explanation from the trustee in the motion

23    for settling these claims is that the purchaser was unwilling

24    to  separate the claims from the other assets that are being

25    purchased  and we heard more about that in the opening.  But

Page 43

1   I think we need to hear more from the trustee about what

2   diligence was done regarding the Monitoring Technology sale;

3   what diligence was done regarding the five-million-dollar

4   liquidating dividend; what diligence was done regarding the

5   estate's acquisition of these patents for $3.5 million from

6   Kobayashi; what level of investigation was done regarding

7   these transactions.  Why are these transactions in the best

8   interest of the estate and why is the buyer, the insider,

9   entitled to a good-faith finding?  Basically, how does this

10   transaction satisfy Rule 9019?  These are the issues that we

11   are prepared to examine or cross examine today and challenge

12   the trustee's evidence.

13          THE COURT: Mr. Jones.

14          MR. ADAMS: Excuse me, Your Honor.

15          THE COURT: Yes, sir.

16          MR. ADAMS: This is Thad Adams in Charlotte.  I

17   wonder if I might take just maybe about 30 seconds to explain

18   one particular issue that has specific relevance to the

19   patent case.

20          I'm counsel for Carotex in the New York action.

21   There's been a couple of references to some letters and I

22   think it might be helpful to have a very brief explanation of

23   why those letters played a role in this.

24          The letters were sent out by Stein Sperling.  There

25   are 12 in all, and they were sent at a time when Carotex and

Page 44

1    ECS were competing directly with Kobayashi and Monitoring

2    Technology for the sale of equipment to some very large

3    paper companies.

4          Clearly a patent owner has a right to send out

5    properly worded threats of infringement and if that is all

6    that had happened there would be no objection from Carotex.

7    We would have been willing to simply address the matter as

8    was.

9          However, the letters that were sent out accused

10   Carotex of patent infringement; and in fact, Carotex had been

11   a licensee under these patents since the early 2000s.

12         The only claim Kobayashi would have conceivably

13   had against Carotex would have been for royalties; and in

14   fact, the hundred thousand dollars that the trustee

15   referenced is a judgment that the court entered because of a

16   minimum royalty payment contained in Kobayashi's  - in the

17   license agreement.

18         So, we had on the one hand Kobayashi telling the

19   court in New York that we were a licensee and were therefore

20   obligated to pay the 24,000-dollar minimum annual royalty

21   and at the very same time they were sending out letters to

22   our customers telling them that we were patent infringers.

23         It was worse than that though because the demands

24   that were made in those letters were totally outrageous.

25   They demanded companies like Kimberly Clarke, Procter

1    Gamble and many others, similarly large companies, to

2    accumulate millions of pages of documents and records and to

3    account for all the equipment that they had purchased from

4    Carotex going back into the 1990s, far beyond any conceivable

5    statute of limitations that could have resulted in liability

6    to these companies even if we had not been a licensee, and

7    that clearly is way outside the bounds of a patentee's right

8    to give notice and in fact a claim of infringement to

9    customers.

10          Furthermore, these were not simply customers of

11   Carotex that Carotex was competing with Kobayashi for

12   business with but in fact these were customers of Carotex

13   going back as far as ten and 12 years that had substantial

14   relationships with Carotex, and those letters had a

15   devastating effect on Carotex and ECS' business.

16          Your Honor, that's all I wanted to say, really.  I

17   just wanted to clarify to some extent the characterization

18   that Mr. McCarthy made regarding those letters.  I'm sure,

19   as he said, he hadn't seen them; and so, he had no way of

20   knowing the basis on which we asserted those claims.  So,

21   that's all I have to say, Your Honor.

22          THE COURT: Okay.  Mr. Jones.

23          MR. JONES: Thank you, Your Honor.  I'm here on

24   behalf of my firm, Whiteford Taylor & Preston, which was

25   prepetition corporate counsel to the debtor and also handled

Page 46

1   some litigation, as was represented, defending in the

2   derivative action.

3          We filed a limited objection, raising two points,

4   and my partners up in Baltimore have been working with the

5   trustee and counsel for the purchaser to work out a deal.

6          Mr. McCarthy accurately represented the terms of

7   the arrangement that we've agreed to, subject to seeing the

8   language of the release that he mentioned on the record.

9          So, with that, Your Honor, that resolves our

10  limited objection to the sale motion and I wanted to let

11  the court know that we are here to represent that ours is

12  withdrawn and no opposition.

13         THE COURT: Okay.  Thank you.

14         MR. REYNOLDS: Your Honor, may I just address the

15  court briefly?

16         THE COURT: Yes, you may, Mr. Reynolds.

17         MR. JONES: Your Honor, I have a matter on Judge

18  Mayer's docket that's supposed to be continued.  It's at

19  11:00.  If I might beg the court's indulgence to go upstairs.

20         THE COURT: Certainly.

21         MR. JONES: Thank you.

22         MR. REYNOLDS: Thank you, Your Honor.  James

23  Reynolds on behalf of Kobayashi Ventures, LLC.

24         I won't rehash all of the issues that Mr. McCarthy

25  has raised.  I just wanted to at one point just clarify a

Page 47

1    little bit the record for Your Honor and then explain briefly

2    why the benefit of this offer justifies the approval of the

3    motion.

4             First off, if the court approves this settlement,

5    the claims that are going to go away are Kobayashi's claim in

6    the amount of $513,000; MTLLC's claim in the amount of

7    approximately $30,000; the indemnification claims of several

8    individuals.  Among them are James Dechman, John Fiore, Ed

9    Spiva, J.B. Doherty and Molly Hale.  If the settlement is

10   approved, those claims would go away.

11            Another significant benefit to the trustee that I

12   don't think can be ignored by this court and was touched upon

13   by counsel for Carotex is that Kobayashi under this

14   settlement is assuming the reasonable costs of the trustee to

15   litigate the claim against Equaphor up in New York; and as

16   the court has heard just a little bit from the opening

17   arguments, that has the potential of being a very significant

18   administrative claim that if this settlement is not approved

19   the trustee is going to have to assume.

20            We have the Markman hearings coming up.  That is

21   what would be heard next up in New York, and the bankruptcy

22   estate does not have sufficient funds to appropriately

23   litigate the validity of the patents which is one of the

24   assets of the case.

25            If the settlement is approved, the trustee is not

Page 48

1    going to have to come out of pocket for any costs to

2    determine what if any claim Carotex has against the debtor in

3    this case.

4              So, the trustee will have the $250,000 on top of

5    the additional funds that he has in the case.  He's not

6    going to have to expend administrative expenses to litigate

7    up in New York.  We will be assuming those expenses.

8              I think most important, Your Honor, is no one.

9    We're the only ones that have come forward and offered money.

10   No one else has offered money.  What Carotex is offering

11   and what the Series F shareholders are offering is all the

12   risks for the trustee and administrative expenses that in all

13   likelihood will swamp whatever recovery, whatever funds the

14   bankruptcy estate has, and I just don't think the court can

15   ignore that issue, on top of the fact that there simply is no

16   one else interested in making a bid for the assets which

17   makes sense since the values of the assets are at issue and

18   are subject to the liquidation up in New York.

19             Finally, Your Honor, I don't think the court can

20   ignore the fact that of the Series F shareholders that are

21   involved, Monitoring Technology, LLC currently owns 83

22   percent of those shares and the derivative shareholders, the

23   remaining derivative shareholders own 17 percent.  So, who

24   would benefit from the derivative shareholders' lawsuit going

25   forward when Monitoring Technology has 83 percent of those

Page 49

1    shares?

2           Your Honor, based on all the circumstances, the

3    sale is justified and we ask that the court approve it.

4           THE COURT: Okay.  Mr. McCarthy, did you want to put

5    on any evidence?

6           MR. McCARTHY: Your Honor, I can testify as to what

7    I presented in my argument or I can make a proffer and ask

8    opposing counsel if they'll accept my proffer.

9           The issue before the court, of course, is not

10   some of the details of the patent litigation or the

11   derivative suit but whether the trustee has reasonably looked

12   into things and exercised its judgment; and I'm happy to get

13   on the stand and say again under oath what I said earlier.

14          THE COURT: Well, I don't tell lawyers how to try

15   their case.

16          MR. McCARTHY: Well, okay.  I'm making a proffer and

17   I'm asking opposing counsel if they'll accept my proffer.  If

18   they won't then I'll get on the stand and I'll say under oath

19   what I said in my opening statement.

20          MR. SWAN: So, your opening statement was your

21   proffer?

22          MR. McCARTHY: Yes.

23          MR. SWAN: And we can cross examine?  Is that what

24   you're suggesting?

25          MR. McCARTHY: Yes.

Page 50

1          MR. SWAN: Okay.

2          MR. SHAPIRO: It's agreeable with me, Your Honor.

3          THE COURT: Okay.  Well, then I'll accept the

4    proffer as your direct testimony.  If you will be sworn,

5    counsel can cross examine.

6          (Witness sworn.)

7          MR. MISKEN: Your Honor, I have some exhibits that

8    I'll be referencing I could hand up.

9          THE COURT: Okay.

10          (Documents handed to the court.)

11          (Pause.)

12          MR. MISKEN: May I proceed, Your Honor?

13          THE COURT: Yes, you may.

14    Whereupon,

15                    KEVIN McCARTHY

16    was called as a witness and having been first duly sworn,

17    was examined and testified as follows:

18                    CROSS EXAMINATION

19          BY MR. MISKEN:

20      Q    Good morning, Mr. McCarthy.  Can you please state

21    your name and address for the record, please?

22      A    Kevin McCarthy and my business address is 1751

23    Pinnacle Drive, Suite 1115, McLean, Virginia.

24      Q    Can you please turn to Exhibit 2 in the binder?

25    Can you identify this document for the court?

Page 51

1      A    Yes.  This is the agreement that I'm asking the

2    court to approve today.

3           MR. MISKEN: Your Honor, I move the admission of

4    Exhibit 2 into evidence.

5           THE COURT: It's admitted.

6                              (Carotex's Exhibit No. 2

7                              was received in evidence.)

8           BY MR. MISKEN:

9      Q    **If you could turn to the second page of that**

10   **exhibit as marked CAR0009 and in particular to paragraph**

11   **1-A.  You propose to sell, among other things, all of the**

12   **debtor's patents; correct?**

13     A    All the debtor's what?

14     Q    **All the debtor's patents?**

15     A    Yes.

16     Q    **And what have you done to determine the value of**

17   **those patents?**

18     A    Well, I talked to Jeff Schwaber at Stein Sperling.

19   I talked to Joe Parisi who's here in the courtroom today,

20   who was helping the debtor with the Markman matter.  And

21   mostly in the beginning, I talked to them about how can we

22   go forward with the patent litigation?  And I was set to hire

23   them but what became very clear early on to me was that the

24   expense involved would be a deterrent to pursuing the

25   patents.

Page 52

1          So, although my sense was that they felt that the

2    patents were well worth pursuing, my other sense was that  -

3    oh, and I also talked to, I think it was, Mr. Fletcher of

4    LeClair Ryan.  I talked to him a bit, as well, and I heard

5    pretty much the same thing, that, you know, gee, they had  -

6    they had unpaid fees and it was going to  - the Markman

7    hearing was important but things were very  - it was going t

8    get very expensive and, you know, of course I knew what I

9    had.  I had about $40,000 at that point because I hadn't

10   received one of the state tax refunds.

11         So, when I started to look into pursuing the

12   patents on the theory that they were worth whatever the

13   litigation would prove them to be worth, I was met with the

14   response that I described, that I didn't, you know, I didn't

15   really have enough money to pursue it.

16         And so, I found myself kind of up in the air about

17   how am I going to realize the value of these patents,

18   whatever the value is?

19         And then, I talked to Carotex's attorney, as well,

20   and Mr. Adams made it very clear that he didn't have any

21   interest in even paying sort of a settlement ransom to the

22   estate, that his client's position was the patents were not

23   worth very much.

24      Q    **Besides Mr. Adams, I think you mentioned Jeff**

25   **Schwaber, Joe Parisi and Mr. Fletcher.  Are all those**

Page 53

1    **individuals either getting a release or getting their claims**

2    **paid in full in this bankruptcy case or as a result of** -

3        A    Well, they are now.  They weren't then.

4        **Q    As a result of the motion that you filed with the**

5    **court?**

6        A    Yes.

7        **Q    Did you determine what the values of those patents**

8    **are, just the patents?**

9        A    No.  I did not get that far because of what I

10   already said.

11       **Q    I believe in your opening statement you mentioned**

12   **you had an offer from Papertech to purchase the patents for**

13   **$64,000?**

14       A    Yeah.  Papertech sent me a proposal to buy the

15   patents for $60,000.  I'm not sure how they found out about

16   this.  They are a licensee of the patents and apparently it's

17   a small group.  So, they may have just been aware of it by

18   virtue of being a licensee.

19           But yes, they offered 60 and I let them know  -

20   when I made my deal, I let Tom Shapiro who represents the

21   shareholders know the outline of the deal as soon as it was

22   made and before this agreement was hammered out; and I let I

23   think David Swan, your partner, know the outline of the deal,

24   and I let Papertech's attorney know the outline of the deal,

25   as well.  Again, that was before the agreement was hammered

Page 54

1   out because those were the parties who had expressed an

2   interest, coming from one direction or another, Papertech

3   being the offer to pay $60,000.  They never increased that

4   offer.

5       **Q      You had two offers then for the purchase of the**

6   **patents; correct?**

7       A    Right.  The deal that started out at 50,000 and

8   became the deal that we have today from Kobayashi and the

9   offer from Papertech to pay 60,000.

10      **Q      Did Papertech's offer include releases similar to**

11  **Kobayashi's offer?**

12      A    No.

13      **Q      So, Papertech's deal was just for the patents?**

14      A    Correct.

15      **Q      And did you do anything to conduct an auction for**

16  **just the patents?**

17      A    Well, at one point, I thought I was pursuing that

18  when I got Kobayashi to separate how much it was willing to

19  pay for the patents versus the shareholders' derivative suit

20  and that was $40,000 for the former, the patent suit, $10,000

21  for the shareholders' derivative suit, and that was at Tom

22  Shapiro's suggestion which as I said was a wise suggestion

23  but Kobayashi didn't stick with that.

24          I have to say, I was looking for a way to try to

25  resolve what was a messy case on a scale that at least got

Page 55

1  something to the various interests; and so, I probably am the

2  one who proposed to put everything together myself.  But

3  certainly, there came a point where I couldn't separate it;

4  and Kobayashi said, if we're going to pay this money there's

5  got to be these releases, as well.

6      **Q    I think in your opening statement you mentioned**

7  **that if you didn't accept Kobayashi's offer that you would**

8  **only have $40,000 to liquidate the claim, Carotex's claim up**

9  **in New York; correct?**

10     A    Right.  I actually had 48,000 because  -

11     **Q    Forty-eight thousand.  If you would have accepted**

12  **Papertech's, you would have had 64,000 additional dollars?**

13     A    Sixty.

14     **Q    Plus you would still have the potential preference**

15  **actions and fraudulent transfer actions; correct?**

16     A    Well, wait a minute.  Papertech was offering to  -

17  they were offering to buy the patents, not to pursue them.

18  I mean, I wouldn't have kept them for the estate.

19     **Q    Right.  Carotex would still have to liquidate its**

20  **claim; correct?**

21     A    Right.

22     **Q    If you would have accepted Papertech's offer  -**

23     A    Oh, to deal with their claim?

24     **Q    To deal with the claim; correct.**

25     A    Yes; pro rata with the law firm claims.

1      **Q     If you look at paragraph 1-A, you also propose to**

2    **sell all past, present or future causes of action,**

3    **infringement claims and enforcement rights relating to**

4    **patents; correct?**

5      A    You're on page three?

6      **Q     Yes.   Same page.   Paragraph 1-A, CAR0009.**

7      A    Oh, nine.   Okay.

8      **Q     So, you are proposing to sell past, present and**

9    **future causes of action, infringement claims and enforcement**

10   **rights relating to the patents?**

11     A    Right.   Whatever it says; right.

12     **Q     And what have you done to determine the value of**

13   **those causes of actions, infringement claims and enforcement**

14   **rights?**

15     A    What I've already described.   To me, patent rights

16   were everything as described in this paragraph.

17     **Q     Do any of those claims exist or are you aware of**

18   **any of those claims?**

19     A    Well, whatever is embraced within the debtor's

20   patent  - the intellectual property of the patent rights that

21   it owns.

22     **Q     Have you done any analysis to determine if any**

23   **claims exist?**

24     A    Not separately from what I've already described.

25   My understanding would be that all claims arising out of its

Page 57

1    patent rights are included within this, and I already

2    described how I talked to attorneys and started down one road

3    and ended up going down another road as a result of what I

4    was told.

5         Q    You're not aware of any claims that would fall

6    under that asset?

7         A    Not separately from the patent rights.

8         Q    And who did you talk to to determine whether those

9    claims existed?

10        A    Are you distinguishing between claims and patent

11   rights?  I am ignorant of patent law and I would have assumed

12   that any claims were embraced within the debtor's ownership

13   of the patents and if I were to sell the patents and

14   everything that goes with it, including, claims would go with

15   it, too.

16        Q    And what I'm asking is, did you do any analysis to

17   determine if there were in fact any claims?

18        A    Just what I've described.

19             THE COURT: Mr. Misken, I hate to do this but I need

20   to take just a five-minute recess and we'll resume.

21             (Whereupon, a recess was taken.)

22             THE COURT: Okay, Mr. Misken.

23             MR. MISKEN: Thank you, Your Honor.

24             BY MR. MISKEN:

25        Q    Mr. McCarthy, we're still on Exhibit 2 and also

Page 58

1    paragraph 1-A, that same paragraph.  In that paragraph, you

2    propose to sell the trustee's and the debtor's interest in

3    any claim or causes of action against Carotex and/or Event

4    Capture and the patent litigation; is that correct?

5        A    Yes.

6        Q    And do you know what the face value of those

7    claims are?

8        A    I can't add to what I have already said. I can't

9    put a number on it; no.

10       Q    Do you know what the value of those claims are?

11       A    No.

12       Q    As part of the purchase price, do you know what

13   value, what portion of the purchase price is allotted to

14   those causes of action?

15       A    Well, it started out at 80 percent and it became

16   part of a global deal.

17       Q    Have you done any analysis to determine the

18   merits of those claims or causes of action?

19       A    Talked to the attorneys for Equaphor.  Talked to

20   Thad Adams, the attorney for Carotex.

21       Q    Have you reviewed any documents?

22       A    In connection with the patent litigation, I would

23   say, no.  I relied solely on my conversations with the

24   attorneys involved because I knew I wasn't going to be able

25   to understand anything on my own.

1    **Q    Have you considered settling those claims against**

2    **Carotex and Event Capture?**

3        A    Oh, I asked.  Before this became the kind of deal

4    it is now, I asked Mr. Adams if he wanted to buy the patents,

5    and I was told -

6    **Q    I'm not talking about the patents.  I'm talking**

7    **about the causes of action.  Has there been any consideration**

8    **in settling the New York litigation with Carotex or Event**

9    **Capture?**

10       A    In my mind, they're one and the same, the patent

11   rights and the New York litigation.

12   **Q    Well, in the next sentence of paragraph 1-A, it**

13   **states that the claims specifically include any claims of**

14   **the debtor against Carotex and/or Event Capture for attorney**

15   **fees, lost profits of potential sale of the debtor's Smart**

16   **Advisor product and any reduced enterprise value resulting**

17   **from lost sales and profits of the Smart Advisor product.  Do**

18   **you know what the face value of the attorney**

19   **fees portion of that claim is?**

20       A    No.

21   **Q    Do you know what the face value of lost profits,**

22   **potential sale portion of that claim is?**

23       A    I was told that was a weak claim.  It was one

24   originally to be left behind in the estate because there was

25   an opinion by Stein Sperling that that was unassignable; and

Page 60

1    then Stein Sperling changed its mind, and it was not a claim

2    that I was very interested in anyway because I was told it

3    was weak.  And so, we ended up including it in the package.

4         Q    And did Stein Sperling tell you that that claim was

5    weak?

6         A    I may have heard that from Jim Dechman.

7         Q    You may?  You don't know if you did?

8         A    I think I did.  I think I heard it from Jim

9    Dechman who obviously had been in touch with Stein Sperling.

10        Q    Is there anybody else that you would have heard

11   that from?

12        A    I may have heard it from Thad Adams, as well, but

13   certainly any  - any time I raised the possibility of selling

14   anything of what I owned against Carotex or settling what I

15   owned against Carotex, I was rebuffed and told that the

16   patents were of no value.  So, you know, they were not

17   willing to pay.

18        Q    So, what is the face value of the reduced

19   enterprise value portion of that claim against Carotex, if

20   you know?

21        A    Isn't that the one you just asked me about?

22        Q    There are two different parts: Lost profits of

23   potential sales of the debtor's Smart Advisor product, that's

24   what I just asked about, and I subsequently asked, and any

25   reduced enterprise value resulting from lost sales and

Page 61

1   **profits.   Is that different than the first portion?**

2       A    At this point, I don't remember.  They may be

3   different ways of saying the same thing and it may be the

4   answer I gave you and if they're not the answer I gave you

5   earlier probably was intended to refer to the reduced

6   enterprise value.

7           I know what that  - basically that has to do with:

8   You guys have been selling stuff and charging full value.

9   You were supposed to have been giving us 5 percent; and so,

10  you've been  - you know, you've been making more money than

11  you should have and we've been losing money that we should

12  have been receiving.

13          There was a 5-percent, I believe it was a royalty

14  fee, that was supposed to be paid or at least our position,

15  Equaphor's position was it was supposed to be paid and

16  resulted in both lost profits to Equaphor and a reduction of

17  the value of Equaphor's business.

18      **Q    Is there any claim against Carotex and/or Event**

19  **Capture that you know of that has merit?  I believe you**

20  **testified that this portion of the claims was weak.**

21      A    Certainly the attorneys felt that the patent

22  claims overall had.  At least I believe they felt they had

23  merit although they were somewhat circumspect.  Apparently

24  patent litigation is very complicated and each side has a

25  different view of how broad the patent is and that involves

Page 62

1   the construction claim process that we heard about earlier

2   and the Markman hearing that plays a role in that.

3          So, what I was told was, you have to sort of take

4   it one step at a time, and it's really expensive and if we

5   win we get a lot of money because Carotex intentionally did

6   some things which has I believe a treble damage component and

7   an award if the patent was violated.

8       Q    So, what's the value of those claims then?

9       A    I can't answer other than what I have said before.

10  The attorneys felt the claims were worth pursuing.   Nobody

11  put a number on it for it.

12      Q    And what attorneys are you talking about?

13      A    Jeff Schwaber at Stein Sperling.

14      Q    Those are the attorneys that are getting released

15  under your motion or under the asset purchase agreement?

16      A    And Bob Fletcher at LeClair Ryan and Joe Parisi of

17  his firm.

18      Q    I think in paragraph 1-A, you also propose to sell

19  causes of action that may be filed in the future against the

20  debtor's current or former shareholders and/or directors.

21  What are those claims that you're selling?

22      A    Where are you?  Oh, okay.

23      Q    It's the next sentence,  Sale of assets shall

24  further include but not be limited to any and all claims

25  or causes of action whether such claims or causes of action

Page 63

1   have been filed or may in the future be filed that the debtor

2   may have against Carotex as well as those that the debtor may

3   have against the debtor's current or former shareholders

4   and/or directors.   What are those causes of action that

5   you're selling?

6        A    Well, I think that is any claims I have against

7   the shareholders or directors which are currently embodied in

8   the shareholder derivative suit which is addressed elsewhere

9   in the agreement, as well.  I think that was a throw-in to  -

10       Q    Is that all, just the shareholder derivative suit,

11  or are there any other causes of action?

12       A    Well, does it say directors?  I think it's just the

13  shareholder derivative suit that's being referred to

14  indirectly in this phrase.

15       Q    And did you analyze the merits of the shareholder

16  derivative suit?

17       A    Well, I did the best I could.

18       Q    What did you do?

19       A    I read the complaint.  I talked to Tom Shapiro,

20  kept him apprised of what was going on and what my thinking

21  was, and I made the deal, what the outline of the deal was.

22            I met with Jim Dechman and John Fiore for over

23  three hours one afternoon and they went through what Tom

24  Shapiro referred to as the dog and pony show with me which

25  was a pretty detailed presentation and in my mind a pretty

Page 64

1    detailed rebuttal of some of the main allegations in the

2    derivative suit; and you know, I came away from it with a

3    different mindset about the derivative suit, and what I said

4    in my proffer was, gee, there is a reasonable basis for

5    concluding that this could be lost.

6         **Q    Did you review any documents that supported that**

7    **shareholder derivative suit or any of the claims raised**

8    **therein?**

9         A    Well, I read the complaint.  The complaint refers

10   to the master services agreement.  I know at one point, I got

11   that and looked at it.  I don't know that I read that in

12   detail.  I think I looked at parts of it.

13        **Q    Was the sale incentive plan a separate document?**

14        A    I think that was part of the master services

15   agreement but my knowledge of the sale incentive plan and the

16   master services agreement was very much based on the

17   descriptions of it that were contained in the complaint in

18   the derivative shareholder suit and the dog and pony

19   presentation that Jim Dechman and John Fiore presented.

20        **Q    Are there any other documents that you reviewed in**

21   **order to determine the merits of the shareholder derivative**

22   **suit or any other type of action that could be brought**

23   **against the current or former shareholders and/or directors?**

24        A    I can't think of any documents.  I did talk to two

25   of the directors who are defendants in the suit and they're

Page 65

1    actually in the courtroom today, J.B. Doherty and Ed Spiva.

2        **Q    Did you talk to anybody who is not getting the**

3    **release under the motion or asset purchase agreement?**

4        A    Well, I talked to Tom Shapiro on a number of

5    occasions and he was representing the plaintiffs in that

6    case.  He would tell me things that I thought I needed to

7    look into and I would look into them as best I could.

8        **Q    And what did you do to look into those?**

9        A    I had a number of conversations with Dechman and

10   Fiore but the main one was what I mentioned earlier, the

11   three-plus-hour one in my office on  -

12       **Q    So, is it fair to say you're just taking the word**

13   **of Mr. Dechman and Mr. Fiore as to the merits of these causes**

14   **of action?**

15       A    I'm certainly taking their word that there's a

16   reasonable explanation or an explanation that does not appear

17   to be unreasonable to respond to the allegations and the two

18   directors who were on the board in  07 and I think  09 as

19   well that supported their view of the world; but they are

20   getting a release, as well, or  -

21       **Q    Are there any directors of the debtor that didn't**

22   **approve any of these transactions that you talked to?  Were**

23   **there any directors that dissented to the bankruptcy filing**

24   **or the purchase of the patents?**

25       A    Right.  There was a fellow by the name of Evans who

Page 66

1    apparently abstained but then later, according to Dechman who

2    sent me an e-mail - actually, he sent it to me last night

3    but he had said it to me earlier that Mr. Evans abstained

4    but later said that he abstained from approving the deals in

5     07 because there was a rush and he didn't feel like he had

6    enough time to approve it but later on he believed that the

7    deal was okay.

8         **Q    Is Mr. Evans getting a release under the asset**

9    **purchase agreement?**

10        A    I'm not sure.  If he's one of the defendants, he

11   would be.

12        **Q    Were there any directors that voted against any of**

13   **the transactions that are  -**

14        A    I think there was only one who voted against it

15   and that was Harry Kaufman, and I did not talk to him.

16   Again, all of my conversations with people supportive of

17   the shareholder derivative suit were with Tom Shapiro.

18        **Q    In paragraph 1-A  - we're still there  - it states**

19   **that   The purchaser agrees that it will not initiate a**

20   **lawsuit against the debtor's current or former shareholders**

21   **and/or directors based upon claims purchased in this**

22   **section.   What does that mean?**

23        A    Right.  There is a lot of distrust apparently

24   between the Dechman-Fiore camp and the George-and-others

25   camp; and Dechman and Fiore expressed a concern that

Page 67

1    notwithstanding the settlement of the derivative suit that

2    Harry George would find a way to file additional claims

3    against them in some other fashion, and Dechman and Fiore

4    felt that these claims were not meritorious and that the

5    debtor itself might have claims and they might have claims

6    against Harry George.  And so, he wanted to be able to

7    protect themselves by, if necessary, saying, if you sue us,

8    we're going to sue you or if you threaten to sue us, you

9    know, we're going to threaten to sue you.

10           I, of course, was trying to put an end to anything

11   that had to do with the debtor; and so, I agreed that they

12   could have any claims that the debtor might have against

13   Harry George but I did not want them to use it offensively

14   because I was trying to do what I could, even though the

15   shareholders didn't want me to, you know, to keep the

16   shareholders from getting sued.  And so, this is what we came

17   up with, defensive use of potential claims by the debtor

18   against the derivative shareholders.

19       **Q    At the time that the debtor purchased the patents,**

20   **2009, who were the debtor's board of directors?**

21       A    Well, I have this in my notes.  J.B. Doherty, Ed

22   Spiva, I believe Molly Hale who works for Dechman and Fiore,

23   and maybe Harry Kaufman.

24       **Q    Was Mr. Dechman on the board?**

25       A    He was on the board for a while.  I'm not sure he

Page 68

1   was on  - actually, Fiore was on the board for a while, too.

2   I'm not sure of the precise makeup of the board in  09.   I

3   think there were up to five of the people that I described.

4       **Q      What is Mr. Dechman's relationship with Kobayashi?**

5       A    Well, he controls Kobayashi along with John Fiore.

6   They own most of Kobayashi.   I don't think they own the

7   entire thing.   I think they might own 80 percent of it.

8       **Q      What is Mr. Dechman and John Fiore's relationship**

9   **with Monitoring Technology?**

10      A    They also control Monitoring Technology.   They may

11  own that in its entirety.   I'm not certain.

12      **Q      You mentioned Molly Hale was on the board of**

13  **directors.   Who is Molly Hale?**

14      A    She works for one of those companies that Dechman

15  and Fiore control.   She seems like the accounting person,

16  the controller, that kind of thing.

17      **Q      Do you know when she became a board member of the**

18  **debtor?**

19      A    I think that was in  09.

20      **Q      Do you know when?**

21      A    She was on the board when the transactions in  09

22  were approved and I think they were approved in July of  09.

23      **Q      Do you know if she was appointed to the board for**

24  **the sole purpose of the vote to approve the purchase of the**

25  **patents?**

Page 69

1     A    I don't know that.

2     Q    **So, you don't know why she became a member of the**

3  **debtor's board of directors?**

4     A    No.

5     Q    **Have you seen any documents evidencing her appoint-**

6  **ment to the board?**

7     A    No, unless they're in the minutes attached to the

8  opposition filed by the shareholders.

9     Q    **Turn to paragraph 8-A.  It is Bates stamped**

10  **CAR00015; and 8-A is titled,  Releases and Covenant not to**

11  **Sue.**

12     A    Oh, page 15?

13     Q    **Yes; 15.**

14     A    Okay.

15     Q    **In paragraph 8-A, you propose to release the**

16  **purchaser, which is Kobayashi, James Dechman, John Fiore,**

17  **Monitoring Technology, LLC, Molly Hale, J.B. Doherty and**

18  **Edward C. Spiva of all claims, demands and causes of action**

19  **that the trustee, debtor or the bankruptcy estate may have**

20  **against them, including claims under Chapter 5 of the**

21  **Bankruptcy Code.**

22          **So, you propose to release the debtor's board of**

23  **directors from any liability whatsoever; correct?**

24     A    Right.

25     Q    **And you also propose to release Monitoring**

Page 70

1    **Technology and Kobayashi from any liability whatsoever;**

2    **correct?**

3         A    Correct.

4         **Q    Have you evaluated any potential causes of action**

5    **against these released parties arising under Chapter 5 of the**

6    **Bankruptcy Code?**

7         A    Well, the statement of financial affairs discloses

8    large payments to I think Monitoring Technology, and I have

9    looked into what the basis of those payments were.  For

10   example, there was something like $900,000.  I don't know.

11   There was some large amount of receivables that apparently

12   came in to the debtor and were paid over to the  - we'll say,

13   Monitoring Technology.

14              I remember looking at the agreement and asking for

15   the agreement that supported that event, that justified that

16   transaction, because it was explained to me by Mr. Dechman

17   that under the sale agreement that was approved in  09, the

18   receivables that were then due to Equaphor were being sold

19   along with the business of Equaphor that wasn't being sold to

20   Cognex, being sold to Monitoring Technology.

21              I looked at that agreement, you know.  It had an

22   appendix to it and had  account receivables  on it; and I

23   said, okay, that's supported by the contract.

24              I know at the meeting of creditors I asked for

25   balance sheets because I was wondering then, do I have a

Page 71

1    fraudulent conveyance action?  If so, I need to if there's

2

3    some evidence of insolvency.  I think I got those and I think

4    I looked at them, you know, just with my simplistic lawyer's

5    evaluation of insolvency.  I looked at whether there was

6    equity or not equity in the entities and it looked like there

7    was, if I recall correctly.

8            So, you know, I looked into it to that minor extent

9    but mostly I determined that the payments that were made were

10   in accordance with the agreement that was made or that was

11   approved by the board of directors; and if I recall right,

12   looking at the balance sheets, you know, it really was true

13   that things went downhill after a certain point but there was

14   money in the company up until that point and that the

15   litigation was the draining factor as to why the company

16   ended up with not enough money.

17           So, I concluded that there could be claims there

18   but they would be very expensive claims to pursue to try to

19   establish insolvency and all of the other things that go into

20   a 548 kind of claim.

21           So, to that extent, I looked into them but they

22   got rolled into the overall package that had other

23   attractions for me.

24      **Q    So, I think what you just testified to is that you**

25   **looked at the face of the claim?  You looked at the contract,**

Page 72

1    **saw that the payment matched the contract and that was the**

2    **extent of your analysis?**

3        A    Well, I wanted to determine that much for sure; but

4    remember, as I looked into the derivative suit, I was also

5    looking into, you know, well, what do I think about this

6    derivative suit?

7            I mean, it is not maybe the same as a derivative

8    suit but it kind of lines up with a derivative suit.  If

9    something bad is happening and payments are made, you know,

10   that sounds more like maybe breach of fiduciary duty and a

11   fraudulent conveyance.  If everything was approved and

12   payments were made then there's certainly no bad intent, and

13   I think you're into reasonably equivalent value and

14   insolvency and things like that.

15           So, there was some overlap with my looking, in my

16   analysis of the potential there with my analysis of the

17   valuation of the derivative suit.

18       **Q    And what did you look at to determine that the**

19   **debtor received reasonably equivalent value with these**

20   **transactions that are in question?**

21       A    Well, there was a contract that was approved by

22   the board and the payments were made in accordance with that

23   contract.

24       **Q    What board?  The debtor's board?**

25       A    Yes.

Page 73

1    **Q      Did you look at any documents showing the value of**

2    **these assets that were transferred?**

3        A    As I mentioned, I read the derivative suit

4    complaint which was very long and I read it in detail at

5    least once and I read through it more than once and that has

6    a pretty detailed explanation of the income and why the

7    shareholders in the derivative suit think that the assets

8    were more valuable than what the debtor sold them for.

9    **Q      Then what you're testifying to is that you read the**

10   **derivative suit complaint, you talked to Mr. Dechman and Mr.**

11   **Fiore for about three hours and you looked at the contract**

12   **and the payment history and that was the extent of your**

13   **analysis; is that correct?**

14       A    Talked to Tom Shapiro about the derivative suit,

15   looked at balance sheets, asked for a schedule of all the

16   payments that were made during the one year period, had an

17   additional conversation over the phone where I went through

18   all of it although there I was  - I was looking mostly at

19   the law firm payments.  And that's all I can remember right

20   now.

21   **Q      If the estate were to keep these causes of action,**

22   **did you do any analysis whether the estate would be able to**

23   **collect on any judgment that it obtained?**

24       A    I assumed that Dechman and Fiore could respond to

25   a claim against them although these were entities.  These

Page 74

1   were actually payments to entities, I believe.  According to

2   Thad Adams, Kobayashi, you know, may not have much in the way

3   of assets on its own.  I think Monitoring Technology owns the

4   operating companies.  So, it presumably would be good for a

5   claim against it.

6        **Q     Did you look at any documents to verify whether**

7   **judgments were collectible?**

8        A     No.  I think I would have assumed that if I had a

9   claim I could have collected it from one of the defendants

10  based on what I said.

11       **Q     In paragraph 8-A, and I believe it's on page 16,**

12  **you reference in your proffer that the released parties may**

13  **file a contingent indemnification claim.  What does that**

14  **mean?**

15       A     I think the deadline to file claims is Friday and

16  that was  - because we didn't know what would happen to the

17  deal, whether it would be disapproved or approved or taken

18  under advisement for a while.  That was to allow the

19  defendants in the shareholder derivative suit to file a

20  timely claim which would be withdrawn or resolved if the deal

21  is approved for their attorney fees that would be incurred or

22

23  will be incurred if the derivative suit goes forward under

24  the bylaws of the company.

25       **Q     Did you analyze whether any of these insider**

Page 75

1   **claims, either indemnification claims or any of the claims**

2   **listed on the schedules could be subject to be characterized**

3   **as equity or equitably subordinated?**

4      A    I think prior to the deal, no.  I saw reference to

5   Dornier Aviation yesterday in one of the briefs that I think

6   raised that issue.  It certainly wouldn't be an issue for the

7   indemnification claims.  I mean, Molly Hale is just an

8   employee.

9      **Q    But the question is, did you do any analysis to**

10  **determine whether the estate would have those causes of**

11  **action against the insiders?**

12     A    Well, I thought you had asked me if I did an

13  analysis to see whether the estate could say those were

14  payments of equity distribution as opposed to something else.

15     **Q    That's correct.  That's what I meant by those**

16  **causes of action, the recharacterized as equity or equitable**

17  **subordination.**

18     A    Molly Hale clearly not.  I mean, she wasn't an

19  owner of anything.  I suppose the other defendants who had

20  ownership interest.  It would be a possibility.

21         Again, I probably have it in my briefcase over

22  there but I have a vague recollection of looking at the

23  balance sheets and thinking, huh, they appear to have  - they

24  appear to be solvent up until the end of  09 or something

25  like that.

1      **Q    And that was all you did to determine whether the**

2  **estate could recharacterize those claims as equity or**

3  **subordinate them?**

4      A    That's one I did not look into.

5      **Q    Please turn to Exhibit 10.  Can you identify this**

6  **document?**

7      A    Statement of financial affairs.

8      **Q    These are statements of financial affairs that were**

9  **filed in this bankruptcy case?**

10     A    Yes.

11         (Pause.)

12         THE WITNESS: I said yes.

13         MR. MISKEN: Okay.  I'm sorry.

14         Your Honor, I move the admission of Exhibit 10 into

15  evidence.

16         THE COURT: It will be admitted.

17                              (Carotex's Exhibit No. 10

18                              was received in evidence.)

19         BY MR. MISKEN:

20     **Q    In paragraph two of the SOFA it states that within**

21  **the last two years immediately preceding the commencement of**

22  **the case the debtor earned approximately 4.5 million from**

23  **the Cognex sale; is that correct?**

24     A    Yes.

25     **Q    Are you familiar with the Cognex sale?**

Page 77

1       A    Yes.

2       **Q    And what was it?**

3       A    It was a sale of part of the debtor's business to

4    Cognex.  It was what I referred to in my proffer.  It came

5    along.  I had been on again, off again, according to Mr.

6    Dechman.  It had been off since December of  08 and then came

7    on again in the summer, I think July of  09, and Cognex said,

8    we're ready to make a deal.  They hinted there might be a

9    third party.  They were ready to move on if they couldn't

10   make a deal quickly in reference to a trade show.

11          The CEO said: And I don't want to be dealing with

12   those venture capitalist guys who are on your board.  I want

13   to deal with you guys, the managers.  And that was I think a

14   sale that nobody has any problem with of $5 million.  In

15   fact, the derivative shareholders use it as a benchmark for

16   the value of the rest of the company.

17      **Q    Do you know what percentage of the debtor's assets**

18   **were sold to Cognex?**

19      A    I believe it was about a third.

20      **Q    Do you know how much revenue those assets generated**

21   **for the year preceding the sale?**

22      A    No, I can't tell you that now.  That is explained

23   in the derivative shareholder suit as a basis for why the

24   rest of the business should have been sold for more than it

25   was, according to their view.

1      Q     Do you not dispute what the derivative shareholders

2   have put in their papers?  Do you dispute the amount of what

3   that revenue was?

4      A     No; I don't think I do.  I mean, I  - no.

5      Q     Do you know if the debtor obtained any valuation of

6   those assets that it sold to Cognex before selling them?

7      A     Well, in the dog and pony show, I know that there

8   had been years of trying to sell all or part of the company.

9   From them, I know that.  I certainly don't know about any

10  particular valuation.

11     Q     In that same paragraph of the statement of

12  financial affairs it states that within the last two years

13  immediately preceding the commencement of the case the debtor

14  earned $1,572,992 from Monitoring Technology sale; is that

15  correct?

16     A     Right.

17     Q     And are you familiar with the Monitoring Technology

18  sale?

19     A     Right.  Yes.

20     Q     What was that sale?  What assets were sold to

21  Monitoring Technology?

22     A     It was the other two-thirds of the operating

23  businesses.

24     Q     And do you know the revenue that those assets

25  generated?

1      A     The derivative suit complaint has numbers in it

2    which I had no reason to dispute but I don't know what they

3    are offhand.

4      **Q     Do you know how much revenue those assets have**

5    **generated after the sale to Monitoring Technology?**

6      A     No.

7      **Q     Did you see any valuation reports of those assets?**

8      A     After the sale?

9      **Q     Or prior to the sale.   Was there any valuation of**

10   **those assets done?**

11     A     Only what was in the derivative shareholder

12   complaint which used Cognex as a benchmark for calculating

13   what the other assets  - based on the business sold to Cognex

14   was worth, what the other assets should have been worth.

15     **Q     But the debtor didn't obtain any valuation reports**

16   **or opinions as to what the value of those assets were?**

17     A     Not to my knowledge.

18     **Q     Did you review any documents regarding the value**

19   **of those assets that were sold to Monitoring Technology?**

20     A     Nothing other than what I've already described.   I

21   would have relied upon the shareholder complaint for that

22   information.

23     **Q     Did you review any documents to determine that the**

24   **debtor received reasonably equivalent value in exchange for**

25   **those assets from Monitoring Technology?**

1      A    In this sense, the explanation that was presented

2    to me in what I'll call the dog and pony show was that

3    this - you know, based upon the formula that was used, that

4    was agreed to in 2007, approved by the board whereby the

5    company had to be sold for  - if the company were sold for a

6    certain multiple of, you know, and here I'm going to get lost

7    but there's free cashflow and there's net asset value and

8    that kind of thing. And then whatever that number is, you

9    add an investment premium and then whatever that is, if the

10   company gets sold for more than that, that's the sale

11   incentive fee.

12        And so, the argument which struck me as a

13   reasonable one is that it really didn't matter, you know,

14   because we had a deal that was approved in  07; and by the

15   terms of that deal, according to what was the Dechman-Fiore

16   view, it would seem like a reasonable view to me. Whether it

17   was sold to IBM or back to them, you know, as long as the

18   investors got their investor premium, it didn't matter; and

19   so, it was kind of a paper transaction as to how you valued

20   that particular sale as long as the investor premium got

21   paid.

22      Q    Would you please turn to CAR204 and paragraph

23   ten, titled,  Other Transfers.   This section outlines in a

24   little bit more detail the transactions that occurred in

25   September 2009; correct?

Page 81

1    A    Yes.

2    **Q    The top transfer says,  Monitoring Technology,**

3    **LLC?   Correct?**

4    A    Uh-huh.

5    **Q    And it says,  Debtor transferred Hindsight video**

6    **business.   Do you know what that Hindsight video business**

7    **was?**

8    A    It's part of the two-thirds operating businesses

9    that were sold to the Dechman-Fiore-controlled entity,

10   Monitoring Technology, LLC.

11   **Q    Have you seen any documents that would show what**

12   **the value of the Hindsight video business was at the time of**

13   **this transaction?**

14   A    Just what I described earlier.  The calculation of

15   the sale incentive fee seemed to moot that at least as based

16   on how Dechman and Fiore calculated it; and to me, it seemed

17   like a reasonable way of looking at it.

18   **Q    You saw no other document evidencing what the value**

19   **of that portion of the business was?**

20   A    The derivative suit, again, had numbers in it.

21   **Q    How about the Smart Advisor Vibration business?**

22   A    Same answer.

23   **Q    The next asset says,  Accounts Receivable.   Do**

24   **you know how much in accounts receivable was transferred to**

25   **Monitoring Technology?**

Page 82

1      A    Well, that was the basis on them getting the

2    $900,000 or so that's in the statement of financial affairs,

3    and I did verify that that was a list.  That was on the list.

4    That phrase, accounts receivable, was on the list of assets

5    being sold.

6      **Q    So, you're saying Monitoring Technology purchased**

7    **the assets for 1.5 million but received over 900,000 in the**

8    **accounts receivable?  So, they purchased over 900,000 in**

9    **accounts receivable?**

10     A    Well, they got the 900,000 over time and the sale

11   price involves of course the sale incentive fee consideration

12   that I explained earlier.

13     **Q    Also, in paragraph ten it states that debtor**

14   **transferred $2,950,000 in cash plus a 500,000-dollar**

15   **promissory note to Kobayashi Ventures; is that correct?**

16     A    Well, it doesn't say in cash and it wasn't in cash;

17   and that was what I mentioned earlier.  That sale price was

18   mostly accrued royalties and the sale incentive fee and

19   bonuses, I believe, that had been approved.

20          So, Equaphor had liabilities on its books that were

21   owed to Dechman and Fiore or their entities and that was

22   being satisfied.  So, I think about three million or 2.9

23   million was paid in that fashion; and that  - that caught

24   my eye, you know, three million, 3.4-million-dollar sale

25   price back in  09 and, well, now we're selling it back to

Page 83

1    these guys for a lot less.  But that was the explanation and

2    it struck me as okay.

3        Q    So, you're saying that the debtor didn't transfer

4    any cash to Kobayashi for those patents?

5        A    That's my understanding.  Now, the debtor did take

6    back a  - or did give a 500,000-dollar note, and I believe

7    there was cash.  There might have been cash to pay that note

8    at the time of the deal.  Then the cash got siphoned away

9    through the litigation costs for the patent litigation.

10       Q    Is the 500,000-dollar note the basis for

11   Kobayashi's claim in this bankruptcy case?

12       A    Yes.

13       Q    Also, in paragraph ten at the bottom it states

14    Series F Preferred Shareholders,  that the debtor

15   distributed $5,200,000 liquidating dividend amongst

16   its preferred shareholders; is that correct?

17       A    Yes.

18       Q    Do you know who received the bulk of that

19   distribution?

20       A    It was  - I  - it was  - it was a Dechman-Fiore-

21   controlled entity, and I kind of get mixed up between when

22   it's Kobayashi and when it's Monitoring Technology.

23       Q    If you'll turn to Exhibit 11, Bates stamped CAR214.

24   Let me back up.  Can you identify Exhibit 11 for the court?

25       A    Right.  This is a list of the shareholders who got

Page 84

1    paid in the liquidating distribution that you just asked me

2    about.

3        **Q      Was this document filed with the court?**

4        A      I've seen this document and I can't remember

5    whether it was or not.  I kind of think it was.

6        **Q      If you look at CAR214, at the bottom, category of**

7    **the spreadsheet, it says,  Series F Preferred.   Do you see**

8    **that?**

9        A      Yes.

10       **Q      About halfway down it says,  MTLLC?**

11       A      Yeah.  That's Monitoring Technology, also.

12       **Q      And what percentage of the Series F preferred did**

13   **they own?**

14       A      Well, I believe it was 83 percent by this point

15   in time.

16           MR. MISKEN: Your Honor, I move the admission of

17   Exhibit 11 into evidence.

18           THE COURT: It will be admitted.

19                       (Carotex's Exhibit No. 11

20                       was received in evidence.)

21           BY MR. MISKEN:

22       **Q      So, do you know how much Monitoring Technology**

23   **received out that 5.2-million-dollar liquidating dividend?**

24       A      I believe they received 83  - it looks like 83.5

25   percent of that money.

Page 85

1      Q    Do you know at the time that that liquidating

2   dividend was made whether Equaphor had any creditors that

3   remained unpaid at the time?

4      A    I don't know that.  The answer may well be they

5   did not, no, because I think the attorney fees  - fairly

6   recent accruals.

7      Q    Did Carotex have a claim against Equaphor at that

8   time, or as a result of the patents?

9      A    The patent issue was going on.  You know, what all

10  that looks like in detail, I don't know.  I sort of thought

11  Carotex's main goal of theirs was to establish that they

12  didn't owe anything to whoever held the patents.

13     Q    Did you conduct any analysis to determine whether

14  that 5.2-million-dollar transfer was a fraudulent transfer.

15     A    I asked about it.  I remember being told it was

16  consistent with the corporate structure.

17     Q    Who told you about it?

18     A    Well, Dechman told me it was consistent with the

19  corporate structure.  He may have said that at the 341

20  meeting.  I mean, as I  - it was consistent with the

21  corporate structure. I haven't heard any complaints about

22  that.  The complaint is that there  should have been a lot

23  more.

24          So, I guess I don't know why it would have been a

25  fraudulent transfer.  I don't know of any reason to think

Page 86

1    that the company was insolvent at that point in time.

2        Q    Did you do any analysis to determine whether that

3    liquidating dividend caused the debtor to become insolvent?

4        A    No; not specifically.  I believe there was money  -

5    there's money left in the till and I think it was $500,000;

6    but boy, I'd have to look at more than what I have in front

7    me right now; and Mr. Dechman would probably have the answer

8    to that.

9        Q    If you could turn back to Exhibit 2 and in

10   particular paragraph 9-A, CAR16.

11       A    Okay.

12       Q    It's entitled,  Settlement of Preference Claim,

13   Releases,  and it states:  The trustee, debtor and the

14   bankruptcy estate release and forever discharge Stein

15   Sperling of all claims, demands or causes of action known or

16   unknown relating to Section 547 that the trustee, debtor or

17   the bankruptcy estate may have against Stein Sperling.   Is

18   that correct?

19       A    Right.

20       Q    And who is Stein Sperling?

21       A    They are one of the counsel involved in the

22   patent litigation that represents Equaphor.

23       Q    Did they represent anyone else in that patent

24   litigation?

25       A    There are other defendants in that litigation and

Page 87

1    I think they represent them all, you know, and there were

2    counterclaimants, as well, and they represent the counter-

3    claimant or claimants.

4        Q    And in the APA it states that Stein Sperling

5    received $249,205.31 during the preference period; correct?

6        A    Yes.

7        Q    Did you look at the Stein Sperling invoices that

8    were paid during the preference period?

9        A    I looked at  - I think the answer to that precise

10   question is no.

11       Q    Did you look at Stein Sperling's invoices that

12   were paid during the one year preceding the bankruptcy case?

13       A    I don't think I did but I may have.  I received the

14   spreadsheet that I have in my bag over there that lists all

15   of the payments that were listed in the statement of

16   financial affairs and what the invoice dates were and when

17   the payments were made, and Stein Sperling was on there.

18   Whether theirs go back more than 90 days, I don't know.  I

19   kind of don't think it does.  I think the spreadsheet tracked

20   the SAF, question three, A and B, of 90 days for non-insiders

21   and the one year, whatever it is, one year, maybe two  - one

22   year for insiders.

23       Q    Did you do any analysis to determine whether

24   Equaphor was paying the attorney fees of Kobayashi or the

25   other defendants in that New York litigation?

Page 88

1      A    I didn't prior to entering into the agreement.

2    Frankly, it did not occur to me that a scheduled attorney

3    claim, you know, when I knew Equaphor was engaged in this

4    litigation would not be Equaphor's own.

5          Now, last night, I talked to an attorney from Stein

6    Sperling who's actually here today  - her last [sic] name,

7    Deanna -- about one of the points raised in the objection

8    which was, how could this fee be so high on behalf of Stein

9    Sperling as to the debtor given the way the litigation was

10   timed in New York?  And I received what I thought was a

11   reasonable explanation.  But I didn't  - that was after I

12   entered into the agreement.

13         Prior to the agreement, as I said, I took the

14   schedules as they were.

15   **Q    Other than talking to a released party, you didn't**

16   **do any further investigation on your own to determine the**

17   **extent of the preference payments or fraudulent transfers?**

18     A    Well, you just asked me about preferences and

19   then fraudulent transfers as opposed to invoice payments.

20   I guess you're saying they're the same thing arguably.

21         I looked at the spreadsheet and I talked to  - I

22   talked to, I believe, Jim Dechman; and Molly Hale may have

23   provided it, prepared it, and I can't remember whether I

24   talked to her, as well.

25         But what I did was: I went through all the payments

Page 89

1    that were made during the preference period, as to the law

2    firms, and there's an accounting firm in there, as well.  I

3    can't tell you it was, you know, a really detailed analysis

4    but I was asking basic questions like, well, you know, when

5    was this invoice and when was this payment and was that

6    consistent with how you all had paid them before and did they

7    do any work after they got the payment?  And I was checking

8    it off.

9           I have my notes in my bag over there.  In every

10   case, I wrote down ordinary course, or probably ordinary

11   course and new value, until Stein Sperling and then that one

12   troubled me because the payments were bunched at the end and

13   that's the one that I thought that had a  - that there was a

14   real claim against.

15          So, that was the analysis that I did; and I did

16   look at a spreadsheet of payments which had the invoice dates

17   on them and compared that to when the payments were made.

18   **Q    Did you see any invoices that Stein Sperling**

19   **submitted to Kobayashi or any of the other defendants?**

20   A    I don't think I looked at actual invoices.  I

21   know I talked to Dechman about how come they got paid on

22   this, you know, July invoice and October, that kind of thing.

23   They made the mistake, apparently, of working with the debtor

24   which I thought created a potential claim against them.

25          THE COURT: Mr. Misken, I did want to alert you.

Page 90

1   I'm not trying to short-circuit your examination but when I

2   set this matter I already had a commitment in Richmond this

3   afternoon.  I understood this would be a maximum three-hour

4   hearing which it's obviously not going to be, and it doesn't

5   look like it's going to be concluded by 12:30.  So, I just

6   want to alert you that at that point we are going to have to

7   recess and I'm going to have to find either tomorrow morning

8   or Thursday morning for a continuation of this, assuming

9   counsel are available.  I just wanted to alert you to the

10  time issue.

11          MR. MISKEN: Okay.

12          MR. SHAPIRO: I'm sorry but I'm not available, Your

13  Honor.  I have a commitment.  I have a court hearing in

14  Delaware Thursday and I have to go home and prepare for that.

15  I'm from Boston.

16          THE COURT: What about Monday of next week?

17          MR. SHAPIRO: I don't have my schedule with me.  I

18  probably could do that.

19          THE COURT: Okay.  Well, we will take up the precise

20  scheduling after.

21          Go ahead, Mr. Misken.

22          MR. MISKEN: And just so you know, Your Honor, I

23  did reach out to the trustee to see if we could set it for a

24  time certain and we concluded that it was already set for a

25  time certain.

Page 91

1          THE COURT: Well, it was set for a time certain.

2    It's just that when we set it, I assumed that we could

3    conclude this in three hours which obviously has turned out

4    not to be the case.

5          BY MR. MISKEN:

6      **Q    I believe in your proffer you testified that you**

7    **did conduct a new-value analysis at least for the payments**

8    **within the 90-day preference period?**

9      A    Yes.

10     **Q    And what was your conclusion as to how much new**

11   **value Stein Sperling could show?**

12     A    It was a small proportion.  I think their claim  -

13     **Q    I believe they filed a claim for 25,000?**

14     A    Right.  That's what I was going to say.  I think

15   they're still owed 25,000.  So, that probably came after the

16   payments.

17     **Q    And what did you conclude as to ordinary course of**

18   **business?**

19     A    As to them?

20     **Q    As to them.**

21     A    Well, I thought that was a  - you know, they  - I

22   thought the payments were late.  I mean, they were certainly

23   late based on, you know, we bill in July and we get paid in

24   October.  I'm sure their invoice didn't contemplate that.

25          As I said, the debtor said they agreed to work with

Page 92

1    the debtor; but I kind of don't think that, you know, puts

2    you in  - well, these days, maybe it does, since BAPCPA.

3            So, when I wrote the explanation of the compromise

4    motion, I said, there could be some ordinary course.  I did

5    not credit a big percentage to new value or ordinary course.

6    I thought there was a substantial claim against Stein

7    Sperling.

8        **Q      Would you say approximately a 200,000-dollar claim**

9    **against Stein Sperling?**

10       A    It could easily be that much; yes.

11       **Q      Are you aware of the debtor has any D&O insurance?**

12       A    Well, it did.  But it's my understanding it doesn't

13   apply here because the shareholders in the derivative suit

14   got one of the former directors to bring the derivative suit.

15   So, it became an insured versus insured kind of thing which

16   takes it out of the coverage of the D&O insurance, the way it

17   was explained to me.

18       **Q      Did you review the policy?**

19       A    Did I what?

20       **Q      Did you review the D&O policy?**

21       A    No.

22       **Q      Did you get a copy of it?**

23       A    No.

24       **Q      Who did you talk to about the D&O policy?**

25       A    Jim Dechman and John Fiore.

1       Q      Would you turn to Exhibit 3?  Are you familiar with

2    this document?

3       A      No.

4       Q      You're not?

5       A      No.  I don't think I looked at the pleadings in

6    the -

7              MR. SHAPIRO: Can you identify what that is?

8              THE WITNESS: I assume this is the patent

9    litigation.  I don't think I looked at any of those

10   pleadings.

11             MR. MISKEN: Exhibit 3 is the second amended

12   declaratory judgment and complaint for affirmative monetary

13   relief as filed in the Southern District of New York.

14             BY MR. MISKEN:

15      Q      You have not reviewed this document?

16      A      I don't think I have.

17      Q      Has Carotex's claim in the Southern District of

18   New York been liquidated?

19      A      No.

20      Q      And why not?

21      A      My understanding is, a lot more would have to

22   happen in order for the judge reach a final decision.  Even

23   the Markman hearing, you know, is an important part of it but

24   even that doesn't establish finality as to who owes who

25   money.

Page 94

1          So, it's my understanding it would take quite a

2    while and litigation has been proceeding at a slow pace as it

3    is.

4       Q    **And what did you rely upon to make that conclusion?**

5       A    Well, when we were here for the motion to lift the

6    stay, it seems to me I was being told by both sides that

7    nothing was likely to happen any time soon, you know; and so,

8    I guess I would say, based on my conversations with the

9    attorneys involved on both sides of the litigation, I

10   inferred it would take quite a while for Carotex's claim to

11   be liquidated.

12          MR. MISKEN: One second, Your Honor.

13          (Pause.)

14          BY MR. MISKEN:

15      Q    **Mr. McCarthy, are you aware of what the D&O**

16   **coverage is on the policy that was in effect?**

17      A    A million.

18      Q    **And do you know if the policy is voided if the**

19   **Chapter 7 trustee brings that action rather than a derivative**

20   **suit?**

21      A    No, I don't know.

22          MR. MISKEN: I have no further questions, Your

23   Honor.

24          THE COURT: Okay.

25          MR. SHAPIRO: I would like to examine, Your Honor,

Page 95

1    but perhaps I could defer until we resume.

2            THE COURT: Well, why don't we take up 15 minutes of

3    it and then I'll let you do the rest of the cross

4    examination  - I would like to get as much done as I can.

5            MR. SHAPIRO: First, Your Honor, if I could offer

6    into evidence.  I don't think there's any objection.  The

7    exhibit  - I don't have an extra copy with me.  I could bring

8    it next.  The derivative complaint which is Exhibit 1

9    to my opposition. I do have copies of Exhibits 2, 3 and 4 for

10   my opposition.  Unless there's objection, I would like to

11   offer  -

12           MR. REYNOLDS: Your Honor, I haven't seen the

13   documents that Mr. Shapiro is talking about.

14           MR. SHAPIRO: Maybe I'll do that next time.

15           THE COURT: Okay.  Why don't we do that next time

16   and that way we don't have to delay things.

17                       CROSS EXAMINATION

18           BY MR. SHAPIRO:

19      Q    I'm going to try to avoid repeating anything Mr.

20   Misken went over, Mr. McCarthy.

21           Did I understand you correctly?  You did not look

22   at any of the bills from the law firms that are on the

23   Schedule?  You looked at the amounts of the invoices and

24   dates.  Did you get copies of the actual bills?

25      A    I don't think I did; no.

Page 96

1    Q    Okay.  So, any detailed time charges, description

2    of what was done, you didn't get any of that?

3    A    Right.

4    Q    Okay.  And you testified that prior to entering

5    into the sale and compromise agreement that it didn't occur

6    to you that any of the attorney bills charged to Equaphor

7    which are on the schedule reflected work that had been done

8    for any other defendants in the patent litigation.  Is that

9    your testimony?

10   A    Right; not until I read your objection, and then I

11   posed that question in conversation with the Stein Sperling

12   lawyer yesterday.

13   Q    Do you recall that in one of our early conversa-

14   tions, I encouraged you to look at the bills and see whether

15   the bills properly belonged to Equaphor or to  other

16   defendants?

17   A    You may have and I don't recall at this point but I

18   don't doubt that.

19   Q    And you said last night you talked to a Stein

20   Sperling attorney.  Was that Mr. Schwaber?

21   A    No.  It was Deanna; and again, I don't remember her

22   first [sic] name but she's over there in the well of the

23   courtroom.

24   Q    I see.  I thought I'd see Mr. Schwaber in the

25   courtroom but I'm mistaken.

1          **And what did she tell you?**

2     A     Your objection had raised  - it said, how could

3  this fee be so large for Equaphor because they didn't start

4  to represent Equaphor until whatever, December of  09, and

5  they'd been in the case, you know, prior to that?  So,

6  basically, how do we know that Equaphor is not being charged

7  with fees that accrued before that?

8          And she explained that there had been a stay of the

9  case until like October of  09, and it was in October of  09

10  that the deal was done whereby the patents that are the

11  subject of this compromise motion were transferred to the

12  debtor and the motion wasn't filed to  - substituted or put

13  in to put Equaphor into the case until December of  09 but

14  that the bill really was allocated to work on behalf of

15  Equaphor, you know, from the point where Equaphor acquired

16  the patents.  That is what she told me.

17     **Q     Did she indicate that all of their bills were**

18  **allocated to Equaphor from that point forward?**

19     A     I don't recall that.  I don't know if that's the

20  case.

21     **Q     Okay.  So, you don't know whether Mr. Dechman,**

22  **who has continued to be a party in the litigation  - correct?**

23     A     He's still a party; yeah.

24     **Q     Or Kobayashi which continues to be a party in the**

25  **litigation; correct?**

Page 98

1      A    That's a party; yeah.

2      **Q    So, you don't know whether Stein Sperling has**

3   **charged Mr. Dechman and/or Kobayashi even a dollar since this**

4   **point in October 2009 to the present?**

5      A    I don't.

6      **Q    All right.  And Equaphor has paid some $800,000 in**

7   **legal fees in the past year; has it not?**

8      A    I take  - you know, I don't doubt that it did.  As

9   I said, I think there was a lot of money in  09, at the end

10  of  09, and it's gotten paid out.

11     **Q    And if all that money hadn't been paid out then**

12  **Equaphor would be perfectly solvent and there wouldn't be any**

13

14  reason for a bankruptcy; would it?

15          MR. REYNOLDS: Your Honor, I'll object on the

16  grounds of speculation.  There's no foundation that would

17  allow Mr. McCarthy to respond to this.

18          THE COURT: I'll overrule the objection.  He can

19  answer it if he can; if he can't, he won't.

20          THE WITNESS: I probably don't know how to answer

21  that, the way it was asked at least.

22          BY MR. SHAPIRO:

23     **Q    When you were appointed trustee of Equaphor, did**

24  **you take possession of any Equaphor, of property, documents**

25  **or records?**

Case 10-20490-SSM   Doc 71-2   Filed 06/08/11   Entered 06/08/11 11:41:38   Desc
Exhibit B - Hearing Transcript dated April 26, 2011   Page 99 of 108

Page 99

1    A    No.  I would say not.  You and I talked at one

2   point about books and records and, you know, and I inquired

3   about that.  I thought about that.  Should I  - there was

4   some software program.  It wasn't QuickBooks which is where I

5   expected it to be but it was something else, Blake's or

6   something of that nature, you know.

7        And you sent me a proposal to do the lawsuit, the

8   contingency lawsuit or the derivative shareholder suit on a

9   contingency basis, and I thought about getting the books and

10  records when I was thinking about taking you up on your offer

11  but when we went in this other direction, I didn't.  So, I

12  never got them.

13       **Q    Do you know if Equaphor has an office?**

14       A    Well, I know that Monitoring Technology and

15  Kobayashi have offices in the same building or adjacent

16  buildings or something of that nature.  I believe Equaphor's

17  address was the same thing.  So, I never really distinguished

18  in terms of office space among the various Dechman-Fiore

19  entities.

20       **Q    Did you look into who was in possession of**

21  **Equaphor's property or books and records?**

22       A    No.  I'm sure it was the managers of the company

23  which  -

24       **Q    Mr. Dechman and Mr. Fiore?**

25       A    Right.

Page 100

1        Q     So, they're in possession of all the books and

2    records?

3        A     Right.

4        Q     And you haven't obtained minutes of board of

5    directors meetings; correct?

6        A     Correct; other than what you put into your

7    objection.

8        Q     Okay.  Minutes of one meeting in December 2010.

9    Okay.  I'll get those into evidence next time we're here.

10              In deciding whether these undisputed, as they are,

11   creditor claims, the three law firm claims, are debts of

12   Equaphor, wouldn't you want to know whether Mr. Dechman and

13   Kobayashi were charged for any of the work that Stein

14   Sperling did on behalf of all of the defendants and counter-

15   claimants in the patent litigation?

16       A     I think there are four, by the way, four law firms.

17       Q     There are three law firms that represent these

18   parties in the patent litigation and there's one that

19   represents Equaphor and the directors in the derivative

20   litigation; is that right?

21       A     LeClair Ryan was involved in the patent litigation.

22   I think it's Lindeman, Joe Parisi sitting the courtroom

23   here.  Stein Sperling.  That's Jeff Schwaber and his partner,

24   Deanna, who is also here in the courtroom.

25       Q     And Whiteford Taylor?

Page 101

1    A    Oh, yeah, Whiteford Taylor.

2    **Q    Do they appear in the patent litigation?**

3    A    Well, I'm not sure.  Maybe not.

4    **Q    Whiteford Taylor represents Equaphor and certain**

5    **directors in the derivative litigation in Delaware; isn't**

6    **that right?**

7    A    Right.

8    **Q    And it's up to the discretion of the trustee, is it**

9    **not, as to whether those bills can be reimbursed by the**

10   **company, by the debtor?**

11   A    I'm not quite sure what you mean.

12   **Q    Well, put it this way: There has been reference to**

13   **indemnification claims with respect to the derivative litiga-**

14   **tion, indemnification claims against the debtor by Mr.**

15   **Dechman and Fiore, directors, and Molly Hale, for example;**

16   **right?**

17   A    Yes.  I -

18   **Q    And whether indemnification is paid is in the**

19   **discretion of the board of directors of the company if it's**

20   **not in bankruptcy; isn't it?**

21   A    I thought it was an entitlement under the bylaws.

22   I did look at the bylaws.

23   **Q    The bylaws authorize but do not require**

24   **indemnification; do they not?**

25   A    I didn't realize that.

Page 102

1    Q    And wasn't there a reference earlier that they may

2    be entitled to indemnification if the actions on which they

3    were sued were taken in good faith?

4    A    Right.  It definitely requires good faith.

5    Q    And if the claims in the derivative case were

6    determined to be meritorious by definition the actions of

7    the defendants would not have been in good faith; is that

8    right?

9    A    No.  I don't agree with that.  I think the bylaws

10   had a provision that said that even if they're determined  -

11   I think it gave an out or like reasonable, you know, some

12   discretion on the part  - I don't know if it was the judge or

13   the board of directors but I think it wasn't necessarily the

14   kiss of death if they were to lose.

15   Q    But the discretion of the board of directors as to

16   whether or not to pay any indemnification claim, that

17   devolved upon you as trustee once the company filed for

18   bankruptcy?

19   A    Right.  Certainly if they lost.  Now, where you

20   have me is, I had been thinking it was required that they

21   be reimbursed if they won.

22   Q    Do you have in your possession a copy of the

23   company's bylaws; I mean not today but in your office or  -

24   A    I think I do.  I may have just a part of it but I

25   may have the whole thing.  I think I have the whole thing and

Page 103

1    it's in my bag.

2         Q    Did you inquire as to whether Equaphor's board of

3    directors raised any conflict of interest in having the

4    Stein Sperling firm represent Equaphor along with Kobayashi

5    and Dechman in the patent litigation?

6         A    In the patent litigation?

7         Q    Yes.

8         A    You have talked to me about that issue but I don't

9    recall specifically what I think about it.

10        Q    Would that also be true as to the other two firms

11   that are representing both Equaphor and the other parties to

12   the patent litigation?

13        A    I never focused on the appropriateness or

14   inappropriateness of getting or not getting conflict waivers

15   of who was representing whom from the board.

16        Q    And did you inquire as to why it was necessary to

17   have three different law firms in the patent litigation?

18        A    Well, I know that Joe Parisi is supposed to be an

19   expert in the Markman hearing stuff.

20        Q    He's from the Lindeman firm?

21        A    Yeah.

22        Q    All right.

23        A    And I talked to Bob Fletcher of LeClair Ryan and

24   it seems to me, you know, there was not duplication of

25   effort.  It was just a very complicated kind of thing that

Page 104

1   is a lot different from what I'm accustomed to in bankruptcy

2   practice and that there was a division of expertise.

3       Q       Under the claim that you propose to the court, the

4   estate - the debtor remains liable on Carotex's damage

5   claims; doesn't it?

6       A       Right.

7       Q       So, Kobayashi and Mr. Dechman have agreed to pay

8   Equaphor's legal fees but not agreed to be responsible for

9   any damages that Equaphor has?

10      A       Right.  I proposed that and they refused.

11      Q       And the only reason that Equaphor is involved in

12  the litigation at all is because Mr. Dechman transferred the

13  patents to Equaphor -

14              MR. REYNOLDS: Your Honor, I'm going to object.

15  This isn't a question.  He's trying to get a statement of

16  his argument into evidence.

17              THE COURT: Overruled.

18              BY MR. SHAPIRO:

19      Q       Would you agree that the only reason Equaphor is

20  a party to the patent litigation is because Mr. Dechman had

21  Kobayashi transfer the patents to Equaphor as part of these

22  transactions in September 2009?

23      A       That is why they're a party to the litigation.

24      Q       And it was added to the litigation only after that

25  transfer?

Page 105

1       A    Yes.  That's right.

2       Q    And there was reference this morning to letters

3   that Mr. Dechman had sent to customers or potential customers

4   of Carotex.  Do you recall that?  I think Mr. Adams went over

5   it on the telephone?

6       A    Sure.

7       Q    And are you aware of those letters?

8       A    He has mentioned them to me before.

9       Q    Okay.  And those were letters that were sent while

10  Kobayashi owned the patents, were they not, as far as you

11  know?

12      A    I think that's right.

13           THE COURT: Okay.  I think we have unfortunately

14  reached the 12:30 point, and I apologize.  I would have liked

15  to have concluded this today but I had already made plans for

16  this afternoon where I have to be down in Richmond.  So, we

17  will carry this over to Monday, May 2nd.

18           Now, since you're coming from out of town, I could

19  start at 10:30 rather than 9:30 which is my normal starting

20  time, Mr. Shapiro.

21           MR. SHAPIRO: If there is any other day after

22  Monday.  Monday is difficult for me to get down here.

23           THE COURT: Monday is my only free day next week or

24  the week after, or even the week after that.

25           MR. SHAPIRO: I don't know if Your Honor has time

Page 106

1    for this, maybe assessing how long other witnesses are going

2    to be or how long witnesses might take for whatever witnesses

3    are being called.

4            THE COURT: Okay.  Can I get some view from counsel

5    about how much longer you think this hearing is likely to

6    last?

7            MR. MISKEN: Mr. McCarthy hasn't completed putting

8    on his evidence.

9            MR. McCARTHY: Yeah. I would expect to call Mr.

10   Dechman and one of the directors, probably Mr. Doherty.

11           THE COURT: Recognizing that I'm not trying the

12   cases.  So, I want to try to keep this under control here.

13   I'm not going to make any findings as to the viability or

14   non-viability of the litigation.  I'm here to assess the

15   reasonableness of a settlement and whether certain portions

16   of it really, I guess for lack of a better term, are contrary

17   to public policy; but I will certainly let you put on some

18   testimony but it's not going to exceed an hour from Mr.

19   Dechman or anyone else.

20           MR. McCARTHY: I'm happy for it not to.

21           THE COURT: Okay.

22           MR. MISKEN: I would say a half hour for cross

23   examination.

24           THE COURT: Monday is the only day I have.  I would

25   like to accommodate you more, Mr. Shapiro, but I just don't

Page 107

1    have any other time.

2           MR. SHAPIRO: I will get here, Your Honor.

3           THE COURT: The reason I like Monday is, right now

4    I don't have anything scheduled.  So, if you all tell me it's

5    going to take three hours and it takes four, there's no

6    problem.

7           I can put it on the afternoon of Thursday, the

8    5

            th but at that point the morning is already taken. So, we

9    really do only have three hours.

10          MR. SHAPIRO: Can we start, say, at 11:00 and I

11   can come down that morning instead of the night before.  I

12   do have something in Boston I'm committed to Sunday night.

13          THE COURT: Okay.  You want to start Monday at

14   11:00.  Okay.  That's fine.

15          MR. McCARTHY: Judge, I wonder if he would be

16   interested in just continuing his participation by phone, if

17   you would let him and he wanted to.

18          MR. SHAPIRO: I appreciate it but I think I ought to

19   be here in person.

20          THE COURT: Okay.  So, we will continue it over to

21   May 2nd at 11:00 o'clock.

22          Okay.  We will stand adjourned.

23          (Whereupon, at approximately 12:35 p.m., the

24   proceedings were recessed to reconvene May 2, 2011 at 11:00

25   o'clock a.m.)

1                              * * * * *

UNITED STATES BANKRUPTCY COURT

T R A N S C R I B E R ' S   C E R T I F I C A T E

Diversified Reporting Services hereby certifies that:

(A) The foregoing pages represent an accurate and complete

transcription of the proceedings, before the United States

Bankruptcy Court, the Honorable Stephen S. Mitchell, Judge,

presiding, in the matter of EQUAPHOR INCORPORATED (debtor),

and (B) these pages constitute the original transcript of the

proceedings.


                              Diversified Reporting Services, Inc.

                              1101 16th Street, NW

                              Second Floor

                              Washington, D.C.  20036


                         Court Reporter/Transcriber